# In The Matter Of:

*Bennett v.*
*Sterling Planet*

---

*Kelly Bennett*
*September 30, 2010*

---

*Martin Deposition Services, Inc.*
*Malta Commons Business Park*
*100 Saratoga Village Boulevard*
*Building 37, Suite 37C*
*Malta, New York  12020*

Original File 09-30-10 Kelly B.TXT
Min-U-Script® with Word Index

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK


------------------------------------------------

KELLY BENNETT,
                        Plaintiff/Counterclaim
                                   Defendant

            -against-              09-1176
                                  (GLS/DRH)

STERLING PLANT, INC.,
                    Defendant/Counterclaim
                                   Plaintiff


------------------------------------------------



     The following EXAMINATION BEFORE TRIAL of

KELLY BENNETT, in the above-entitled matter

was held pursuant to Notice at the law office

of COUCH WHITE, 540 BROADWAY, ALBANY, NEW YORK

12201 on SEPTEMBER 30, 2010, commencing at

9:00 a.m., before JOAN A. DE CARO, Court

Reporter and Notary Public.

2

1   A-P-P-E-A-R-A-N-C-E-S:

2

3   COUCH WHITE, LLP

4   Attorneys for Plaintiff/Counterclaim Defendant

5   540 Broadway

6   Albany, New York  12201

7

8   BY:  MICHAEL T. WALLENDER ESQ.,

9        and NATHAN R. SABOURIN, ESQ.

10

11

12

13   FORD & HARRISON

14   Attorneys for Defendant/Counterclaim Plaintiff

15   271 17th Street

16   Suite 1900

17   Atlanta, Georgia  30363

18

19   JOSEPH COSTYN, ESQ.

20

21   (404) 888-3811

22

23

24

25

3

1                    INDEX TO EXAMINATIONS

2

3

   Examined by:                          Page

4

5

   Mr. Costyn                            4

6

7  Mr. Wallender                         177

8

9

10                   DEPOSITION EXHIBITS

11

12  No.           Description              Page

13

14  1        Offer Letter                   59

15

16  2        E-mail from R. Mitchell to
            Kelly Bennett 8-30-2006        90

17

18  3        Letter from Kelly Bennett to
            Sonny Murphy                   95

19

20  4        End-User Referral Form        137

21

22  5        E-Mail from Greg Chambers
            dated 6-18-06                  139

23

24  6        E-mail from Valerie
            Christopher to K. Bennett
            Re: Commissions 1-18-08        150

25

4

1               REQUEST FOR DOCUMENTS

2

   Document                              Page

3

4   Furnish Bates Stamp number for

5   Exhibit 5                            139 &

6                                        174

7

8                 S-T-I-P-U-L-A-T-I-O-N-S

9

10      IT IS HEREBY STIPULATED AND AGREED by and

11   between the parties through their respective

12   counsel that the herein testimony may be taken

13   at the time and place designated pursuant to

14   the Federal Rules of Civil Procedure.

15      IT IS FURTHER STIPULATED that the deponent

16   has the right to review and correct the

17   transcript under 30-E.

18

19

20

21

22

23

24

25

Kelly Bennett - September 30, 2010

1              MR. WALLENDER:  We make a

2       request under 30-E for the right to

3       review and correct the transcript.

4              MR. COSTYN:  This is a

5       deposition of Kelly Bennett taken

6       pursuant to notice for discovery

7       cross-examination, and all purposes

8       allowed that exist under the Federal

9       Rules of federal procedure.

10             We stipulate all objections will

11      be to the form of the question, and

12      she will answer, and we will reserve

13      any substantial objections for another

14      time.  Is that acceptable with you,

15      Mr. Wallender?

16             MR. WALLENDER:  We agree to

17      follow the Federal Rules for the

18      objections, and we make a request to

19      review the transcript under rule 30-E.

20             MR. COSTYN:  Okay, sounds good.

21             KELLY BENNETT, the Plaintiff

22      herein, having been first duly sworn,

23      was examined and testified as follows:

24                  EXAMINATION BY

25   MR. COSTYN:

6

1     Q    State your full name and address for

2  the record.

3     A    Kelly Bennett, ████████████,

4  Latham, New York  12110.

5     Q    Ms. Bennett, my name is Joseph Costyn.

6  I'm an attorney for Ford Harrison.  I

7  represent Sterling Planet in the lawsuit you

8  brought against it.

9        Have you ever had your deposition taken

10 before?

11    A    No.

12    Q    Okay.  The purpose of the deposition is

13 to obtain sworn testimony for the purpose to

14 use in a lawsuit against the company.  I will

15 ask a couple of questions that relate to the

16 allegations identified in the complaint and

17 ask you in general about the lawsuit, about

18 your employment with Sterling Planet, and

19 anything that kind of has a relevance to the

20 case.

21     Something that people often do wrong at

22 depositions, they nod or shake their head to

23 give answers.  The court reporter can't take

24 that down.  So be sure to say yes or no when

25 it's that type of question; give verbal

7

1    responses.

2        A    That one won't be a problem for me.

3        Q    Sometimes the court reporter will get

4    mad if you say um-hum.  If you don't

5    understand the question, feel free to

6    interrupt me and ask me to repeat or rephrase

7    the question.  That is fine.  Sometimes I ask

8    compound questions.  I'm not supposed to do

9    that.  If there are two questions in one

10   sentence, feel free to stop me and ask me to

11   repeat one at a time.  Your attorney will

12   probably do that for you if I do something

13   like that.  If anything is unclear, make sure

14   that I know beforehand before you give an

15   answer so we can rephrase the question or

16   state it in a way that you understand it.

17           Is there anything that would prohibit

18   you from giving correct answers today?

19       A    No.

20       Q    Have you taken any medication or drugs

21   recently?

22       A    No.

23       Q    Is anything present today that could

24   affect your ability to remember past events?

25       A    No.

8

1    Q    In preparation for this deposition, did

2    you review any documents?

3    A    I reviewed the documentation that

4    Sterling Planet provided through the discovery

5    process.

6    Q    The documents Sterling Planet has

7    produced, is that correct?

8    A    Correct.  Yes.

9    Q    Anything else?

10    A    Whatever I have, whatever we have

11    produced on our end, and whatever you produced

12    on your end.

13    Q    Documents produced in discovery is what

14    you reviewed in preparation for today?

15    A    Correct.

16    Q    Have you reviewed any of the pleadings

17    for the case, like your complaint or any

18    discovery questions or responses that have

19    been given by either party --

20    A    Yes.

21    Q    -- in preparation for today's

22    deposition?

23    A    Yes.

24    Q    What about any notes; have you reviewed

25    notes in preparation for today's deposition?

9

1      A    Only notes between attorneys, between

2    myself and my attorney.

3      Q    Okay.  Any tape-recordings or any type

4    of statements that you reviewed?

5      A    No.

6      Q    Have you discussed this deposition with

7    anyone other than your attorney in preparation

8    for today's deposition?

9      A    No.

10     Q    You have already stated your name.

11   Have you ever been known by any other name?

12     A    My other name is Kelly Beck, B-E-C-K.

13     Q    What is your current address?

14     A    ███████████, Latham, New York  12110.

15     Q    How long have you resided there?

16     A    At least five years.

17     Q    It's been awhile?

18     A    It had been awhile.

19     Q    Do you rent or own?

20     A    I rent.

21     Q    What is your current telephone number?

22     A    518-782-1931.  That's the home number.

23     Q    You stated you haven't had your

24   deposition taken before, correct?

25     A    Correct, yes.

10

1    Q    Have you ever been involved in a

2  lawsuit before as a plaintiff or as a

3  defendant?

4    A    No.

5    Q    This is the first time?

6    A    Yes.

7    Q    Let me ask you a couple of questions

8  about your educational background.  When did

9  you go to high school?

10    A    I graduated high school in 1987.

11    Q    What about college?

12    A    I almost graduated the first time in

13  1991 from Binghamton University.  I officially

14  got a B.A. from SUNY Albany in ninety --

15  December '94 I graduated from SUNY Albany.

16    Q    What did you study?

17    A    I studied Geography was my major, with

18  Political Science as a minor.  And then I got

19  a Master's in Regional Planning from SUNY

20  Albany, and course work at RPI and an MS in

21  Environmental Management Policy.

22    Q    Outside of college and your educational

23  experience as you have explained to me, have

24  you had any other type of formal training or

25  vocational training, post-college education,

Kelly Bennett - September 30, 2010

1    anything like that?

2        A    No, no professional or otherwise.

3        Q    Do you hold any professional licenses?

4        A    I do not.

5        Q    Prior to coming to work for Sterling

6    Planet, what was your job immediately prior?

7        A    Immediately prior I was Deputy

8    Executive Director for the Environmental

9    Business Association of New York State.

10       Q    What did you do in that capacity?

11       A    Everything unofficially.  Officially, I

12   was responsible for regulatory policy, for

13   lobbying for policy development.  I also did

14   programming for, oh, a hundred plus programs

15   that the organization.  I was an interface

16   with our member companies.  I was an external

17   interface with other strategic partners, with

18   other associations, and a number of other

19   things.  But those were the primarily

20   responsibilities.

21       Q    Did you have some expertise in the

22   regulatory field that would affect things like

23   clean energy sales and new energy credits?

24       A    I had a very broad background in

25   environmental policy at that time, which would

12

1    have included a focus in the energy field.  We

2    focused on issues for our members ranging from

3    air to water and everything in between.

4        Q    All over the place?

5        A    Yes.

6        Q    Can you give me a little bit of a

7    description about your environmental policy

8    background?  You said you had a broad range of

9    experience.

10       A    As I described from my education,

11   energy and environmental work has been a core

12   focus of mine from the beginning, from an

13   undergraduate focus even.  So I spent my

14   entire career in the environmental and energy

15   field beginning with some work with the State

16   Legislature, working for the Environmental

17   Conservation Committee and working for the

18   speaker staff on environmental and

19   transportation issues primarily there.  So

20   it's been what I have done my whole career.

21       Q    Okay.  Have you ever had a job that

22   involved any type of sales or any type -- do

23   you have any type of sales experience prior to

24   your employment with Sterling Planet?

25       A    I did as early as my freshman year of

13

1    college when I filled in for my mother who a

2    publisher at a newspaper and had a sales

3    responsibility.  I did that for summers.  I

4    always was selling.  In every job I ever had,

5    I sold.  I was external, I was the face of the

6    company, I was an expert in the company.  The

7    nature of whatever responsibility I had

8    involved selling.  Whether the title said

9    "sales" or "business development" or not,

10   there was always a component of my

11   responsibilities which involved selling.

12         I did that also at Clean Air

13   Technologist, which is a small start-up firm,

14   I did in between the government work and

15   working for the Environmental Business

16   Association.  And, you know, I recruited

17   members at EBA, I, I did Member Services at

18   EBA.  I sold whatever institution I was

19   working for, for sure.

20     Q   So whether that be recruiting members

21   or trying to advance the, whatever objective

22   the business had, at the time you considered

23   that to be selling, because you were trying to

24   push a particular agenda for the company, is

25   that right?

14

1     A    That's, that's a fair assessment.

2  Sterling Planet was the first company that I

3  worked for that had a product to sell in a

4  traditional definition of selling a product

5  for sales.  But, again, everything else was

6  relating to selling a concept, selling an

7  issue, advocating for an issue, selling the

8  benefits of membership in an organization,

9  along those sorts of lines.

10    Q    Sterling Planet was the first company

11 that had a product that you were in marketing,

12 is that correct?

13    A    It was, yes.

14    Q    Talking about the product, we are

15 referring to Renewable Energy Credits, that

16 sort of thing?

17    A    I also attempted to sell energy

18 efficiency certificates, also known as white

19 tags, and we sold a carbon offset product, as

20 well.

21    Q    For the record, can you explain what

22 Renewable Energy Credits are?

23    A    Sure.  When you produce renewable

24 energy, you produce two components.  You

25 produce an electron, and you produce an

Kelly Bennett - September 30, 2010

15

 1    environmental attribute called a Renewable

 2    Energy Certificate, or a green tag or a green

 3    certificate.  And it represents the

 4    environmental attributes of producing

 5    renewable energy and that's a depositive

 6    externality.

 7        Q    You mentioned something about white

 8    tags.  Can you describe what a white tag is?

 9        A    A white tag is one megawatt hour of

10    energy, efficiency of energy not used.  And

11    the concept was if you could calculate the

12    environmental benefit of a renewable energy,

13    an electron, you could calculate the benefit

14    of not using a brown energy electron, and so

15    the absence of using dirty energy was clean

16    energy.

17        Q    The EBA in New York City, what role did

18    someone named Rubinstein play there?

19        A    Ira Rubenstein was the executive

20    director of the association.

21        Q    What did he do as executive director?

22        A    Everything an executive director would

23    do.

24        Q    Okay.  Was he involved in sales?

25        A    He was certainly involved in member

Kelly Bennett - September 30, 2010

16

1   recruitment in the way that I was, in that you

2   were external and in the public eye and were

3   identifying potential members to join the

4   organization and making recommendations to Ed

5   Parker, who was our membership services.  We

6   had somebody focused exclusively on membership

7   services, and on selling sponsorships for

8   programs and things like that.  So, yes, Ira

9   would have been involved in shaking hands with

10  people in the market, yes.

11      Q   I think we have had enough background

12  here.  One more question about EBA.  Did you

13  support Ed Parker?

14      A   In so much as there were five people,

15  sometimes less, in the office, and Ed had

16  responsibility, again, for raising sponsorship

17  dollars for closing members, oftentimes, we

18  were, we provided leads to Ed.  I supported

19  Ed, I supported the front desk, I supported

20  our program person, I supported our energy

21  smart communities person; I supported

22  everybody in the office.

23      Q   I think we have definitely had enough

24  background here.  I want to move on to talk

25  about your employment with Sterling Planet.

17

1          From the beginning can you describe to

2    me how you first became aware of Sterling

3    Planet and the opportunity to seek employment

4    there?

5               MR. WALLENDER:  Object to the

6          form.

7     A    Mel Jones --

8               MR. COSTYN:  You can answer the

9          question.

10    A    Mel Jones was a board members of EBA,

11    and I met him through his function there.  As

12    a part of his membership, he provided us some

13    background information on the company.  He

14    came to the office with a woman who would

15    eventually become my colleague, Elizabeth

16    Kasprowicz, to talk to our members about a

17    green power option.  He came to Albany on

18    occasion for regulatory or other proceedings.

19    There was a renewable portfolio standard

20    proceeding at that time in Albany, and he came

21    here.  And I went up the hill and sat with him

22    for awhile and that.  So I knew him as

23    primarily as a board member.  I was very

24    interested in the company and what the company

25    was doing.  I loved the concept, never heard

18

1   of the concept before.  I had been at EBA for

2   awhile and was ready for a change.  It was

3   really -- I was really interested in putting

4   my education to practice, which was that

5   corporations were a critical component and I

6   was very interested in getting into the

7   for-profit corporate world.

8      Q   Did you have any conversations with Mel

9   during his business in Albany as part of the

10  EBA events about potential employment; how did

11  you bring that concept up?

12     A   I recall I -- that Ed Parker had given

13  me a background on a Green Schools Program

14  that Sterling Planet was thinking of

15  developing, and I loved it.  And I called Mel

16  and I said, "I love this.  I love this

17  company, how do I get involved?  Is there an

18  opportunity for me to get involved."  I called

19  him directly on his cell phone -- I called him

20  on his cell phone from my cell phone.  And he

21  said, "You would be a great asset, we should

22  talk about it."  And I said -- but at that

23  time, it was probably early on and it wasn't

24  an immediate opportunity.  It was, do you want

25  to get involved if we can figure out a way for

19

1    you getting involved.  I said, No, I'm

2    interested in employment."  Then he said, We

3    need to wait to have a discussion on

4    employment."

5        Q    Do you remember approximately what date

6    that was when you had the first conversation?

7        A    I don't recall the exact date, but it

8    would have been in 2005, maybe as early as the

9    summer 2005.

10        Q    It was several months before you

11    actually started going with the employment

12    process with Sterling Planet?

13        A    Correct.  Yes.

14        Q    After you had that call with Mel, what

15    happened next as far as your interactions with

16    Sterling Planet about employment?

17        A    It was, to the best of my recollection,

18    infrequent, other than professional, you know,

19    Mel would come.  We perhaps would see each

20    other that way.  By the fall of 2005, I was

21    ready to really move.  I needed to leave EBA.

22    I hadn't been getting paid.  And so it was

23    important for me to take care of myself

24    financially, and my family financially and

25    that was a big motivation.  I needed some --

20

1   obviously, I needed some consistency there.

2   So I said, "I'm really interested in joining

3   the company, and he said, "Let's see if we can

4   get that done."

5       Q   You said you were working for EBA, but

6   you weren't receiving compensation?

7       A   It was sporadic.  We were dependent on

8   State funding, and as we know, that can be

9   challenging at best.

10      Q   I'm aware of that, yes.  So you talked

11  to Mel in the fall about moving forward and

12  wanting to work for Sterling Planet, correct,

13  in 2005?

14      A   Yes, correct.

15      Q   Chronologically, what happened next in

16  the employment process?

17      A   Mel sent along an offer letter.

18      Q   When did you receive the offer letter?

19      A   It was in December 2005.

20      Q   Okay.  And do you remember

21  approximately when you accepted the employment

22  offer?

23      A   It was before the end of the year in

24  2005.  I don't recollect what the date of that

25  executed offer letter was and employment

21

```
 1    contract was, but it, it was before the end of
 2    the year, although I didn't start with the
 3    company until March of the next year.
 4         Q   When you first started for Sterling
 5    Planet, what was your job title?
 6         A   Director, Business Development, Empire
 7    Region.
 8         Q   Director of Business Development in the
 9    Empire Region?
10         A   Yes.
11         Q   Empire referring to New York?
12         A   New York and New Jersey.
13         Q   Is that the same job title you had
14    throughout your employment with Sterling
15    Planet?
16         A   No.
17         Q   What was the next job title?
18         A   Director of Northeast Region.  That
19    came quickly.
20         Q   How quickly?
21         A   Within a couple of months.
22         Q   Did you maintain the title of Director
23    of the Northeast Region throughout your
24    employment, or did it change again?
25         A   It changed again to Vice President.
```

**Kelly Bennett - September 30, 2010**

1    Q    To Vice President?  Was there any other
2    title other than Vice President or just --
3    A    Not initially.  In the interim as
4    Director of the Northeast Region, I also
5    assumed, when appropriate, National Policy
6    Director responsibilities, as well -- although
7    it did not ever appear on a business card.
8    Q    You started out as Director of Business
9    Development for the Empire Region?
10   A    Correct.
11   Q    And that changed next to the Northeast?
12   A    Correct.
13   Q    After that was Vice President?
14   A    Correct.
15   Q    What was the official job title after
16   VP?
17   A    Then I become VP of Carbon and
18   Efficiency Markets.
19   Q    What are Carbon and Efficiency Markets?
20   A    There are -- they were emerging
21   environmental attribute markets.  It was a
22   reflection of my role in those markets for the
23   company.
24   Q    Did you have any other official job
25   title after Vice President of Carbon and

23

1   Efficiency Markets?

2       A    No.

3       Q    As Director of Business Development for

4   the Empire Region, what type of job duties did

5   you have?

6       A    Sales; I was business development.

7       Q    How long were you in that role?

8       A    For the Empire Region role, just two or

9   three months, maybe?  I think it was by May of

10  2006, the title had changed to the Northeast

11  Region.

12      Q    As Director of Business Development for

13  the Northeast Region, did your job duties

14  change at all, or was it just an expanded

15  territory?

16      A    It was an expanded territory.  It was a

17  broader view.  It wasn't exclusive to business

18  development.  It also included some regulatory

19  work, as well.  So keeping track of what was

20  going on in state houses and the region,

21  interacting with external stakeholders, such

22  as ACORE, or the Environmental Business

23  Association.  It was a reflection of a broader

24  scope in a region that was important

25  strategically to the market.

Kelly Bennett - September 30, 2010

24

1    Q    While you were in the business

2  development roles for Empire and for

3  Northeast, what type of products of Sterling

4  Planet were you selling?

5    A    Primarily Renewable Energy

6  Certificates, REC's.  Although as early as

7  2007, a little before that, maybe towards the

8  end of 2006, I was in discussions with

9  customers around White Tags.  There was not a

10  carbon focus in the company and a product line

11  at that point.

12    Q    What about carbon offsets?  Were you

13  involved with carbon offsets at that time?

14    A    No, minus knowing what they were, minus

15  knowing that they were a product we needed to

16  think about and consider, minus my association

17  with climate leaders, E.P.A. climate leaders,

18  we did not have a specific carbon offset

19  offering.  That said, if somebody asked for

20  it, we would have figured it out.

21    Q    Are renewable credits essentially the

22  same as offsets?

23    A    No.

24    Q    What is the difference?

25    A    The difference is, one, renewable

25

1    energy, which is a megawatt hour, and the

2    other is the destruction, avoidance of carbon

3    emissions, of a wide range of carbon

4    emissions, greenhouse emissions, really.

5        Q    During your time doing business

6    development for Empire and for Northeast, were

7    you involved in the sales or the marketing of

8    energy efficiency credits?

9        A    I don't recall but the first

10   conversation we had with Pfizer -- but that

11   would have been, to the best of my

12   recollection, in 2006, late in 2006, around

13   energy efficiency certificates.

14       Q    Is that the same thing as White Tags?

15       A    Correct.

16       Q    When you moved into the Vice President

17   role, do you know approximately what date that

18   was?

19       A    It was, it was July 2007.

20       Q    What brought about that change?

21       A    I earned it.

22       Q    What do you mean.  Can you give me a

23   little description?  I'm assuming it was a

24   promotion, correct?

25       A    Correct.

Kelly Bennett - September 30, 2010

26

1      Q    Can you explain why you were given the
2  promotion?
3      A    I was given the promotion, because I
4  was increasingly involved in high profile
5  sales -- including Mohawk Paper -- in
6  regulatory issues, increasingly involved in
7  speaking on a national level on emerging
8  market issues, like energy efficiency
9  certificates and carbon offsets.  I was
10  increasingly important from a strategic
11  perspective internally.  There was no female
12  vice president.  I got to be the first female
13  vice president in the history of the company.
14      Q    Did you consider yourself to be an
15  expert on the products that Sterling Planet
16  sold and the regulatory affairs, that kind of
17  governed them?
18      A    As much as one can be in this
19  ever-evolving market.
20      Q    You said you were speaking on a
21  national basis.  Can you tell me about your
22  speaking engagements for Sterling Planet?
23      A    They arrived by one of two ways.
24  Oftentimes, especially early on, they arrived
25  by Mel Jones calling me oftentimes the night

**Kelly Bennett - September 30, 2010**

27

1   before an event and saying, I'm double booked,

2   I have got an opportunity, can you pinch hit

3   for me?  And I would say, absolutely.  What

4   are we presenting?  But I, I filled in -- much

5   of the national presence was filling in for

6   Mel.

7        Q    What did you speak about?

8        A    It depended on the conference.  Early

9   on, primarily Renewable Energy Certificates,

10  what is a REC, what is the market, how are

11  they used, what is the difference between

12  voluntary and compliance, the basics, 101.

13       Q    I understand you're also an expert in

14  regulatory affairs that affected the Renewable

15  Energy Certificate market.  Can you describe

16  your expertise in that area to me?

17       A    I can't explain the expertise in that.

18  I have never written a piece of legislation.

19  I was an expert at knowing how to follow the

20  changes and how to keep abreast of the changes

21  and raising those changes as both challenges

22  potentially and/or opportunities potentially

23  to us from a business perspective and to our

24  customers from a marketing perspective -- was

25  there a risk in the regulatory environment to

1    our customers?  Was there an opportunity for

2    us?

3        Q    How did you track regulatory changes

4    and trends?

5        A    A number of ways.  E-mail, we had

6    membership to a number of professional

7    organizations which provided updates.  I had a

8    professional network of people.  We were

9    involved in trade associations whose primary

10   responsibility was tracking policy.

11       Q    Did you receive regular updates from

12   these organizations?

13       A    Um, on some issues, yes.  On some broad

14   issues, I would have to hunt for it.  I would

15   have to know where to look.

16       Q    When you are talking about hunting, how

17   would you go about doing that?

18       A    Sometimes directly to the regulatory

19   agency's website or a third party who might be

20   tracking legislation, or an NYSERDA-like

21   entity who has very broad focus.

22       Q    Did you ever participate in letters,

23   comment on rule making?

24       A    I did, yes.

25       Q    Did you ever publish any comments?

29

1    A    We did publish comments.  I recall

2    specifically in Connecticut with the

3    Connecticut DPUC.  And I may have done other

4    comments.  By the time we were very much

5    involved in rule making and regulatory

6    comments, we were involved in an association

7    called REMA, R-E-M-A, Renewable Energy

8    Marketer's Association, which was writing a

9    lot of the substantive work on behalf of the

10   organization.  There were other activities

11   that took place that others may have been

12   involved with, too.

13   Q    You mentioned the DPUC.  What does the

14   DPUC stand for?

15   A    The Department of Public Utilities

16   Commission, or Public Utility Commission.

17   Q    So that was your involvement with the

18   rulemaking of the Connecticut DPUC -- at the

19   state level, not at the national level?

20   A    Correct.  I don't recall that we ever

21   submitted any comments in any federal

22   proceeding.

23   Q    In addition to your knowledge of the

24   regulatory development in the industry, what

25   other type of steps did you take to keep

30

1    yourself informed about developments in the

2    renewable energy market, in general?

3        A    I read voraciously, I attended numerous

4    conferences, I had conversations with

5    customers, with colleagues, with external

6    parties.  I asked my colleagues, including

7    Mel, including Marcus Krembs, including

8    anybody else -- Bob Maddox was a great

9    resource to me.  I had a steep learning curve

10   initially, and after -- you know, it was a

11   small market.  If you needed to get educated,

12   you could find out how to get educated.  If

13   you didn't know something and it didn't exist,

14   it meant that maybe there was an opportunity

15   to create it.

16       Q    Did Sterling Planet ask you to, or rely

17   on you, to inform its customers about

18   regulatory changes or regulatory affairs in

19   the industry?

20       A    On occasion, when required.

21       Q    How did your knowledge of the

22   regulatory issues that affected Renewable

23   Energy Credits and the market in general add

24   value to your job?  How did you use that in

25   your employment with Sterling Planet?

31

1      A    We existed because of a regulatory

2   environment.   Many of our customers, not all,

3   created products and services because of a

4   regulatory policy environment, whether it was

5   a voluntary policy or whether it was a

6   mandatory policy.   So having knowledge around

7   the drivers for decision-making, both from a

8   compliance perspective, why a utility would

9   need to buy a Renewable Energy Certificate

10   under a mandate, or whether it was why Intel

11   wanted to buy a Renewable Energy Certificate

12   voluntarily.   So it was a key component of the

13   drivers of purchasing, both from, either from

14   a mandatory perspective or voluntary

15   perspective.

16      Q    In your sales activities that you

17   described earlier, did you continue to do that

18   as a Vice President?

19      A    I did.

20      Q    In your VP program for carbon and

21   efficiency markets, did your duties change at

22   all to go along with the times?  Were you

23   involved with carbon efficiency markets in a

24   different way than you were before?

25      A    The -- my -- I will take the first part

32

1    of the question first.  My responsibilities,

2    my responsibilities did not fundamentally

3    change.  The external focus was what was meant

4    to change.  It was meant to signal a high

5    level acknowledgment, expertise at Sterling

6    Planet to the external market.  It was as much

7    an external communication as it was an

8    internal communication.  That said, the

9    management of our carbon focus and our

10   efficiency focus internally was disparate.

11   Was this a supply issue, was this a project

12   issue?  Was it a sales issue?  Who was the

13   person who would make that decision?  Who

14   would review where we got our supply?  Who

15   would review what our price was for our

16   product?  That was not handled necessarily in

17   one place.  So it was meant in that change to

18   aline myself and Marcus Krembs, who for, I

19   think, most of his tenure had title of

20   Director of Greenhouse Gas Programs or

21   something along those lines.  So it was meant

22   to have an internal "go-to" team.  We were to

23   work directly with Mel.  We were to handle --

24   Marcus was the supply side and I was the

25   coordination of the sales side, and, of

33

1    course, there was always the what's going on

2    in the regulatory market and/or the voluntary

3    market for that matter.

4        Q    Did this carbon efficiency market, did

5    that refer to carbon offsets into white tags?

6        A    Broadly, yes.

7        Q    Was there any other product the company

8    sold in the carbon or efficiency markets other

9    than carbon offsets or white tags?

10       A    Could you repeat that?  Sorry.

11       Q    Were there any other products that the

12   company sold within what we call the carbon

13   efficiently markets, other than carbon offsets

14   or white tags?

15       A    You could sell a REC to anybody under

16   any circumstances.  A REC could be used for

17   customers focused on carbon.  That person,

18   that customer, could buy REC's to meet a

19   carbon reduction goal, a greenhouse gas

20   reduction goal.  So even though it said carbon

21   and efficiency certificate, REC's, were still

22   the primarily driver for customers in dealing

23   with carbon.  It was, it was more a reflection

24   of the evolution of the market from a pure REC

25   green power driver to a carbon reduction or

34

1   carbon management driver, and REC's were a

2   very important part of carbon efficiency from

3   that perspective.

4       Q    Earlier you mentioned Marcus Krembs.

5   Can you tell me who he was?

6       A    Marcus was the Director of Greenhouse

7   Gas Programs.  My association with him -- I

8   believe that was his title.  Early on, he may

9   have had a different title, I don't recall

10  what that was.  He was on the supply side of

11  the house.

12      Q    What do you mean by the supply side?

13      A    We were bifurcated.  So we had a sales

14  side and we had a supply side.  Those people

15  that sold REC's and those people who delivered

16  on the contracts, who bought the REC's.

17      Q    Where did people on Marcus's, on the

18  supply side, where did you they purchase REC's

19  from?

20      A    Hundreds, potentially, of suppliers.

21      Q    Were the suppliers, did they originate

22  the renewable energy credits, or were they

23  middlemen or resellers of credits?

24      A    Could you clarify that?  Who was the

25  originator, was Marcus the originator of the

35

1    REC's?

2        Q    The hundreds of potential sources that

3    you're describing that Sterling Planet would

4    purchase renewable credits from, were they

5    originators of these credits, or were they

6    resellers?

7        A    The supply team worked with both

8    brokers in the market, who would have been

9    middlemen, and the supply team also worked

10   with the renewable energy generators, with

11   owners of renewable energy assets.

12       Q    For the record, can you describe how

13   the Renewable Energy Credits are originated or

14   created in the first place?

15       A    It depends on the rule, but in the

16   basic sense when you have a renewable energy

17   project defined by a particular body,

18   regulatory or voluntary, you create renewable

19   energy.  If -- it may depend on when that

20   project was, when it came online, when the

21   switch was flipped.  It may be that the switch

22   could have been flipped, but they weren't

23   eligible to sell into a market until 10 years

24   later.  It all depended on the rules and all

25   depended on the definition and all depended on

36

1    the buyer's preference, as well.

2       Q    Going back to Marcus, did you ever

3    supervise him, or did he ever report to you?

4       A    He did from about -- for a very short

5    period of time, apparently.  I believe the

6    title change for me came in October of '08 --

7    maybe it was earlier than that.

8       Q    Which title?

9       A    To the carbon efficiency markets.  To

10   specify, VP of Carbon and Efficiency Markets.

11   That is when Mel made the decision to have

12   Marcus come and sit in that group, and that

13   group was me and Marcus with Marcus reporting

14   to me.

15      Q    Marcus Krembs started reporting to you

16   around October '08?

17      A    To the best of my recollection.  There

18   is an e-mail that I wrote for Mel to announce

19   the change that I sent to him that he

20   approved, but was never sent out.  So whether

21   that was official that Marcus report to me or

22   not, it was certainly never broadcast to

23   anybody else in the company.

24      Q    The e-mail you are referring to, is

25   that a document that has been either produced

37

1    by either party in the discovery of this case?

2        A    It has, yes.

3        Q    Was that provided by Sterling Planet

4    for you?

5        A    Sterling Planet.

6        Q    It was a draft e-mail or an e-mail to

7    Mel, the announcement that was never actually

8    published to the other employees of the

9    company?

10       A    Correct.

11       Q    Do you know why it was never published?

12       A    I do not.

13       Q    Was Marcus Krembs involved in sales

14   activities?

15       A    Yes.

16       Q    Can you describe the sales activities

17   to me?

18       A    Broad.  Marcus, although he was sitting

19   on the supply side, was actively involved in a

20   number of high profile, what Mel termed "blue

21   chip" accounts.

22       Q    Do you know if he ever earned a

23   commission while employed by the company?

24       A    I don't believe he earned a commission.

25   I don't believe he was hired under a

38

1    commission structure, because he was hired on

2    the supply side.

3        Q    Is it correct to say it's your

4    understanding that he did not have

5    commission-based sales or compensation with

6    the company by contract or by any other means?

7        A    That's my understanding.

8        Q    Do you know how he was compensated?

9        A    He was a salaried employee as far as I

10   knew.  Again, I was not with HR, I have never

11   seen anybody else's employment contract.  I

12   only know where he sat in the company.  I was

13   on sales, I had commissions.  He was on

14   supply, he did not.  But he supported -- we

15   were on a team and he supported sales, as

16   necessary.

17       Q    Was he located in Albany, or was he

18   somewhere else?

19       A    He was in Denver, Colorado.

20       Q    How did you guys communicate?

21       A    Phone, a lot, and e-mail.  And on

22   occasion, we would be in the corporate offices

23   in Atlanta together, or we would be at a

24   conference together.

25       Q    Did you ever have to discipline him

39

1    while you supervised him?

2        A    There was one occasion when Mel asked

3    me to speak to him about a conversation he had

4    with a broker.  Marcus was not ever formally

5    disciplined.  I never formally disciplined

6    Marcus.

7        Q    What about in his file?

8        A    I never wrote anything up.  I don't

9    know if anybody else did.  But I, during that

10   period, did not.

11       Q    When you say Mel asked you to talk to

12   him about the way he spoke to a broker, what

13   would a broker be in the context of the

14   company's business?

15       A    A broker could facilitate a supply

16   contract.

17       Q    Were brokers entitled to a percentage

18   of whatever that particular sale was that they

19   set up?  Was it a flat fee?  How were they

20   compensated?

21       A    I don't know whether it was a

22   percentage or a flat fee.  I don't know the

23   terms between brokers and Sterling Planet.

24   Bifurcation, again.  I was not on that side of

25   the house, although there was a fee involved,

40

1   a cost to us involved in using a broker.

2       Q   Were all supply transactions

3   facilitated by brokers?

4       A   Not that I'm aware of, no.

5       Q   Sterling Planet sales activities, you

6   said the house was bifurcated.  On the sales

7   side, did the employees who were responsible

8   for sales, did they work as a team when they

9   were trying to pitch to customers?

10      A   If it was an strategic account, a big

11  fish, there would be perhaps a larger

12  discussion around strategy.  But, by and

13  large, it was the responsibility of that

14  individual sales rep to sell to his or her

15  lead, to his or her prospect.

16      Q   How were prospects generated?

17      A   Initially, they were given to us by Mel

18  and as the sales team expanded and as sales

19  reps left, they were redistributed.  Of

20  course, we added prospects continuously

21  through our activities at conferences, through

22  word of mouth with other customers, referrals

23  from existing customers, and through efforts

24  by the sales team, primarily myself, to

25  generate new and additional sales leads.  I

41

1  created a list of 5000 prospects, the big

2  honking BD master spreadsheet as I called it

3  internally.

4      Q   What was the big honking BD

5  spreadsheet?

6      A   It was an amalgam of companies, working

7  both in the carbon market and participating in

8  government programs, such as the Environmental

9  Protection Agency's Green Power Market

10  Program, or E.P.A. Climate Leaders, or

11  for-profit entities that were members of the

12  climate registry, or college and universities

13  that were members of AASHE, or cities that had

14  signed the mayor's climate commitment.  That's

15  where that list originated.

16      Q   For employees that were involved

17  directly in sales, were most of the sales that

18  you were aware of as Vice President, were they

19  made to companies or prospects that were

20  provided by or referred to the sales people by

21  the company?

22              MR. WALLENDER:  Object to the

23      form.

24      A   Could you, could you repeat that?

25      Q   The sales team --

42

1      A    Okay.

2      Q    -- is it your understanding that the

3   majority of the actual sales that were made,

4   were those to prospects or to customers

5   referred to the sales team by the company as

6   opposed to --

7      A    I don't know.  I don't know the

8   percentage breakdown of sales to customers

9   that we found versus sales to customers that

10  came to us.  We took a lot of orders.  We were

11  big in the marketplace, so could have been --

12  certainly was a mixture of both.

13     Q    Do you know what Sterling Planet's

14  prominence in the market was?  Did it have

15  competitors or other companies that sold

16  renewable credits to companies and consumers?

17     A    If you look at the end of any press

18  release or what's on the website, it says we

19  are, that Sterling Planet is the largest

20  retailer of Renewable Energy Certificates.

21  Mel positioned it always that we were the

22  biggest, we were the largest, we were the

23  first.  We had competitors.  And at times our

24  competitors may have been bigger.  We could

25  still always say we were first.  And there

43

1    were some significant competitors.

2        Q    Did you ever consider or were you ever

3    offered employment, prospective employment, by

4    Sterling Planet's competitors while you were a

5    Sterling Planet employee?

6        A    Not that I ever recall.

7                    MR. WALLENDER:  Objection, form.

8        Q    While you were working for Sterling

9    Planet, who was your supervisor when you first

10   started?

11       A    Mel Jones.

12       Q    Did anyone else ever supervise you?

13       A    No.

14       Q    It's correct to say Mel Jones was your

15   supervisor from the day you started until the

16   very end of your employment?

17       A    Yes.

18       Q    Did you report directly to Mel?

19       A    Yes.

20       Q    Did you ever report to anyone else?

21       A    No.

22       Q    What was your involvement or your

23   professional relationship with Sonny Murphy?

24       A    He was the Chairman.  He is still, as

25   far as I know, the Chairman of Sterling

44

1    Planet.  He was the board chair.  He was our

2    senior statesman.  He was actively involved in

3    directing the strategy and creating the

4    culture of our company.

5        Q    How often did you engage in direct

6    communication with your supervisor, Mel Jones?

7        A    Frequently.

8        Q    Would it be on a daily basis?

9        A    No.

10       Q    A weekly basis?

11       A    Minimally, on a weekly basis.

12       Q    What was your primary means of

13   communication with Mel?

14       A    Phone.  Although I did see him

15   physically, often considering our geographic

16   distance.

17       Q    When you saw him in person, was that

18   typically you visiting Atlanta or him visiting

19   New York?

20       A    I did visit Atlanta, but oftentimes it

21   was at a conference with an investor, with a

22   potential customer, at strategic, with an

23   strategic partner, with a, at a membership

24   organization event.

25       Q    Can you please describe your general

45

1    relationship with your supervisor, Mel Jones?

2        A    Good, professional, mentor.

3        Q    Were you comfortable communicating with

4    Mel?

5        A    Yes.

6        Q    What was the supervisory relationship.

7    What was his role in directing your work?

8        A    Mel set the overall strategy for the

9    company.  He was not a micro manager.  He

10   trusted his team.  He empowered his team.  If

11   he hired you, he trusted you.  He gave

12   responsibility and he gave direction, and you

13   were to ask for forgiveness, not permission.

14   And it was a very good working environment.

15   Although with that management or supervisory

16   structure there wasn't a lot of formal

17   structure to it, so there weren't policies,

18   there weren't procedures, there weren't

19   directives.  There were conversations.

20       Q    It was a conversational relationship?

21       A    Overwhelmingly, yes.  There were

22   certain things that we did that were process

23   and procedure, but, overwhelmingly, it was you

24   had discussions.

25       Q    Did you ever have disagreements with

46

1   Mel Jones of a professional nature?

2       A    At the end of my employment, I

3   disagreed that we couldn't offer some services

4   around carbon offsets, around carbon.  I think

5   that was the biggest disagreement I ever had

6   with him, and it wasn't a big one.  And it was

7   his decision.

8       Q    What were the services you thought the

9   company should have been able to offer?

10      A    Simple things.  Not formally

11  articulated, but as simple as let's calculate

12  the greenhouse gas footprint of a customer,

13  let's do a calculation for the customer, let's

14  get a baseline, let's provide those services

15  for an existing or potential customer.

16      Q    How did you express your disagreement

17  to Mr. Jones?

18      A    I said I think we are missing out on

19  generating revenue and providing services for

20  the market.  My position was that we were

21  poised to be an environmental asset management

22  company, and that would include knowing where

23  a customer started from to know how we would

24  help them, either sell their environmental

25  assets or buy environmental assets if they

Kelly Bennett - September 30, 2010

47

1    needed to.  So I felt we were missing a

2    marketing opportunity and I stated it.

3        Q    How did he respond to your concern?

4        A    He didn't agree.  He didn't want to go

5    down the road of consulting.  He was worried

6    it would take a lot of time and we weren't

7    good at accounting for our time, and, you

8    know, and paperwork, and, you know, we didn't

9    want to do billable hours.  That just wasn't

10   the road he wanted to go down.  I said that's

11   fair, but what if it cost, you know, X to do

12   Y, a menu of services.  It just, we just -- he

13   was concerned that we didn't have the

14   resources, and it would be a distraction to

15   what we did in our core business.  It was his

16   call.

17       Q    Were there ever any other disagreements

18   you had with him?

19                  MR. WALLENDER:  Objection, form.

20                  THE WITNESS:  Do I answer?

21                  MR. WALLENDER:  Yes, answer the

22       question.

23                  MR. COSTYN:  You may answer.

24       A    Any other disagreements.

25                  I disagreed with the handling of Robert

Kelly Bennett - September 30, 2010

48

1    Purser, who is our CFO.  I disagreed with

2    removing Ron Mitchell and Joseph Barclay from

3    the supply team.  I was disappointed, although

4    didn't disagree with the decision that we

5    didn't hire Mike Ashford for a carbon

6    position.  These were normal business, I think

7    that, you think of that.

8        Q   The situations with Purser, Mitchell

9    and Barclay, did you express your concerns

10   about their removals to Mr. Jones?

11       A   Yes, and to Sonny.

12       Q   Was that in person or over the phone?

13       A   Both.

14       Q   If you didn't like something, you would

15   feel comfortable talking to Mel about it --

16   you had the kind of relationship where you

17   would be able to talk to him about that.

18              MR. WALLENDER:  Objection, form.

19       A   In general, yes.

20       Q   Did you ever supervise anyone besides

21   Marcus Krembs while were employed by Sterling

22   Planet?

23       A   Unofficially.  Again, I'm not sure if I

24   officially supervised Marcus.  Unofficially, I

25   assumed responsibility for all non-utility

1    business development.  In the late spring of

2    2008, Alden Hathaway, Senior Vice President of

3    Business Development, was instructed to focus

4    only on utility business sales.  We needed a

5    separate focus on non-utility business sales.

6    Mel asked me to lead that.  Sonny asked me to

7    lead that, and I assumed that officially my

8    title would even be changed.  In that context,

9    official or otherwise, I managed what was then

10   a three person sales team which was Sandy

11   Johnson, Dara Mc Carney, and Sarah Huttu.

12       Q    What is the difference between

13   non-utility and utility customers?

14       A    Utilities are utilities, so they're

15   Con Edison, they're -- and they have a

16   different product, they have a different need.

17   They may be in a mandatory market.  They may

18   be selling small volume individual REC's,

19   small volume REC's to individual utility

20   customers versus a non-utility customer, which

21   would be an Intel, a Mohawk Paper, Staples,

22   CISCO, who is buying for different purposes

23   and buying a different product.

24       Q    Utility customers, is it correct they

25   would purchase Renewable Energy Credits from

1  Sterling Planet and sell to them to their

2  customers, their utility customers?

3     A    They could do that.  They could buy

4  directly for compliance purpose, they could

5  contract with us to manage a program and never

6  buy a REC directly from us.

7     Q    Did Sandy, Sarah and -- I believe it

8  was Dara?

9     A    Yes.

10    Q    Did those three report to you directly

11  when you were non-utility?

12    A    Again, officially?  I don't know the

13  answer to that question.

14    Q    In practice.

15    A    In practice, they took direction from

16  me at a high level.  We reassigned leads, we

17  focused on verticals instead of horizontals,

18  or horizontals instead of verticals.  We

19  worked together to determine how we would go

20  about, how we would go about getting

21  additional customers, not just knocking on our

22  door, but how do we knock on their door.  It

23  was during that period that I created that

24  lead list.  When I was given that

25  responsibility over non-utility BD is when I

1  created this spreadsheet.  When we imported

2  those leads into Quickbase, when we talked

3  strategically about who is doing what and

4  where, um, from a day-to-day perspective, from

5  a practical perspective, the three of them

6  were in the office together.  Mel was next

7  door in the office.  Alden, who was the Senior

8  VP of Business Development was down the hall.

9  If Alden needed support, he could ask for

10  support.  If Mel needed support, he could ask

11  for support.  If Mel wanted to do something,

12  he could do something.  It's not "I'm out of

13  it, it's yours.  It's "I need to focus on this

14  because I have to focus on raising money."

15  Alden has to focus on utilities, I need you to

16  help the BD team, focus on pushing out

17  non-utility business.

18      Q   All three of the individuals, Sandy,

19  Dara and Sarah, they were engaged in strictly

20  non-utility sales?

21      A   They may have supported utility sales.

22  Dara could have gone with Alden or Sandy could

23  have gone with Alden.  Sarah could have found

24  an opportunity in her region in a utility sale

25  and worked on it.  You know, we weren't boxed

52

1   in necessarily.

2       Q    Did any of those three, Sandy, Dara or

3   Sarah, do you know if they were compensated on

4   a commission basis?

5       A    I don't know.

6       Q    During your tenure with Sterling

7   Planet, we mentioned Marcus Krembs, Sandi, and

8   Dara.  Who officially or unofficially reported

9   to you; was there anybody else you managed?

10      A    From a personnel perspective, no, that

11  I'm aware of.  I did have responsibility for

12  managing some external relationships in the

13  market.  So that would include our agent

14  program, that would include our strategic

15  partnerships with other entities in the

16  marketplace who might want to sell a REC.

17      Q    What was the agent program?

18      A    The agent program was individuals who

19  were interested in selling REC's for Sterling

20  Planet.  Those that I dealt with were not

21  salaried.  They were 100% commissioned.

22      Q    Were these individuals employed by

23  Sterling Planet or were they independent

24  contractors?

25      A    To the, to the best of my knowledge,

53

1    those that I interfaced with, that I managed,

2    that I dealt with, were not employees.  They

3    were contractors.  They had an agent contract.

4        Q   Were you involved in retaining the

5    services of any of these agents, or were they

6    preexisting relationships with Sterling

7    Planet?

8        A   Some were preexisting, some were new.

9    I didn't, by and large, recruit agents.

10       Q   What was the nature of your supervision

11   of or overview of the agent program and the

12   individual agents?

13                  MR. WALLENDER:  Object to the

14           form.

15       A   My responsibilities with the agents

16   included initially training, education.  It

17   depended on the agent, however.  Some agents

18   came to the company with some pretty good

19   knowledge of the marketplace and saw a REC as

20   being additive to their current job.  Others

21   were, like me in 2005, who said, wow, this is

22   great.  I want to do this.  I don't know how I

23   can do this.  So I would trained them and

24   provided them with resources and gave them the

25   company's literature and got them set up with

54

1    business cards and an e-mail account, those

2    internal administrative functions.  I worked

3    with them on their leads.  I approved their

4    leads.  They came to me and they said I'd like

5    too work on, for example, Shaw's Supermarket.

6    Do you, does anybody have Shaw's Supermarket

7    right now?  And I would go to Quickbase and I

8    would check Quickbase, and I would say no,

9    that's yours, get it in quickly because that's

10   how we're going to track it for you.

11       Q   Did the agents report to you on a

12   regular basis?

13       A   There was not -- there was not regular

14   proactive discussions by me to the agents.  If

15   the agents needed me, I was available to the

16   agents.

17       Q   What was your understanding of what the

18   agent's compensation structure was?

19       A   100% commission.

20       Q   Do you know who at the company was

21   responsible for calculating and paying their

22   commissions?

23       A   I calculated commissions for Gary

24   Skulnik, for Bill Bastuk, for John Mc Keller.

25   Mel calculated commissions for Charles

55

1  Segerman.  Accounting -- that would vary who

2  that might be -- might calculate commissions

3  for our strategic partners, such as Good

4  Energy or Strategic Energy.  They sold, if

5  they made a sale and bought REC's through us.

6      Q   The Strategic partners can you give me

7  a really quick overview of how they worked to

8  sell REC's?

9      A   They had, I believe what we call an

10 aggregator agreement.  In essence, they were

11 companies, not individuals.  If there was a

12 guy out there that wanted to sell a REC and a

13 company who may sell energy service or retail

14 electric energy and wanted to add the

15 capability of delivering a green product to an

16 existing customer base.  And we were behind

17 their brand, as opposed to the agents who were

18 our brand.  They were Sterling Planet.  We are

19 just delivering REC's to Good Energy.

20     Q   So kind of acting as a middleman?

21     A   We were.

22     Q   Providing supplies?

23     A   We were.  We would work closely with

24 them.  They would call us and say, we need

25 your help on this.

Kelly Bennett - September 30, 2010

56

1     Q    Did any of the agents that you ever

2    work with ever have an agreement about the

3    amounts of their commissions?

4     A    Yes.

5     Q    How often did that happen?

6     A    It happened once that I had direct

7    knowledge of.

8     Q    Which agent was that?

9     A    Charles Segerman.

10    Q    Did he discuss that with you?

11    A    Yes.

12    Q    What action did you take?

13    A    I attempted to reconcile his sales,

14   first his payments that we received from

15   vendors versus payments we had -- sales we

16   received from customers -- sorry -- and

17   payments we had made to Charles in the past.

18    Q    How was this situation resolved?

19    A    It had not been resolved to my

20   knowledge before I left.

21    Q    Did you report the issue to anybody

22   else in the company?

23    A    Mel Jones, Robert Purser, I think.

24   Probably, I probably mentioned it to Sonny in

25   a conversation.  I had to work directly with

1  Crystal Drane who I think at one point was in

2  AP accounting.  I'm trying to figure it out.

3  I may also have talked to Tuan -- I can't

4  remember his last name -- Pham, about the

5  issue, as well.  It was primarily with Mel,

6  and I think early on I probably talked to Ron

7  Mitchell about it, too.  Ron had been involved

8  in making payments prior to Robert Purser

9  coming on and, and expanding the accounting

10  team.

11     Q   Did you engage in e-mail or any other

12  written correspondence about the commissions

13  as you've mentioned?

14     A   Yes, I provided him with an accounting.

15  I provided Mel with the same accounting.  I

16  had e-mail discussions with Mel about that, as

17  well.

18     Q   To your knowledge that was the only

19  commission dispute that occurred with any of

20  the agents of the company?

21            MR. WALLENDER:  Object to the

22        form.

23     A   I, I heard of other disagreements in

24  the past about making payments to contractors.

25     Q   When you say "contractors," do you mean

Kelly Bennett - September 30, 2010

58

1    agents?

2       A   I don't -- contractors.  I don't know

3    whether they were contracted as an agent, as

4    an aggregator, a consultant, I don't know --

5    contractors.

6       Q   You weren't directly involved in any of

7    these issues?

8       A   No, I was not.  I received frustration

9    from agents in terms of how they knew they

10   could -- in terms of how they got paid.  They

11   were modest sales, and we, you know, we

12   eventually paid them, those three that I

13   specifically mentioned.

14              MR. COSTYN:  Can we take a break

15        for about five minutes?

16              (At this time a recess was

17        taken.)

18   BY MR. COSTYN:

19      Q   Ms. Bennett, you said that you started

20   working for Sterling Planet, I believe, in

21   March 2006; is that correct?

22      A   Yes.

23      Q   When you first started working for the

24   company, what was your salary?

25      A   $100,000.

59

1    Q    Did that salary change at any time

2  during your employment?

3    A    Yes, we received a six percent raise

4  in -- I believe it was 2007.

5    Q    You said "we received."  Was that a

6  company-wide policy?

7    A    As communicated to me, it was across

8  the board six percent.

9    Q    Was there ever any other indication of

10  that conversation?

11    A    No.

12    Q    How was that starting salary

13  negotiated?

14    A    I had two requests of Mel when I

15  negotiated my contract.  One was I wanted to

16  double my salary, considering I worked in a

17  nonprofit; he was amenable to that.  And the

18  other was I wanted equity.  I wanted to work

19  for a company that I could, that I could earn

20  something back.  I wanted it to have meaning.

21  I wanted to build something.  And both of

22  those terms were met in the employment

23  contract.

24    Q    So the $100,000 was approximately twice

25  what you were making for the nonprofit?

Kelly Bennett - September 30, 2010

60

```
 1      A    Approximately, yes.
 2      Q    Where were you physically located when
 3   you worked for Sterling Planet?  Did you have
 4   an office?
 5      A    I had a home office.
 6      Q    Was that in Albany, New York at all
 7   times?
 8      A    In Latham, New York.
 9      Q    How do you spell that?
10      A    L-A-T-H-A-M.
11      Q    Is that close to Albany?
12      A    Yes.
13      Q    Is that the home that you earlier
14   stated you owned for about five years?
15      A    Rented.
16      Q    Rented for about five years?
17      A    Yes.
18      Q    I'm going to hand you what has been
19   previously marked as Plaintiff's Exhibit 1.  I
20   will slide it over.  Do you recognize this
21   document?
22      A    Yes.
23      Q    Can you tell me what it is?
24      A    It is the offer letter that was
25   e-mailed to me by Mel Jones in December '05.
```

61

1     Q    It was e-mailed to you?

2     A    Correct.

3     Q    How did you execute this letter?

4     A    I printed two copies, signed both, sent

5  one back by mail to Mel.

6     Q    Did you ever execute any other

7  contractual documents with Sterling Planet

8  that regulated the terms and conditions of

9  your employment?

10    A    Yes.

11    Q    Who was that?

12    A    A confidentiality agreement in 2007.

13 We received an employee handbook in 2008, I

14 believe, and we received a Permissible Use

15 Guide in 2008 to the best of my recollection.

16    Q    Did any of those documents, the

17 Confidentiality Agreement, the Handbook or the

18 Permissible Use Guide, do they contain any

19 language that related to your compensation?

20    A    No.

21    Q    Is it fair to say that this offer

22 letter which you executed is the only document

23 that you have with Sterling Planet that

24 discussed your terms of compensation, the way

25 you were paid for your services?

Kelly Bennett - September 30, 2010

62

1           MR. WALLENDER:  Object to the
2      form.
3      A    This is the document that describes my
4  employment terms and conditions with Sterling
5  Planet.
6      Q    But there were no other contracts that
7  discussed the terms and conditions of your
8  employment as far as compensation goes?
9           MR. WALLENDER:  Object to the
10     form.
11     A    Not regarding compensation.
12     Q    I just wanted to make sure.
13         If you look at paragraph one of the
14  agreement, it states that your employment
15  start date would be February 13th, 2006.  Did
16  you start in on February 13th, or was it later
17  on?
18     A    It was March 20th, 2006.
19     Q    Can you tell me why you didn't start on
20  February 13th pursuant to what the letter
21  says?
22     A    I don't, I don't recall specifically
23  why it was March 20th instead of February
24  13th.
25     Q    Did it just work out that way?

**Kelly Bennett - September 30, 2010**

63

1    A    It may have.  There may have been other

2   issues internally to Sterling Planet that I

3   was unaware of.

4    Q    When did you quit your job with the

5   nonprofit?

6    A    My last day with EBA was March 17th,

7   2006.

8    Q    The second sentence of paragraph one in

9   the offer letter, can you read that out loud?

10    A    Is this number one, start date or --

11    Q    Number one.

12    A    "This letter is to confirm" --

13    Q    The numbered paragraph, number one,

14   Start Date?

15    A    "This employment offer is contingent

16   upon Sterling Planet closing $5,000,000 in its

17   next round of funding scheduled for January

18   27, 2006."

19    Q    Do you have any knowledge as to whether

20   or not Sterling Planet closed $5,000,000 in

21   its round of funding scheduled for January 27,

22   2006?

23    A    I assumed they did.  I got hired.

24    Q    Do you have any direct knowledge,

25   firsthand knowledge, whether or not the

64

1    funding was actually obtained by that date?

2        A    I don't.

3        Q    So the issue was never discussed with

4    Sterling Planet?

5        A    It was discussed with Mel prior to,

6    prior to my hire date.  He indicated to me

7    that he was building a business development

8    team, and he was raising money, and when he

9    had the money in place, we would be good to

10   go.  And that process was anticipated to take

11   longer than the December to February

12   time-frame.  It went longer than the February.

13   When he indicated to me, we're good to go, I

14   assumed that to mean that the terms and

15   conditions of this employment agreement were

16   met, and I got employed.

17       Q    Understood.  Paragraph two, numbered

18   paragraph 2, stating Salary, earlier you said

19   you expressed to Mel you wanted to basically

20   double your salary from the nonprofit.  Was

21   the specific salary of $100,000 a year

22   negotiated, or was that what was initially

23   offered to you without negotiation?

24       A    It was offered to me without

25   negotiation.

65

1      Q    Number paragraph three, Hiring Bonus

2   Payment, was the bonus payment of $5,000 an

3   additional payment of $5,000 at the three

4   month anniversary with Sterling Planet, were

5   those paid out to you?

6      A    Yes.

7      Q    All right.  I will skip over to

8   numbered paragraph five, Commission Plan.  In

9   the lawsuit that you filed against Sterling

10  Planet you claimed an entitlement to

11  commissions on certain sales that you have

12  identified.  We will talk about the specific

13  sales later on, but is it your contention that

14  this Commission Plan in paragraph number five

15  is the plan under which you were owed

16  commissions?

17              MR. WALLENDER:  I object to the

18        form.

19      A    This was the commission plan that I

20  understood was -- could you repeat your

21  question?  I want to make sure I'm answering

22  it correctly.

23      Q    It wasn't a very good question.  I

24  didn't phrase it properly.

25        Is this the Commission Plan under which

1    you are claiming commissions in your lawsuit?

2                    MR. WALLENDER:  Object to the

3         form.

4    A    This is the Commission Plan.  This is

5    the only Commission Plan that is specified in

6    the document.  It is the basis for my

7    commission claims.

8    Q    Sure.  What is your understanding based

9    on paragraph five, Commission Plan, that you

10   would -- sorry, I will rephrase that.  That

11   was confusing.

12            Pursuant to this Commission Plan, what

13   was required of you in order to be eligible to

14   earn a commission?

15   A    Per this document, an End-User Referral

16   Form and a contract, a sales contract, and a

17   known and calculated cost of either broker's

18   fees and/or supply costs to determine net

19   profits.

20   Q    Were sales ever made without written

21   contracts, like small sales, or did every sale

22   with REC's have a written contract along with

23   it?

24   A    Every sale that I'm aware of that I'm

25   claiming had a sales contract.

1     Q    The sales contracts drafted by Sterling

2  Planet or by the customers?

3     A    They were drafted by Sterling Planet.

4  The customer may have certain requirements per

5  contract, but they were standard.

6     Q    So it was a standard contract typically

7  used?

8     A    Typically.

9     Q    Do you know who drafted the contract?

10    A    I don't.

11    Q    So it existed before you came on board?

12    A    Yes.

13    Q    If a customer wanted to change,

14  customer wanted to change any of the terms

15  contained in that template, did you have the

16  authority to make the changes or did you have

17  to talk to Mel first?

18    A    Would I need to get approval?

19    Q    Was it common for customers to change

20  things in the template contract?

21    A    For small purchases, no.  For small

22  companies, no.  With corporations with a

23  modest purchase, perhaps.  For large

24  corporations with large purchases, yes.

25    Q    Did individuals ever purchase REC's

68

1   from Sterling Planet to your knowledge?

2       A    Yes.

3       Q    Are these people that just wanted to be

4   green?

5       A    Anybody could buy a REC on the website

6   or buy a REC through a utility pricing

7   program.

8       Q    What are utility pricing programs?

9       A    It's a voluntary program that a utility

10  would offer to its customers, oftentimes

11  residential and commercial customers as an

12  up-charge of their basic electricity cost

13  price usage to green up their electricity.

14      Q    So they would check a box on the

15  utility bill to say they wanted to purchase a

16  certain number of REC's --

17      A    Yes.

18      Q    To have a green household, is that

19  right?

20      A    Yes.

21      Q    When was the first time in your

22  employment that you were provided with

23  executed End-User Referral Forms?

24      A    I was given End-User Referral Forms

25  that corresponded to an Excel spreadsheet, a

Kelly Bennett - September 30, 2010

69

1    lead list, by Mel, via e-mail in April 2006.

2    I believe I got my first lead list that Excel

3    spreadsheet prior to the End-User Referral

4    Forms.  But the End-User Referral Forms came

5    by e-mail.  I was to print two copies, sign

6    and return them to Atlanta headquarters.

7        Q    Did you sign and return them?

8        A    Yes.

9        Q    Were these forms executed by Mel Jones?

10       A    Yes.

11       Q    Do you know who was responsible for

12   providing End-User Referral Forms to agents?

13       A    We did not have End-User Referral Forms

14   when I managed the agents.  So prior to my

15   responsibility with the agents, I don't know.

16           I knew of no executed End-User Referral

17   Forms from the agents I managed, but they did

18   exist because I imported those leads, those

19   leads that were on the End-User Referral Forms

20   in Quickbase for Alan Zox and Vinnie Fugere,

21   who were agents.

22       Q    You were never responsible for

23   providing end-user forms for agents, were you?

24   Was that your job?

25       A    We had, we had foregone the cumbersome

70

1    process in place of the electronic Quickbase

2    system.  So my agents used Quickbase.

3        Q   So the answer would be, no, you did not

4    provide them?

5                    MR. WALLENDER:  Object to the

6            form.

7        A   I did not provide agents with End-User

8    Referral Forms.  They did not exist for me and

9    their usage at that time.

10       Q   After that first set of end-user forms

11   that you said Mel provided to you possibly in

12   April 2006, did you ever receive any

13   additional End-User Referral Forms from Mel or

14   from the company?

15       A   I did not.

16       Q   On the very last page of the offer

17   letter, it indicates that you signed on

18   January 2nd, 2006.  Is that date accurate?

19       A   To the best of my recollection that is

20   accurate.  That is my signature.

21       Q   Does the document that you have

22   identified as Plaintiff's Exhibit 1 appear to

23   you to be a true and correct copy of the offer

24   letter that you signed on January 2nd, 2006?

25       A   Yes.

71

1    Q   The Commission Plan contained in the

2  offer letter, was that something that was

3  negotiated with the company, or was that just

4  presented to you in the offer letter for the

5  first time?

6    A  It was presented to me.

7    Q  Did you have any discussions with Mel

8  Jones or anyone else at the company around the

9  time you received the letter about the

10  commissions?

11    A  Not other than to say the terms you

12  presented to me are acceptable.

13      I didn't negotiate any element of that

14  contract after it was presented to me.

15    Q  I skipped over paragraph four.  I

16  wanted to go back over that.

17      Can you look at paragraph four

18  entitled, Stock Options?  What's your

19  understanding of what the management stock

20  options pool was?

21    A  It was a certain number of shares that

22  had been set aside for employees.

23    Q  What was your understanding of how a

24  share will vest pursuant to the language in

25  this contract?

Kelly Bennett - September 30, 2010

72

1    A    Those numbers, 8,333 after every year

2    that I was employed.  And there's additional

3    language in the contract which outlines the

4    process of vestment if the company is sold or

5    merged.

6    Q    What is your understanding as to what a

7    stock option is?

8    A    I don't think I have a stock option.  I

9    have a share.  My understanding --

10    Q    My question is --

11    A    There are differences between an option

12    and a share, an option is the option to buy

13    something.

14    Q    Paragraph four is entitled Stock

15    Options, correct?

16    A    The title of the paragraph is Stock

17    Options, yes.

18    Q    And it states in the first sentence

19    that you will receive as part of this offer

20    25,000 shares from the management stock

21    options pool, is that correct?

22    A    Yes.

23    Q    And the last sentence of paragraph

24    four, it deals with terminations and states,

25    "If you decide to leave the company or

73

1    terminate it before all the options are vested

2    above, and unvested options in this agreement

3    shall remain with Sterling Planet."  What do

4    you understand that sentence to mean?

5                    MR. WALLENDER:  Object to the

6         form.

7    A    I understand that those are my shares

8    from the stock options employee pool.

9    Q    The language in that sentence refers to

10   options.  Is it your understanding these were

11   not options, but these were shares?

12   A    My understanding of paragraph four is

13   that I had stock in the company, not options

14   to buy stock, but that I owned a part of the

15   company so long as I meet the terms and

16   conditions of paragraph four.

17   Q    That's the way you read paragraph four?

18   A    That is the way I read paragraph four.

19   There is a stock options employee pool, but it

20   is stock.  I have stock.

21   Q    Do you have in your possession or are

22   you aware of any other documents that support

23   your contention that paragraph four is a

24   promise for a contract to provide shares of

25   stock as opposed to options?

1              MR. WALLENDER:  Object to form.

2      A   I have no other documentation other

3  than my employment contract for any of these

4  issues, so I do not have them for stock,

5  either.

6      Q   Are you aware of any other employee at

7  Sterling Planet who had been offered or

8  compensated for actual shares of Sterling

9  Planet stock?

10     A   I'm aware that stock was -- repeat that

11  question for me again, because it's a compound

12  question.  Maybe you can --

13     Q   I apologize.

14     A   Yes.

15     Q   Are you aware of any other employee of

16  Sterling Planet whose ever been offered or

17  compensated Sterling Planet stock?

18     A   I'm aware that -- um, my understanding

19  was that everybody that came on together -- so

20  me and Greg and Elizabeth and Marcus had

21  similar stock.  I'm aware that there was

22  stock.  I'm not aware of who got what, I'm not

23  aware of whoever got paid anything, I'm not

24  aware of -- you know, I broadly knew that

25  stock was made available to employees in the

75

1    company.  I've subsequently learned through

2    this process that there have been other

3    actions taken around stock.

4         Sonny at one point showed meet the

5    Employee Stock Option spreadsheet that he had.

6    Robert Purser mentioned it to me.  I mean,

7    this was just common knowledge.  I certainly

8    didn't know details.  It would be

9    inappropriate, I guess, I thought, for me to

10   even know.  I had it, it was there, and in my

11   mind I was working to create value and wealth

12   for the company, because I had a share of the

13   company.

14      Q   Are you aware of -- regardless of how

15   they obtained it, are you aware of any

16   employees of Sterling Planet who has ever

17   owned stock of Sterling Planet?

18              MR. WALLENDER:  Object to the

19        form.

20      A   I'm not, I'm not sure I understand the

21   distinction between "having," "owning."  It

22   may be that I, you know, am unaware of the

23   definitional language you are getting at here.

24   What I knew is that employees had stock.

25   That's what I knew.

76

1      Q   Earlier you mentioned some individuals

2   who you said came on board around the same

3   time as you who you believe were offered

4   similar promises regarding stock.  Who were

5   the individuals again?

6                   MR. WALLENDER:  Object to the

7        form.

8      A   I was hired with a Western Regional

9   Business Development Manager.  His name was

10  Greg Chambers.  There was a Central Regional

11  Business Development Manager.  Her name was

12  Elizabeth Kaprowicz.  Marcus Krembs had come

13  on board -- they both preceded me as

14  employees, I think, officially.  Marcus had

15  come on, Krembs had come on at the same time.

16  I think those were the group of us that it was

17  the initial expansion.

18     Q   So these individuals or any other

19  employees had a contract with the company that

20  had the exact same language as paragraph four?

21     A   I don't know what their contracts

22  looked like.  I have never seen their

23  contracts.

24     Q   If they did, would you say they were

25  owed shares of stock as opposed to options as

77

1    as well?

2                  MR. WALLENDER:  Objection to

3          form.

4      A    Do I have to answer a hypothetical

5    question?

6      Q    You can answer.

7      A    If they have the same language, then my

8    reading of them would be the same as my

9    reading for me, that they have stock.

10                 MR. COSTYN:  I think we are done

11         with Plaintiff's Exhibit 1 at this

12         time (handing).

13     Q    Did you ever have a conversation with

14   Mel Jones or Sonny Murphy about being granted

15   additional stock options or additional shares

16   of stock?

17     A    I had one conversation with Mel about

18   additional shares, and it came when we, when I

19   received that six percent raise.  And my

20   conversation with Mel was thank you, but the

21   next time that there's a decision around

22   increased compensation or compensation in

23   general, whether it's commissions or whether

24   it's a raise, I would really be interested in

25   knowing whether I had the option to convert

1    that monetary payment to additional shares.  I

2    felt my compensation level was satisfactory,

3    and, again, I was building wealth for the

4    company, I wanted to increase my position in

5    the company.  I was told a lot that we were

6    going public, so shares in the company were

7    very important to me.

8        Q    What was Mel's response that?

9        A    Mel's response, "You don't worry about

10   it.  We're going to take care of you.  Besides

11   we're thinking of getting rid of the

12   commission structure and starting a bonus

13   pool."

14          And I had another conversation with Mel

15   about stock.  I, I don't recall the date.  It

16   was probably late '07, and it was in New York

17   City at Ruth's Chris Restaurant.  And he had

18   had a couple of very successful, what he

19   characterized as "very successful" meetings

20   with investors in New York City.  And we were

21   moving, moving, moving.  And I asked him some

22   administrative procedural questions about how

23   do I get more stock, and, you know, how is

24   that process working?  And he -- and, again,

25   there wasn't a lot of detail.  It was, "We're

1   working that all out, we're going to figure

2   that all out, don't you worry.  We are all

3   going to get rich."

4       Q   Who else was present at that

5   conversation?

6       A   It was just me and Mel.

7       Q   What about the original conversation

8   that you had when you first mentioned the

9   issue of wanting more stock to Mel?

10      A   That took place in Atlanta at the

11  corporate offices.  To the best of my

12  recollection, it was me and Mel, but it's,

13  it's possible there were other people in the

14  room, too.

15      Q   You don't recall specifically if anyone

16  else was there?

17      A   No, I don't.

18      Q   Did you ever have any discussions about

19  stock or stock options with any other

20  employees of Sterling Planet?

21              MR. WALLENDER:  Object to the

22      form.

23      A   Um, only in, only in -- no, I don't

24  think I ever did.  Sonny -- I did have

25  discussions with Sonny.  They weren't

1  specific, 'I have X, this is how it works,

2  what's the value, how do I' -- it was more

3  along the lines of "You have ownership in this

4  company, Kelly.  You are building wealth for

5  this company.  We need you to take it

6  seriously, you know, close sales.  You are on

7  the right path."  We are, you know, we were

8  going public, we are raising money, those

9  kinds of conversations.  They were concerning,

10  again, just common knowledge that as employees

11  and colleagues, we had shares.  I made

12  assumptions about who had -- I assumed about

13  people that came on board, but we didn't talk

14  about it, it wasn't water cooler conversation.

15  Frankly, I didn't have a water cooler to chat

16  around.

17      Q    No water cooler in the home office,

18  huh?

19      A    No.

20      Q    Do you have in your possession or can

21  you identify any written contract agreement or

22  policy that abrogates using End-User Referral

23  Forms that's referred to your agreement offer

24  letter?

25                MR. WALLENDER:  Object to the

81

1        form.

2    A   I do not have a written document that

3  says End-User Referral Forms are no longer

4  required, you must use Quickbase.  However,

5  within two weeks of getting an End-User

6  Referral Form or within a month of getting an

7  End-User Referral Form from Mel, I'm signed

8  Mohawk Paper and I have no End-User Referral

9  Forms.  However, when we import all of our

10  lead into Quickbase, I used the same exact

11  spreadsheet to populate Quickbase as we did to

12  populate the End-User Referral Forms.  We

13  don't have a lot of written documentation for

14  a lot of stuff we just decided to do.

15    Q   Did you have ever have a role or

16  responsibility in populating End-User Referral

17  Forms?

18    A   Other than my own, no.  And I didn't

19  populate my own.  I was given a Word document

20  to print.

21    Q   Do you have in your possession or can

22  you identify any document or written

23  communication that supports your contention

24  that the Quickbase system was used to replace

25  End-User Referral Forms?

82

```
 1                    MR. WALLENDER:  Object to the
 2          form.
 3     A    I have considerable e-mails that talk
 4  about the importance and the necessary
 5  requirement to use Quickbase for lead
 6  tracking.
 7     Q    Do any of those e-mails discuss
 8  commissions in the context of Quickbase?
 9                    MR. WALLENDER:  Object to the
10          form.
11     A    I had discussions with agents, I had
12  discussions with Ron, I had discussions with
13  Mel about the necessity of using Quickbase to
14  calculate the commissions for agents.  If it
15  was used to calculate commissions for agents,
16  it would be to used to calculate commissions
17  for anybody who used the system for anybody
18  who had sales responsibility.
19     Q    The question was did any of the e-mails
20  refer to a conversation about commissions in
21  conjunction with Quickbase?
22     A    E-mails.  Not that I recall.
23                    MR. WALLENDER:  Objection, form.
24     Q    Out of all of the e-mails that
25  discussed the Quickbase system, none of them
```

83

1    mentioned commissions to the best of your

2    knowledge?

3                    MR. WALLENDER:  Objection to the

4         form.

5        A    No, they referenced sales.  You get

6    commissions after you make a sale.

7        Q    Let me back up a step.  First of all,

8    what is Quickbase?

9        A    It's -- Quickbase is an electronic CRM.

10   It's a Customer Relationship Management

11   system.

12       Q    When did Sterling Planet start using

13   Quickbase?

14       A    I started working on the development of

15   Quickbase as early as late spring, early

16   summer 2006.  We officially started using

17   Quickbase in the fall 2006.  We had training

18   for our business development team.  I led that

19   training in the fall of 2006, in September or

20   October.

21       Q    Were you instrumental in bringing

22   Quickbase to Sterling Planet?

23       A    It was not my decision to select

24   Quickbase as a CRM.  It was not my decision to

25   select Stephen Beebe, the original architect

84

1  of the system.  It was presented to me as a

2  responsibility to implement it and drive it

3  throughout the business development team.

4     Q   How many of Sterling Planet's employees

5  did you train on Quickbase?

6     A   The initial training would have

7  included Greg Chambers, Elizabeth Kasprowicz,

8  Alan Zox, Vinnie Fugere.  I know an invitation

9  was sent to Marcus Krembs, to Joe Barclay, and

10  to Ron Mitchell, and to Bob Maddox.  Whether

11  they participated in that initial training is,

12  is unclear to me.  It would have been the

13  original business development team.

14     Q   Was it an in-person training or done

15  electronically?

16     A   It was done over the phone, a

17  conference call, and a WebEx.

18     Q   What is a WebEx?

19     A   An electronic online presentation tool.

20  They could see what was going on on their

21  computers.

22     Q   Like a Powerpoint over the internet?

23     A   Yes.

24     Q   Did you ever conduct additional

25  trainings on Quickbase?

Kelly Bennett - September 30, 2010

85

1     A   Yes, as additional personnel were added

2  to the system, whether they were internal,

3  in-house business development, for example,

4  Sandi Johnson or Valerie Christopher, or

5  whether there was a new employee that came on

6  such as Alden Hathaway, or whether we added

7  new agents, such as John Mc Keller, it was my

8  responsibility to make sure that they were set

9  up in the system as a user, got an invitation

10  to register, and I held responsibility for

11  making sure that they used it appropriately

12  and consistently and accurately.

13     Q   Did you have to discipline or have a

14  conversation with any of the employees about

15  using the system properly?

16     A   Alden Hathaway.

17     Q   What was the nature of that

18  conversation?

19     A   He frequently had errors in the system

20  with his records and with other's records.

21  And there was a, there was some concern on

22  behalf of Mel that Alden was not keeping the

23  system up-to-date and was not maximizing the

24  beneficial use of the system for business

25  development purposes.

86

1    Q   What system did the company use prior

2  to Quickbase to track leads?

3    A   Mel's Excel spreadsheets.

4    Q   So it was just an Excel document that

5  was used by the company that didn't have an

6  any type of hierarchy in the system?  It was

7  just Mel's spreadsheet?

8              MR. WALLENDER:  Object to form.

9              MR. COSTYN:  I didn't word that

10      well.

11    A   Mel had a master lead sheet he kept.

12  For many years Mel was the sales guy.

13    Q   Do you know who imported the data from

14  the spreadsheet into Quickbase?

15    A   Steve Beebe imported a batch of initial

16  leads that came from Mel's spreadsheet.  Then

17  I, once we -- once Steve and I worked out the

18  bugs and had the process down, then I knew how

19  to and frequently did import data into the

20  system.

21    Q   Where did you import the data from?

22    A   From the spreadsheets Mel had given to

23  the business development team.  That was the

24  initial import.  And then from -- once the

25  system was set up, you could do an import from

1  a conference registration list.  So import

2  those names into the system will assign them

3  to a sales rep later.

4     Q   Okay, I got you.  Earlier you mentioned

5  the fact you had developed a large number of

6  leads for the company.  I think you said it

7  was about 5,000.  Did you input those leads

8  into Quickbase, or did that exist in another

9  system?

10                 MR. WALLENDER:  Object to the

11          form.

12     A   We had an internal company drive and

13  that spreadsheet sat on that company drive.

14  The sales reps were assigned in that

15  spreadsheet.  It was a responsibility of the

16  sales reps to input that data into Quickbase.

17     Q   Do you know if they did it?

18     A   Some did, some didn't.  We did it less

19  by here's 500 names, as opposed to here are 25

20  colleges and universities that I want you to

21  pursue.  Let's make sure those 25 colleges and

22  universities were in Quickbase.  And there was

23  duplication from that Excel spreadsheet with

24  Quickbase.

25     Q   Who all had access to the Quickbase

88

1  system?

2     A    Just the registered user.  So just

3  those people who had been sent an invite and

4  registered on the account, registered an

5  account on the system.

6     Q    How did people get an invite in the

7  first place?

8     A    I sent the invite.  Anybody with

9  administrative privileges could have sent an

10  invite.

11     Q    Individuals that had access to

12  Quickbase, were they able to input data

13  whenever they were logged in?

14     A    Yes.

15     Q    Could they edit existing data?

16     A    It depended on the permission level of

17  that user.  So there could be a very low

18  level, low permission level where, for

19  example, those agents could only see their

20  leads.  They couldn't see any other sales reps

21  in the system.  And they only had the ability

22  to modify their lead.  They didn't even have

23  the ability to delete their lead at the lowest

24  level.

25          At the next highest level which

**Kelly Bennett - September 30, 2010**

89

1    everybody but the agents were at, you could

2    edit.  You saw the entire system so you saw

3    every sales rep's records and you could modify

4    any of those records.

5        Q    So employees of the company had the

6    access where they could modify records?

7                     MR. WALLENDER:  Objection to the

8            form.

9        A    They had a higher level access that

10   they could see than did the agents.

11       Q    Did you have a different level of

12   access than the other employees at Sterling

13   Planet who had access to the system?

14       A    I may have had a higher level than some

15   others, I don't recall who was at what level.

16   At some point there were a fairly limited

17   number of users in the system and we were

18   pretty much at the same level.  Everybody had

19   the same privileges, everybody had the same

20   ability to make changes to the records as I

21   did.  Anybody could have invited anybody else,

22   for example, to join the system.

23       Q    That would have been like an e-mail

24   invitation where someone clicked a link?

25       A    You had to selected the invite option.

90

1   You could invite an existing user if you had

2   put in a whole list of employee names or put

3   in a new e-mail address and invite somebody.

4       Q   Did everyone on the sales team have

5   access to Quickbase?

6       A   Yes.

7       Q   Do you recall a specific list of

8   individuals who would have had access to the

9   Quickbase system?

10                  MR. WALLENDER:  Object to the

11          form.

12      A   I don't have a laundry list.  It

13  changed over time as employees came in, as

14  agents came and employees left, as agents

15  left.  It was in flux.  I do recall seeing a

16  list that was sent by Danny Jackson to me in

17  the documents that Sterling Planet provided to

18  us, which printed out the list of current

19  users at that time.  And I don't recall when

20  that e-mail was sent to me except it was 2009

21  and it included some supply team, it included

22  some agents, it included the business

23  development team, it included the CFO, it

24  included a house account, it included an

25  unassigned leads account.

Kelly Bennett - September 30, 2010

91

1    Q   Is it accurate to say most of Sterling

2    Planet's employees had some sort of access to

3    the Quickbase system?

4                MR. WALLENDER:  Object to the

5            form.

6    A    Not most.  I would say the sales team,

7    senior executives -- who never used it.  The

8    supply team did not.  The project team by and

9    large did not; one representative of the

10   project team did.  Certainly administrative

11   staff did not, general contractors did not.

12   So it was, it was, it was meant primarily and

13   overwhelmingly as a resource for the business

14   development team.

15   Q    Understood.  I had handed you what had

16   been previously marked as Plaintiff's exhibit

17   number 2.  Do you recognize this document?

18   A    Yes, I do.

19   Q    Can you describe what it is?

20   A    This was the e-mail that I sent out to

21   the sales team announcing that we had gotten

22   to the point where we were going to load up

23   our leads and do some training on Quickbase.

24   Q    This e-mail was sent out prior to the

25   telephone conference and web stream that you

1    talked about earlier?

2        A    Yes, this was the prep work required by

3    the sales staff to import the data into the

4    system.

5        Q    In this e-mail in the description you

6    provide, is there a discussion of commissions

7    or of End-User Referral Forms?

8                    MR. WALLENDER:   Object to the

9            form.

10       A    There is no direct reference to

11   End-User Referral Forms, although there is

12   reference to, in the second paragraph under

13   the heading of General Information, the second

14   sentence "This includes all leads provided by

15   Mel."

16           Those leads provided by Mel as I

17   described before were the leads used to

18   populate the End-User Referral Forms.  As far

19   as I can tell, there is not a mention in this

20   document of, of commissions.  Again, this is

21   instruction of how to complete an attached

22   Excel spreadsheet.

23       Q    Earlier you stated you were unaware of

24   any e-mails that discussed commissions in the

25   same context as a Quickbase system.  Are you

93

```
 1    aware of any document either in your
 2    possession, whether possessed by Sterling
 3    Planet or that was not produced by any party
 4    that you were aware of its existence?  Sorry,
 5    it's getting compound.
 6        A   Could you ask me one of the questions
 7    at a time, and I will answer.
 8        Q   Are you aware of a document, either
 9    e-mail or otherwise, that discussed
10    commissions in the context of the Quickbase
11    system?
12                    MR. WALLENDER:  Object to the
13            form.
14        A   Any e-mail between me and an agent
15    who's 100% commissioned, talking about leads,
16    would by its nature imply that Quickbase is
17    the system to track your sales -- your leads,
18    your sales, and, therefore, your commissions.
19    Did it explicitly say this is used to track
20    commissions?  I'm unaware of any e-mail that I
21    have been provided with during this process
22    which specifies that.  But it is explicit in
23    my communications with a number of agents that
24    I required them to use commission -- to use
25    Quickbase to track their sales.  There's an
```

94

1  e-mail, a internal discussion between Ron

2  Mitchell and Joe Barclay and me, about the

3  challenge of keeping track of leads, and

4  that's why I required them to use them, being

5  agents and/or aggregators, to use the system

6  to track sales so that we can pay them

7  commissions.

8      Q   Were any of the sales team, according

9  to your recollection, compensated on a

10 commission basis -- talking about employees,

11 not agents?

12              MR. WALLENDER:  Object to the

13         form.

14     A   I had discussions with both Greg

15 Chambers and with Elizabeth Kasprowicz, two of

16 my business development colleagues, who had

17 been hired for sales whose previous jobs had

18 been sales who talked about commissions.  We

19 talked about commissions, we talked about the

20 system, we talked about how you got paid

21 commissions when you got a sale.  So, yes, I

22 had those high level -- I had commissions

23 conversations with Greg and Elizabeth.

24     Q   A moment ago you said you are not aware

25 of any e-mail that explicitly discusses

95

1    commissions in the Quickbase context.  Are you

2    aware of any other document that explicitly

3    discusses commissions and Quickbase in the

4    same document?

5                    MR. WALLENDER:  Object to the

6          form.

7        A    Could you repeat that?

8        Q    Sure.  That wasn't a very good

9    question.  Are you aware of any other document

10   or any document that discusses commissions and

11   Quickbase in the same context?

12                   MR. WALLENDER:  Object to the

13         form.

14       Q    Or that connects commissions to the

15   Quickbase system?

16                   MR. WALLENDER:  Object to the

17         form.

18       A    Again, there are e-mails between me and

19   the agents that talk about Quickbase and

20   sales.  And you get a commission based on your

21   sales.  There is an e-mail between me and Mel

22   when it comes to commissions and End-User

23   Referral Forms as early as April '06.

24       Q    The question was were you aware of any

25   document that explicitly discusses a

Kelly Bennett - September 30, 2010

96

1    connection between Quickbase and commissions?

2                    MR. WALLENDER:   Object to the

3        form.

4    A    Not explicit, that I'm aware of.

5    Q    Were you the primary administrator of

6    the Quickbase system?

7    A    For certain periods of time I had

8    primary responsibility.  Alden, when he came

9    on as Senior Vice President of Business

10   Development, assumed responsibility for the

11   maintenance, overall maintenance and use of

12   Quickbase.  But I had the longest history and

13   the most in-depth knowledge of how the system

14   worked, so I was always a resource.

15   Q    I'm going to hand you what has been

16   previously marked as Plaintiff's Exhibit

17   Number 3.  Ms. Bennett, do you recognize this

18   document?

19   A    Yes.

20   Q    Can you describe it for me?

21   A    It is a response from me to Sonny

22   Murphy to request from him to provide

23   documentation of my commission claims.

24   Q    When was this response sent to Mr.

25   Murphy, approximately?

97

1      A   My letter is not dated, but it had to

2   have -- I presume it came following the August

3   1st, 2009 letter from Sonny.  So subsequent to

4   August 1st, 2009, probably within a few weeks.

5      Q   So it was sent after your employment

6   with Sterling Planet ceased?

7      A   That is correct.

8      Q   Can you please describe to me what the

9   attachment to the letter is?

10     A   The attachment is an Excel spreadsheet

11   that is of my own creation that I used to keep

12   track of key customers, clients,

13   relationships, that sort of thing that I, I

14   created with data from Quickbase.  But it's,

15   it's my own spreadsheet.

16     Q   The customers or the names that are

17   listed under the column that is headed company

18   name, are these the companies or transactions

19   that you are claiming to be entitled to

20   commissions on --

21     A   Yes.

22     Q   -- in this lawsuit that you filed

23   against Sterling Planet?

24               MR. WALLENDER:  Objection to

25         form.

98

1     A    Yes.

2     Q    Are there additional customers or

3  transactions that you claim you are entitled

4  to receive a commission on?

5     A    No, this is the list that we have used.

6     Q    This list is a comprehensive list for

7  all of the transactions to which you claim you

8  are owed commissions, is that correct?

9               MR. WALLENDER:  Objection, form.

10    A    This is the list we have provided to

11 you of the commissions that I am claiming, of

12 the sales, the commissions for the sales that

13 I am claiming.

14    Q    The answer I'm trying to get at, this

15 the complete list and you're not claiming

16 commissions for any other transactions other

17 than what's on the list; is that correct?

18    A    Yes.

19    Q    Sorry, I don't mean to be picky.  This

20 is hard to read, but down at the bottom of

21 this chart is a row that is entitled Profit

22 Margin.  Then there are figures, five figures

23 in the subsequent column in the same row, that

24 I believe one is 55 percent, one is 60

25 percent, one is 85, one is 70 and the next one

99

1    is 65 percent.  Where did those figures come

2    from when you created this document?

3                    MR. WALLENDER:  Object to the

4         form.

5       A   I had a general knowledge from Robert

6    Purser and from Mel and from Sonny in 2008

7    what our yearly profit margin had been.  This

8    was nothing more than a place holder, an

9    estimate on my end for what I guessed to be

10   the yearly overall profit margin for the

11   company on sales that year based on

12   conversations that I had with senior

13   management.

14      Q   Okay.  The amounts of the sales under

15   the column that is entitled Total Contract

16   Value, where did you obtain that data?

17      A   That data came from Quickbase.  And the

18   data in Quickbase came from our Contracts

19   Administrator.

20      Q   The column entitled Notes, the last

21   column on the chart, where do those notes come

22   from and what do they represent?

23                    MR. WALLENDER:  Objection, form.

24      A   They are my notes that I have inserted.

25   There is information about contract, time

Kelly Bennett - September 30, 2010

100

1    period, perhaps product -- looks like that's

2    what we've got on that, "notes".

3        Q    Do you have in your possession or did

4    you ever have an executed End-User Referral

5    Form for any of the companies or sales that

6    are listed under the column entitled

7    Opportunity Title?

8                MR. WALLENDER:  Objection to the

9            form.

10       A    We did not have End-User Referral Forms

11   at the time of these sales.  So, no, I do not

12   have the End-User Referral Forms.

13       Q    The first opportunity is 550 West

14   Washington Property, LLC.  What was the nature

15   of that transaction?

16       A    I received an e-mail from the architect

17   who is associated with that building.  It was

18   a LEED credit.

19       Q    What is a LEED credit?

20       A    A LEED is a U.S. Green Building

21   Counsel.

22       Q    L-E-E-D?

23       A    L-E-E-D.  A simple e-mail saying we

24   need to get some REC's for this property.  We

25   want to get LEED certified.  I said no

101

1    problem, did a proposal request form to Sandi

2    Johnson, received that back, and sent it on to

3    the customer; they purchased.

4        Q   Was anyone else involved in that

5    transaction besides yourself and Sandi

6    Johnson?

7        A   Valerie Christopher would have been on

8    the contract end.

9        Q   There are looks like five entries for

10   Allsteel Incorporated.  Can you describe your

11   interactions with Allsteel for each one of the

12   transactions?

13                   MR. WALLENDER:  Object to the

14          form.

15       A   Allsteel came to me in a similar

16   fashion as the first lead in that I received

17   an e-mail from a representative of the company

18   inquiring about REC's.  The first purchase was

19   a very, very small purchase, I think 12 REC's

20   for a product line, and then there were just

21   subsequent e-mails, subsequent requests.  My

22   original contact had moved onto a different

23   position, I got another e-mail that says, "My

24   field says you're the guy to talk to."  So

25   that was one comment.  So once you had an

102

1    existing contract, you could execute another

2    purchase order potentially off an existing

3    contract, or you could look and enter into a

4    new contract, so it may or may not require a

5    proposal, may or may not require pricing or

6    may or may not require a new contract.

7        Q    Was anyone else at Sterling Planet

8    involved with the interactions with Allsteel?

9        A    Valerie Christopher from a contractor's

10   perspective.

11       Q    Were there any other Sterling Planet

12   employees that received e-mails from Allsteel

13   representatives or that sent e-mails?

14                MR. WALLENDER:  Objection, form.

15       A    I don't recall exactly.  It's possible

16   in every example that there will be multiple

17   communications from multiple Sterling Planet

18   employees.  We were bifurcated in sales and

19   supply, and we had distinct roles on the sales

20   side.  So there may be an e-mail from me an a

21   customer or from a customer to me.  And the

22   next e-mail may be from Sandi Johnson who was

23   in charge of proposals.  She may have sent a

24   proposal.  There may be another e-mails from

25   Val.  That is Val sending the contract.  It's

103

1    quite possible for every single one of these

2    that each of those unique responsibilities be

3    reflected in an e-mail to the customer.

4        Q    Next account, American Council on

5    Renewable Energy, ACORE, can you describe how

6    that transaction came about?

7        A    We had a long-standing relationship

8    with ACORE.  We were a member of that trade

9    association.  I don't recall whether the

10   e-mail came to me or whether it came to Mel --

11   may have come to both of us.  Um, I do recall

12   an e-mail from Mel saying get the pricing to

13   him as soon as we can, he is a board member.

14   We wanted to make sure we were responsive.

15       Q    And responsible?

16       A    And that.

17       Q    Mel was a board member of ACORE?

18       A    Yes.  I did committee work for them.  I

19   knew a number of people there.

20       Q    Did Mel tell you that you would receive

21   a commission for your assistance with the

22   ACORE account?

23       A    No.

24       Q    What about for Allsteel?

25       A    Mel wasn't even involved with Allsteel.

1    Q   Did he tell you that you would receive
2   a commission for your work on that account?
3    A   No.
4    Q   What about 550 West Washington
5   Property?
6    A   No.
7    Q   Did he tell you you would receive a
8   commission, explicitly say you would receive a
9   commission for any of your work on the
10  Opportunity Title listed in the columns to
11  your letter?
12          MR. WALLENDER:  Objection, form.
13   A   When I closed Mohawk Paper, Mel told
14  me, "Good job.  You keep this up, you will be
15  a rich, rich girl."
16   Q   Did he say you would get commissions
17  from this?
18   A   No, but he told me I would be a rich
19  girl.
20   Q   That was for?
21   A   Mohawk Paper.
22   Q   Was that a verbal conversation?
23   A   Yes.
24   Q   There are two entries for Clean
25  Currents.  Can you describe those

105

1    transactions?

2       A   Yes, there is a distinction between

3    Clean Currents.  When they sell to a customer

4    as an agent of ours, as an strategic partner

5    of ours, then they just bought REC's from us

6    separate.  And these were two transactions

7    where Gary Skulnik contacted me and said, "I

8    need to buy some REC's."

9       Q   Was Gary Skulnik an agent of Sterling

10   Planet?

11      A   I don't recall whether the contract was

12   with Gary Skulnik or Clean Currents.

13      Q   Either Gary or Clean Currents acted as

14   an agent for Sterling Planet?

15      A   Yes.

16              MR. WALLENDER:  Objection, form.

17      Q   Dupli Envelope, can you describe that?

18      A   Dupli was a referral from George

19   Millner at Mohawk Paper.  I went and met with

20   Kemper Matt, I pitched him on REC's, he loved

21   the idea, and he purchased.

22      Q   You had an in-person meeting with their

23   representative?

24      A   In that case, yes.

25      Q   Did you have an in-person sales pitch

Kelly Bennett - September 30, 2010

106

1   with representatives from any of the other

2   names listed under the opportunity column?

3                   MR. WALLENDER:  Object to form.

4        A   I met in person with a core staff, I

5   met in person with the current staff.  Most of

6   the others that we have gone over so far were

7   via e-mail and/or phone.

8        Q   ACORE, Clean Currents and Dupli?

9        A   Dupli.

10       Q   Did you have to travel outside of New

11   York or to a different city in order to meet

12   with those individuals?

13                  MR. WALLENDER:  Object to form.

14       Q   ACORE, Clean Currents and Dupli?

15       A   Yes.

16       Q   What kind of travel was involved for

17   ACORE?

18       A   Washington, D.C.

19       Q   What about Clean Currents?

20       A   I believe I met with them in

21   Philadelphia at a conference.  We -- I may

22   have met with them one other time in New York

23   City.  That's -- I'm not certain if that's the

24   correct location for them.

25       Q   What about Dupli?

Kelly Bennett - September 30, 2010

107

1      A    They are in Syracuse, New York.

2      Q    Did you travel to Washington, D.C. for

3  the express purpose of meeting with ACORE to

4  sell them energy credits?

5      A    Not for the express purpose.

6      Q    Did you travel to Philadelphia for the

7  express purpose of selling Renewable Energy

8  Credits?

9      A    Not for the express purpose.

10     Q    What about Dupli?

11     A    Yes, for the express purpose of selling

12  them REC's.

13     Q    Were there any other companies on this

14  list that you met with in person for selling

15  them REC's?

16              MR. WALLENDER:  Object to the

17         form.

18     A    I met in person with Mohawk Paper.  I

19  met in person with Lonnie Canave at Nike.  I

20  certainly have met in person with Pepsi and

21  Intel.  I met in person with RBS, I have met

22  in person with Rutherford, I have met after

23  the sale with Suffolk County.

24     Q    From Mohawk Paper who did you meet with

25  and who did you meet with at -- that is

1    compound.  Who did you meet with at Mohawk

2    Paper?

3        A    I met with George Millner and with

4    Michelle whose last name escapes me right now.

5        Q    Where did you meet with them?

6        A    In their corporate headquarters in

7    Cohoes.

8        Q    Is that in New York?

9        A    Yes.

10       Q    How do you spell that?

11       A    C-O-H-O-E-S.

12       Q    Did you travel there for the express

13   purpose of selling them Renewal Energy

14   Credits?

15                 MR. WALLENDER:  Object to the

16          form.

17       A    Yes.

18       Q    Do you know if Mohawk Paper was a

19   customer or if they had a relationship with

20   Sterling Planet prior to your interaction with

21   George Millner and Michelle?

22                 MR. WALLENDER:  Object to the

23          form.

24       A    Yes, Mohawk Paper was an existing

25   customer sold by Bob Maddox originally.

1     Q    Were you introduced to anyone at Mohawk

2    Paper by any Sterling Planet employee?

3                   MR. WALLENDER:   Objection to the

4         form.

5     A    I was asked by Mel to be the account

6    rep for Mohawk.  There was a third party

7    involved in providing energy to Mohawk.  I was

8    introduced to that third party by Mel.  My

9    relationship with George was my own.

10    Q    From Nike who did you meet with for

11   that transaction?

12    A    Nike.  I met with Lonnie Canave.  It

13   was not exclusively for a sale.  He was a

14   presenter in the program we were producing,

15   and on another occasion he was an attendee at

16   a conference I was at.  Or I should say

17   actually he was an attendee and I made the

18   time to go meet with him, because he was in

19   Saratoga.

20    Q    Were any other Sterling Planet

21   employees or agents involved in the

22   relationship with Nike?

23                   MR. WALLENDER:   Object to the

24         form.

25    A    I believe the history with Nike -- it's

1   one of the oldest customers -- was Mel was the

2   original sales rep.  You could say that about

3   every single, solitary sale.  There was no

4   other sales rep.  And then when we brought

5   additional business development personnel on

6   staff, those leads were then transferred to

7   sales reps.  And the initial transfer was to

8   Greg Chambers.  He was in the Western Region.

9   Nike is in Oregon.  When Greg Chambers was

10  fired, I was then given Nike.  I was given

11  Nike, not because I lived in California, but

12  because it was an strategic account.

13      Q   What types of activities did you engage

14  in in order to manage the account?

15      A   Some customers are easy, some customers

16  need more attention.  So it could be as simple

17  is an a month before the contract ends you

18  ding them, ask them if they want to renew.  It

19  could be as simple as you were lucky enough to

20  have them as a customer and they bought before

21  and they buy again and you get the sale.  Or

22  it could be a lot of work.

23      Q   Just depends on the customer?

24      A   Depends on the customer, depends on the

25  customer's needs, depends on how big they are,

111

1    the market, the drivers for the purchasing,

2    how important it is for the customer.  You

3    know, mine were very, very complex contracts.

4    These were not inordinately time-consuming

5    sales transactions.  They may have a long

6    sales pipeline, but they were pretty

7    straightforward transactions.

8        Q    What does a long sales pipeline mean?

9        A    It may take a long time for a customer

10   to decide to purchase depending on what their

11   starting point is.

12       Q    Okay.  Is that like a forecast?

13       A    No, it's less that than it is what

14   shade of green they are.  Are they very light

15   green , and they're new to the market?  Dupli

16   is an example of a customer who didn't know

17   what a REC was.  And then you had very

18   sophisticated customers like CISCO or UBS or

19   Mohawk Paper, clearly Intel and Pepsi, who had

20   much more rigorous hurdles and questions and

21   needs.

22       Q    Of this list under the column entitled

23   Opportunity Title, can you identify the

24   customers here that were new customers at

25   Sterling Planet when you made a transaction as

112

```
 1    opposed to having some type of existing
 2    relationship with the company?
 3                  MR. WALLENDER:  Object to the
 4          form.
 5       A    550 West Washington was new, Allsteel
 6    was new, ACORE was a new customer.  Eagle
 7    Envelope was a new customer.  Dupli was a new
 8    customer, Eastwood Litho was a new customer,
 9    Grossman was a new customer, Hamilton was an
10    existing customer, Hartwick was an existing
11    customer.  Intel was an existing customer from
12    what I'm claiming.  Larsen was new.  Mohawk
13    was new, although the contract was extended
14    and they made additional purchases.  Navalis
15    was new.  Nike was existing, although the
16    contract was extended and they made additional
17    purchases.  Parks and Rec, I think, was
18    existing -- I think that was existing.  OCC
19    was new.  Pepsi was an existing contract.
20    Quartier was an existing contract.  RBS was
21    new.  Rider was existing.  Rutherford was new.
22    Saratoga was new, Sheer Color was new, Star
23    Litho was new, Suffolk County was new, Beacon
24    Institute was new, Stop & Shop was new, United
25    Jewish Federation was new.
```

113

1    Q   Going back to Pepsi you said you

2  traveled to meet with them.  Who did you meet

3  with at Pepsi?

4    A   I met with, again, not for the express

5  purpose of selling a REC in that meeting.  I

6  traveled, I met for the first time Paul Auger

7  in September or October 2007.  I met with Rob

8  Schassel, who was out of their Texas facility,

9  in 2008.  I talked with marketing people and

10  other folks in relation to speaking and

11  branding and marketing and donations.  I spoke

12  with on the phone with Frito Lay

13  representatives, with Quaker representatives

14  about white tags.  I spoke with --

15    Q   These are all part of Pepsi -- sorry.

16    A   Yes.  Yes.  Again, they were an

17  existing customer.

18    Q   Do you know who the previous account

19  manager for them was?

20    A   Alan Zox.

21    Q   Was that an employee or an agent?

22    A   Z-O-X.  He was an agent.  Then Mel took

23  over that account.

24    Q   Intel, how were you introduced to

25  Intel; who was your contact at Intel?

1      A    Marty Sedler.

2      Q    How were you introduced to Marty?

3      A    The first time I was introduced to

4   Marty was in February of '08.  It was in

5   Phoenix.  Mel and I met with Marty and with

6   Dave Stangas, who is another Intel

7   representative.  It was just prior to the

8   announcement of the first sale, and it was a

9   conversation about marketing the sale,

10   communicating the sale, the challenges with

11   Green-e.  It was a discussion about energy

12   efficiency certificates.  I had e-mail

13   conversations with Marty, either directly or

14   via e-mail when he had questions about the

15   impact of the FTC involvement in green

16   marketing claims, whether he needed some

17   market data.  We spoke -- I spoke with Marty

18   on the phone in the summer of '08 when Mel

19   told him I'm taking Joe away from you and you

20   get Kelly.  And after that telephone call,

21   Marty would, you know, ding me every once in a

22   while with some information.  I saw him at

23   conferences -- again, an existing customer

24   that I was instructed by Mel to have an

25   ongoing relationship with and to take over

Kelly Bennett - September 30, 2010

115

1    management of that account.

2        Q    The first meeting you had with Marty,

3    what type of discussion did you have about

4    announcing the sale or how to market a sale?

5        A    Most of the work around what Intel was

6    doing internally has been decided by Intel.

7    The discussion was around a smallish Wall

8    Street Journal ad that was going to go out to

9    press, but that Marty also wanted to have

10   follow-up discussion about how they maximize

11   their press exposure.

12       Q    Do you know why Marty chose to have you

13   in that meeting?  Did you have expertise in

14   that area?

15       A    I had expertise in the area around

16   claims.  Again, within a knowledge of that,

17   I'm sending information to Jo-Ann Marcus about

18   the FTC, and the risk about bad claims around

19   green products in the market place.  Part of

20   the meeting and one of the reasons I was in

21   that meeting was also to have a discussion

22   around energy efficiency certificates.

23       Q    Did Sterling Planet ever sell energy

24   certificates to Intel to your knowledge?

25       A    Not to my knowledge, no.

116

1    Q    Those are white tags, correct?

2    A    Yes.

3    Q    Is that a term that was trademarked or

4    created by Sterling planet?

5    A    It is a trademark, a registered

6    trademark, the term "white tag".

7    Q    If the sale to Intel had already been

8    made prior to meeting, why are you contending

9    you are entitled to a commission to that sale?

10              MR. WALLENDER:  Objection, form.

11   A    I don't claim commission for the 2008

12   sale.  I claim commission for the 2009

13   reporting year.

14   Q    Who else was involved in the

15   relationship with Intel?

16   A    Everybody in the company.  I think at

17   one point it was a market-making sale.  It was

18   the most important customer in the market.

19   Q    Was Mel heavily involved in the Intel

20   deal?

21              MR. WALLENDER:  Object to the

22        form.

23   A    In the initial sale that was announced

24   in February, March of 2008, yes.

25   Q    Was Joe Barclay involved?

117

1      A    Yes.

2      Q    Was Sonny Murphy involved?

3      A    I imagine from an strategic or pricing

4  perspective, any deal that large, any customer

5  that important, Sonny would have participated

6  in internal discussions.

7      Q    The 2009 amount which you are claiming

8  you are entitled to commissions on, can you

9  describe how that came about or how it's

10  different from the 2008 sale?

11               MR. WALLENDER:  Object to the

12          form.

13      A    Intel, while a customer -- and whenever

14  you have a customer, you have to keep a

15  customer -- so while there was a sale in 2008,

16  there is not a guarantee of a sale in 2009.

17  So part of why Mel directed supply, Joe

18  Barclay and Ron Mitchell having been involved

19  in the close of the sale and a continued

20  contact to Marty, was that he wanted a

21  business development focus.  He wanted a

22  broader focus.  He wanted me, in particular,

23  to manage that relationship, to be involved in

24  that relationship.  You got to keep your

25  customers.  That was my role.

**Kelly Bennett - September 30, 2010**

1    Q   Did Mel ever tell you that you would

2    receive a commission for your assistance in

3    the Intel account?

4    A   No.

5    Q   RBS, who did you meet with at RBS?

6    A   Our original contact was John Queenin.

7    John was a classmate of mine at RPI.  The

8    original contact was with UBS.  John was the

9    sustainability manager at UBS.  He left UBS,

10   he went to RBS, and he took on similar

11   responsibilities at RBS.  So we had initial

12   conversations in his role at UBS and when he

13   moved to RBS, he contacted me directly.  He

14   said, "I changed, we're going to buy.  Heads

15   up, get ready.  Here's what I think we are

16   looking at."

17       Mel and I met with John in Connecticut,

18   oh gosh, in the spring maybe of 2008 -- I

19   think just when John had started there --

20   discussed high level kinds of issues.  We are

21   a going to be doing this -- not details of an

22   exact transaction, but a heads up that they

23   were doing it.  From that point on John

24   just -- John and I communicated about it's

25   coming and coming, and then once the RFP was

1    put out in the street -- I think her name was

2    Sandra Corin was the, was the proposal RFP

3    point of contact for RBS during that process.

4    She was my primarily contact then.

5        Q    Was anyone else involved in the RBS

6    sale besides yourself and Mel Jones?

7                    MR. WALLENDER:  Objection to the

8            form.

9        A    Bob Maddox assisted me at one point

10   because RBS was interested in the Connecticut

11   Clean Options Program.  Bob managed that

12   program.  I needed to enlist the assistance of

13   Joe Barclay in the supply team because they,

14   RBS, prior to deciding to go with Connecticut

15   Clean Options wanted to know specific supply.

16   So I needed to enlist my supply team in order

17   to provide those details.  I was generally the

18   direct point of contact, the conduit to that

19   claim.

20       Q    Who did you meet with at Rutherford?

21       A    The original request came from Steve

22   Meyers, who I have known for a long time.  He

23   was a board member at EBA.

24       Q    Was that a request from an RFP or was

25   that a direct communication?

1          MR. WALLENDER:  Objection to the

2      form.

3    A   It was a direct communication.

4    Q   Was anyone else involved with

5  Rutherford?

6          MR. WALLENDER:  Object to the

7      form.

8    A   I was involved with a proposal, and

9  supply staff would have been involved to

10  complete the sale.

11    Q   Who did you meet with at Suffolk

12  County?

13    A   Suffolk County was another utility

14  program, so it was -- there were some internal

15  staffers at the department.  I, I --honestly

16  at this point, I don't even remember what the

17  guy's name was.  They made the transaction,

18  they made the decision to buy through the LIPA

19  program.  SO most of the discussion was how do

20  you deliver on the LIPA program, how do you

21  get the paperwork right and sign off through

22  the LIPA program.  I got to shake hands when I

23  met in person with the staffers, including the

24  chairman of LIPA, Richie Kessel and the County

25  Executive, Steve Levy, the day we made the

1    announcement.

2        Q    What is LIPA?

3        A    Long Island Power Authority.

4        Q    You said this was a utility program.

5    Can you describe how they would purchase

6    REC's?

7            Sorry, I will rephrase that.  Was

8    Suffolk County purchasing REC's to provide to

9    its utility customers or for itself?

10       A    Suffolk County was purchasing for

11   itself through an existing green power program

12   operated by the Long Island Power Authority.

13   We were awarded part of their electricity

14   usage to green up and our competitor,

15   Community Energy, who was also a retailer in

16   the LIPA program, was awarded a larger

17   percentage of the sale.  We both, Community

18   Energy and Sterling Planet, were at the press

19   release, the press event to announce the

20   purchase.

21       Q    The amount that is listed on the

22   attachment to your letter we have been

23   reviewing, under the total contract value

24   column is $500,000 for Suffolk County.  Where

25   did you obtain the figure?

122

1      A    That figure would have been attained

2   through one of two places, either -- and in

3   every case, an actual contract or an import

4   from an Excel spreadsheet.  So this would have

5   come from a contract, from paperwork in that

6   contract file, that I went through every

7   contract, every sales contract we made when we

8   started Quickbase.  That number may be a life

9   long number, it may be -- it's an ongoing

10  purchase.  They purchase monthly.  It's part

11  of their regular electricity useage.  It's a

12  different kind of contract.

13     Q    If a customer entered into a contract

14  but never paid Sterling Planet, do you think

15  you were still entitled to a commission?

16     A    The employment contract doesn't specify

17  Sterling Planet being in receipt of funds, so

18  I don't, I don't know what the answer to that

19  question would be.  If the answer to that

20  question is no, that I wouldn't be eligible

21  for commission because they hadn't received

22  payment from a vendor, then the contrary would

23  be true, that there would be no supply cost if

24  they didn't pay for supplies.  So,

25  practically, I imagine that was the spirit or

123

1    intent of commissions.  You get paid by your

2    customer before the sales rep gets paid.

3    That's how I have always done it before, but

4    there's no detailed description of what it

5    means, whether it's a contract or whether it's

6    a payment from the customer.

7        Q    In the lawsuit in your claim against

8    Sterling Planet for customers that either

9    cancelled their contracts or did not pay,

10   would you still claim to be entitled to a

11   commission for those transactions?

12                   MR. WALLENDER:  Object to the

13           form.

14       A    I think it would depend on the

15   circumstances of that situation.  But, in

16   general, you know, again the spirit would be,

17   you got paid, I got paid.  That's what we

18   required for our agents when we paid them

19   commission, that we had received payments from

20   our customers.  That seems fair, but I don't

21   know what the policy is.

22       Q    I'm not asking you about the policy.

23   I'm asking whether or not you claim a

24   commission for any transaction that did not,

25   that was never finalized or payment was never

1  made.

2  　　　　　　MR. WALLENDER:  Objection to the

3  　　　form.

4  　A　I'm unaware of any such circumstance,

5  so I can't say.  I'm not knowingly claiming

6  commissions for sales that Sterling Planet did

7  not receive payment for.

8  　Q　If in Discovery it's revealed Sterling

9  Planet did not receive payment for any of the

10  transactions, would you claim entitlement to

11  the commission nevertheless?

12  　　　　　　MR. WALLENDER:  Objection to the

13  　　　form.

14  　A　I would have to seek advice of my

15  counsel.

16  　Q　Okay, I think that you can answer "I

17  didn't know" to that question.

18  　　　　　　MR. WALLENDER:  Objection to the

19  　　　form.  She has answered the question.

20  　　　　　　MR. COSTYN:  I think I'm

21  　　　entitled to a yes or no.  I'm asking

22  　　　what she is seeking in the lawsuit,

23  　　　whether or not she will seek or is

24  　　　entitled to commissions.

25  　　　　　　MR. WALLENDER:  The question has

125

1           been answered and any conversation had

2           with counsel is privileged.

3                MR. COSTYN:  All right.  For the

4           record, I disagree that that was an

5           appropriate answer.

6    BY MR. COSTYN:

7       Q    Going on to Intel, the amount that you

8    listed for the 2009 Intel bill under the Total

9    Contract column was $5,154,760.  I know you

10   have already told me where you obtained the

11   amount, but, specifically for the Intel deal,

12   how did you arrive at that figure?  Where did

13   you obtain the information to put on this

14   chart that you created to support your

15   contention that that sale was for $5,154,760?

16                MR. WALLENDER:  Object to the

17           form.

18      A    That figure was found in Quickbase.

19      Q    Do you know who inputted that figure

20   into Quickbase?

21      A    I did.

22      Q    Where did you obtain that figure in

23   order to input it into Quickbase?

24      A    That figure was obtained from the

25   Sterling Planet invoices sent to Intel that

Kelly Bennett - September 30, 2010

126

1  was in the customer file.

2     Q   Do you have any knowledge as to whether

3  or not Intel ever paid Sterling Planet

4  $5,154,760?

5     A   I do not know whether payment had been

6  received.  It may have been received before I

7  left or may have been received after I left.

8  They were invoiced before I left.

9     Q   Is that amount $5,154,760 the amount

10  that is specified in the contract with Intel?

11            MR. WALLENDER:  Object to the

12        form.

13     A   It is not.

14     Q   We covered the companies that you say

15  you visited in person, which I believe is

16  ACORE, Clean Currents, Dupli, Mohawk, Nike,

17  Pepsi, Intel, RBS, Rutherford and Suffolk

18  County.  To your recollection is that an

19  accurate list of the companies you visited in

20  person or where you met with a representative

21  of in person?

22            MR. WALLENDER:  Objection to the

23        form.

24     A   I -- it's -- I have met many of the

25  reps of the companies listed on this sheet.  I

127

1   had a relationship with them.  If the

2   questions were those the companies that I

3   visited expressly, explicitly to close a sale,

4   or to forward a sale, that seems to the best

5   of my recollection to be accurate.  For the

6   record, it doesn't mean I never met with any

7   of the other customers in one form or another.

8      Q   Understood.  I have a few more to cover

9   here.  Eagle Envelope Company, can you

10  describe that transaction?

11     A   The Eagle sales opportunity came from

12  two places, really.  Mohawk Paper, George

13  Millner, and it came from Energy Next, which

14  was the group working closely with Mohawk

15  Paper.  There was an aggregator for us.

16     Q   What is an aggregator?

17     A   Again, an aggregator is a business

18  entity in the market that has an ancillary

19  complementary product or service.  They want

20  to have the option of selling a REC.  They

21  come to us to sell REC's for customers.  Eagle

22  had a relationship with George Millner.  You

23  will notice that there are a number of

24  different paper companies.  Mohawk Paper is a

25  big advocate for its supply chain to be green.

128

1    We had -- I had a very good friend in George

2    Millner.

3        Q    Eastwood Litho Incorporated, can you

4    describe that transaction for me?

5        A    Eastwood Litho.  I may -- with the

6    paper companies, I may confuse whether they

7    came from Dupli or whether they came from

8    Mohawk.  Frankly, if they came from Dupli they

9    originated from Mohawk.

10       Q    When you say "came from," you mean as a

11   referral?

12       A    Yes.  So Dupli -- if I'm not mistaken,

13   I believe Eastwood came from Dupli.  Andrew

14   contacted me directly, said, I'm interested,

15   what do I do?

16       Q    Were any other Sterling Planet

17   employees involved in that sale?

18       A    Yes, Sandi would have prepared the

19   proposal and Val would have prepared the

20   contract.

21       Q    What is the E-4 2006 Conference?

22       A    E-4 was an annual conference that was

23   presented by the Environmental Business

24   Association, and I sold to them REC's in lieu

25   of some sponsorships.  So their sponsorship

129

```
 1   was valued at $2500.  We paid $2500.  It was a
 2   swap payment.  I can't remember the details of
 3   the contract and I don't remember seeing the
 4   contract itself in the discovery documents,
 5   but it was a sale, was partially a sale and
 6   was partially for sponsorship.  It was a
 7   strange kind of -- but at the end of the day,
 8   you know, it was a $2500 value.
 9        Q    So if the REC's hadn't been provided,
10   then the company would have had to pay $2500
11   to attend the conference; is that correct?
12        A    I may have been more than that.  Again,
13   the paperwork was not in there.
14        Q    Grossman Marketing Group, can you tell
15   me about that transaction?
16        A    Grossman was another lead that came to
17   me via George Millner at Mohawk Paper, and Ben
18   Grossman contacted me and he purchased REC's.
19        Q    Was anybody else in Sterling Planet
20   involved in that transaction?
21        A    I imagine it was Sandi in Proposals and
22   Val in Contracts.
23        Q    We have two rows we have been
24   discussing with Hamilton College; can you
25   describe those transactions?
```

130

1    A    Yes, that is an example of a customer

2   that was a preexisting customer to me.  I was

3   assigned Hamilton College.  In essence,

4   everything in New York, New Jersey, the

5   northeast, plus certain strategic accounts

6   with white tags or carbon interest were given

7   to me.  And Hamilton College was one given to

8   me.  That is one that the sales team gets

9   lucky, a sales rep gets lucky, once in awhile

10   gets lucky, gets a customer that keeps on

11   buying, and you don't have to do too much with

12   the customer.

13    Q    Do you know who the person was with

14   Hamilton?

15    A    I don't know.  It may have been a house

16   account, could have been Joe Barclay or could

17   have been Mel Jones in the first sale.

18    Q    What about Hartwick College, Pine Lake

19   Environmental Campus; can you describe that?

20    A    Hartwick was another that I believe had

21   been an existing customer, or we may have had

22   a proposal to them.  They were a target, a

23   prospect, if they weren't already a customer.

24   They were heavily involved in AASHE, in

25   essence, sustainability initiatives for higher

 1    education.  I had seen an article and did

 2    outreach to the sustainability director at the

 3    Pine Lake campus.  It was a year later they

 4    actually bought.  But the initial contact was

 5    me saying, you are doing great work, are you

 6    interested in buying some REC's?  And then

 7    they did come back eventually and buy some

 8    REC's, and it was a different person that came

 9    directly to Sterling Planet.

10        Q   Do you know who targeted them or dealt

11    with them prior to you being assigned to

12    Hartwick?

13        A   I don't.

14        Q   How about Larsen Engineers?  Can you

15    describe that transaction?

16        A   Larsen was a New York State company, a

17    small sale that came to us via an agent

18    relationship, both Larsen and Navalis.  I

19    think that might have been the only --

20        Q   Do you know what agent that was?

21        A   Bill Bastuk, B-A-S-T-U-K.

22        Q   B-A-S-T-U-K?

23            You said he was involved with Larsen

24    and Navalis?

25        A   Yes.

132

1     Q     How about N-Y-S  O-P-R-H-P, what does

2   that stand for?

3     A     New York State Office of Parks,

4   Recreation and Historic Preservation.

5     Q     Can you describe how that transaction

6   came about?

7     A     That was Executive Order 111

8   transaction.  I have a professional

9   relationship with Mike Wise, W-I-S-E, who is

10  there, and he contacted me to buy some REC's

11  to meet compliance for Executive Order 111.

12          They may have been a preexisting

13  customer.  I'm not sure about that.

14    Q     How about the -- I will probably

15  pronounce this wrong -- Onondaga Community

16  College?

17    A     Onondaga Community College is a similar

18  example to the other colleges in New York

19  State who had been customers who I was

20  assigned to because they were in New York

21  State.

22    Q     Do you know who the agent/manager was

23  for Onondaga prior to you?

24    A     I do not.

25    Q     We already talked about Pepsi, didn't

1   we.  Quartier Printing, tell me about that.

2       A    Quartier is another New York State

3   company that was in my region, in my territory

4   and was my customer.

5       Q    Was that a preexisting customers of

6   Sterling Planet?

7       A    Not that I'm aware of, no.

8       Q    Was it a referral from one of the other

9   paper companies?

10      A    That one was not that I'm, that I'm

11  directly aware of.

12      Q    Was any other employee of Sterling

13  Planet involved in the sale to Quartier?

14                  MR. WALLENDER:  Object to the

15          form.

16      A    The proposal team and the contracts

17  team, which is part of the process of making a

18  sale.

19      Q    Tell me about your relationship with

20  Rider University.

21      A    Rider was made aware -- I was made

22  aware of Rider by John Cusack, who was my

23  board president at Environmental Business

24  Associates, who was involved in a consortium

25  of colleges and universities in New Jersey and

134

1    he passed along a reference, a name, and I

2    reached out to her.  And, again, this is

3    similar to the Hartwick example where you may

4    have a contact, a relationship with one member

5    of an institution, and the sale and the final

6    request comes from purchasing or some other

7    part of the institution.  And, again, it was

8    my region.

9        Q   Do you know if they were a preexisting

10   customer of Sterling Planet?

11       A   I don't think so, but I am not certain

12   about that.

13       Q   Can you describe the transaction with

14   the Saratoga County Chamber of Commerce?

15       A   I had a meeting with Gordon Boyd, who

16   was our Energy Next partner, and I had another

17   meeting with another company, Aztech

18   Technologies, who both recommended that I

19   contact the Chamber, that they would be

20   interested in buying REC's.

21           I talked to the Chamber fairly

22   extensively about creating a program to drive

23   down to their members, but it just didn't go

24   anywhere.  But they at least purchased a

25   modest amount.  They don't have a lot of

135

1   useage

2        Q    Can you describe the transaction with

3   Sheer Color Printing?

4        A    Both Sheer and Star Litho were part of

5   the Grossman Marketing Group.  When I spoke to

6   Ben at Grossman, I said, can you be George

7   Millner in your group?  Do you have additional

8   partners, venders you can bring and create a

9   little green purchasing program of your own?

10  So he did.  He brought in Sheer and Star and

11  talked to them.  They purchased at the same

12  time Grossman did.

13       Q    Can you describe the transaction with

14  the Beacon Institute?

15       A    Beacon was a small sale that came -- oh

16  gosh, did that come from George?  I don't

17  recall whether that came from Gordon at Energy

18  Next or whether that was somebody I met at a

19  conference to be quite frank.  It was a very

20  straightforward transaction.  They called the

21  office in Atlanta.  It was in New York; I got

22  it.

23       Q    So that one was handed to you by Mel

24  because of your location?

25                 MR. WALLENDER:  Objection to the

1           form.

2      A    It was not handed to me by Mel.  It was

3   assigned to me in Quickbase, because I was New

4   York and I had New York customers.

5      Q    Did the original call from Beacon come

6   to Atlanta?

7      A    I don't know whether the original call

8   came to Atlanta.  Whether it came to me and I

9   called Atlanta, I don't remember a lot of the

10  detail of that transaction, frankly.

11     Q    All right.  Can you describe the Stop &

12  Shop - Kennebunk store transaction?

13     A    That inquiry came to me from Paul

14  Grenier asking if I was the appropriate person

15  to help him with REC's.  I said yes, and he

16  purchased for the opening of the new store in

17  Kennebunk.

18     Q    Do you know how Paul obtained your

19  contact information?

20     A    I don't know who referred Paul to me.

21  I was in the market, could have come from any

22  resource.

23     Q    Finally we have the United Jewish

24  Federation of Northeast New York.  Can you

25  describe that transaction?

137

1     A    That was an Energy Next, Gordon Boyd

2   referral along the lines of the Chamber's.

3   "We got a couple of people I think you should

4   talk to" -- they bought.

5                  MR. COSTYN:  Do you have I have

6          interest in breaking for lunch?

7                  MR. WALLENDER:  Sure.

8                  (Luncheon recess.  The

9          deposition continued at 1:41 p.m.)

10  BY MR. COSTYN:

11    Q    Ms. Bennett, I will hand you what has

12  been previously marked as Plaintiff's exhibit

13  number 4.  Do you recognize these documents,

14  Ms. Bennett?

15    A    Yes.

16    Q    Can you describe what they are?

17    A    These are the Exhibit A documents to my

18  Employment Contract, which were the initial

19  leads that were given to me by Mel and a Word

20  document form as an End-User Referral Form.

21    Q    Is this the entire set of End-User

22  Referral Forms given to you by Sterling

23  Planet?

24    A    This is 57 leads.  I do have the

25  original Excel spreadsheet in front of me.  I

138

1    didn't remember -- I wouldn't be able to

2    remember all 57, but it looks to be from what

3    I can tell fairly complete.

4        Q    The center area of each one of these

5    forms where it says the column entitled

6    Product Type that's next to the column

7    Commission Percentage, what does that mean and

8    why are those two columns aligned?

9                    MR. WALLENDER:  Object to form.

10       A    The Product Type indicates the product

11   that we would offer, that Sterling Planet

12   would offer, and the commission is the

13   commission percentage per each product type.

14   And if checked, then that prospect would be

15   eligible, I would be eligible as the sales rep

16   for that prospect to earn commissions if that

17   product type was sold to that customer.

18       Q    The date of your signature is April

19   8th, 2006.  Is it your recollection that that

20   is an accurate date that you signed this

21   agreement for each one of these?

22       A    That seems to correspond with the time

23   period in which I was hired and got the first

24   batch of leads.

25       Q    Is that your signature that appears on

Kelly Bennett - September 30, 2010

139

1    each one of these documents?

2       A    Yes.

3       Q    I will hand you what has been

4    previously marked as Plaintiff's Exhibit

5    number 5.  If you will turn to the second page

6    down near the bottom is an e-mail from Lindsay

7    Roach, and you were included in the recipient

8    list.  Do you recall receiving this e-mail and

9    the attachment that follows?

10                   MR. WALLENDER:  Take a moment to

11            review the exhibit.

12                   MR. COSTYN:  Yes, take sometime

13            to review it.

14       A    What was your specific question?  Could

15    you repeat it?

16       Q    My question is do you recall receiving

17    this e-mail and the attachment that follows?

18                   MR. WALLENDER:  Just for

19            clarification --

20                   MR. COSTYN:  Sure.

21                   MR. WALLENDER:  Is this a

22            document that is produced in the

23            discovery?  I don't see any

24            indication.

25                   MR. COSTYN:  Yes, this was

1            produced in discovery.  The copy we

2            have here does not have the Bate's

3            stamp on it.

4                    MR. WALLENDER:  Do you know what

5            the Bates stamp is?

6                    MR. COSTYN:  I can get that for

7            you and send it to you in an e-mail if

8            that's okay.  I will make a note of

9            that.

10      A    I don't remember receiving the e-mail

11   from Lindsay.  I remember the conversation

12   about End-User Referral Forms and the

13   discussion at the business development

14   meeting, but without this in front of me,

15   without the documents produced, I wouldn't

16   have remembered that exact e-mail from

17   Lindsay.

18      Q    Do you have any reason to believe that

19   you did not receive this e-mail?

20                   MR. WALLENDER:  Object to the

21            form.  I would note for the record you

22            haven't produced this as a document

23            that has been provided in discovery by

24            identifying it in that way, so that by

25            itself is a concern that I have.

Kelly Bennett - September 30, 2010

141

1          MR. COSTYN:  This document has

2      been produced in discovery.  The

3      specific copy that has been used in an

4      exhibit in today's deposition does not

5      contain the Bates stamp number

6      indicating where it was produced, but

7      I will provide it to counsel after the

8      deposition.

9    Q   Do you recall reviewing or ever seeing

10 the memorandum that was attached to the e-mail

11 on the last page?

12    A   I recall seeing this as a part of -- I

13 don't.  I don't.  No, I don't recall seeing

14 this, this attachment.

15    Q   Who is Lindsay Roach?

16    A   Lindsay had been hired according to

17 this document as the Comptroller.  I knew him

18 to be assisting Sonny with some internal

19 process, account payable documents.  I think I

20 met him once.  I don't think he was with the

21 company long.

22    Q   Firsthand with this exhibit you

23 mentioned there was some type of board meeting

24 where the end-user forms were discussed.  Can

25 you give me information about that meeting?

142

```
 1                    MR. WALLENDER:  Objection to the
 2          form.
 3      A    I didn't say board meeting.  It was a
 4  business development call.  I remember having
 5  the discussions about process in general, and
 6  End-User Referral Forms in our weekly business
 7  development calls, in our BD calls.
 8      Q    Who all participated in these calls?
 9                    MR. WALLENDER:  Object to the
10          form.
11      A    It was our sales team, so those that
12  are listed on this e-mail would routinely
13  participate.  There may be some participation
14  with other administrative staff or senior
15  management personnel, as appropriate.  Mel, of
16  course.  Greg led those calls after he was
17  hired.
18      Q    What type of discussions were had
19  regarding use End-User Referral Forms during
20  those meetings?
21                    MR. WALLENDER:  Object to the
22          form.
23                    MR. COSTYN:  I will rephrase
24          that.
25      Q    Do you recall the nature of the
```

143

1   conversations about End-User Referral Forms at

2   any of the meetings that you described?

3       A    The nature of the discussions around

4   End-User Referral Forms was hostile by the

5   sales team.

6       Q    Can you explain what you mean by

7   hostile?

8       A    We were inundated with paper, and we

9   had to do busy work to complete the forms.

10  They were handed to us in this form as you

11  have given me in Exhibit 4, and we were

12  expected to hand write each of those to

13  complete the form.  We were expected to return

14  it with a handwritten, with the contact

15  information handwritten, completed.  And there

16  was negative feedback to that.

17          I had a small number of leads in the

18  beginning.  There were others that had two or

19  three or four times maybe the number of leads.

20  Greg Chambers, in particular, was upset by the

21  process, felt it was time-consuming and

22  cumbersome.  In this meeting or one

23  thereabouts, the decision was made that we did

24  not have to hand fill out these forms, we

25  could electronically submit them in the Excel

144

1   spreadsheets provided to us by Mel.

2      Q   While you were employed by Sterling

3   Planet, did you ever make a request to Mel

4   Jones or to anyone else in the company to be

5   paid commissions?

6      A   I had multiple conversations about

7   commissions.  I had an assumption that I was

8   owed and would be paid commissions based on my

9   sales.  I had conversations with Mel and

10  others, including Sonny and Robert Purser and

11  Mel, in particular, as I stated before, that I

12  was going to be rich if I kept it up.  I had

13  an understanding of the process of how

14  commissions were calculated and when a sales

15  rep would be paid commissions.  And that

16  involved two pieces of data.  One was an

17  executed sales contract, and one was an

18  executed supply contract.  It states it in my

19  employment contract.  If there's not a known

20  supply cost, I can't calculate my net income.

21  And the way the process works for supplies,

22  that those known costs for supplies could come

23  a year, 18 months, 15 months after a sale.  So

24  my first large sale is in June 2007.  I might

25  not have been paid commissions on that until

145

1   May 2008, depending on when we received

2   payment and when we bought supply to calculate

3   the income.

4        Q   Did you ever make a specific request to

5   Mel Jones or anyone else at Sterling Planet to

6   be paid commissions?

7        A   I had multiple conversations around

8   commissions.  Mel said to me I would be taken

9   care of.  I trusted Mel.

10       Q   Did you ever make a specific request to

11  be paid commissions to Mel Jones or anyone

12  else?

13       A   I had a contract, I expected to be

14  paid, and I assumed I would be paid on those

15  sales contracts.

16       Q   Did you ever make a specific request to

17  Mel or anyone else at Sterling Planet to be

18  paid commissions?

19       A   An exact amount paid commissions, I

20  don't recall a conversation, but I had plenty

21  of conversations regarding commissions.

22       Q   Did you ever draft an e-mail or any

23  other correspondence requesting to be paid

24  commissions while employed at Sterling Planet?

25       A   There was not, to my recollection, an

Kelly Bennett - September 30, 2010

146

1    e-mail demanding payment of commissions.

2        Q    Was there any e-mail requesting payment

3    of commissions?

4        A    I don't, I don't think I sent an e-mail

5    about my commissions.

6        Q    Is there any reason why you did not

7    make a request, written or oral, to be paid

8    commissions while working for Sterling Planet?

9                    MR. WALLENDER:   Object to the

10           form.

11       A    Did you ask me the reason that I

12   didn't?

13       Q    Yes.

14       A    There were -- the primary reason was

15   the process I just described.  There was a lag

16   in a sale versus purchasing supply and knowing

17   net profit for that supply.

18            I also had a number of negative

19   interactions with the CFO around pricing.  And

20   I was told, for example, that one of my

21   contracts was -- we are going to lose money on

22   the contract.  I wasn't on the supply side,

23   didn't know about pricing.  I didn't know if

24   he was right or wrong, but I certainly wasn't

25   going to make a demand for payment of

1    something that my CFO was telling me was under

2    water.

3        Q    Who was the CFO you are referring to?

4        A    Robert Purser.

5        Q    Do you remember the specific

6    transaction that you just described that was

7    under water?

8        A    It was the Mohawk Paper contract.

9        Q    By "under water" do you mean Mr. Purser

10   indicated the supply costs exceeded the sales

11   price of the contract?

12       A    That's correct.  And his concern was

13   driven by the new sales price in the contract

14   that I renegotiated, which was a decrease in

15   approximately two dollars a REC.  He was very

16   concerned about supply costs.  My response to

17   him was you will be able to make it up in

18   volume, and I will be the only one hurt

19   because I wouldn't be able to get commission

20   on it, I guess, then.

21       Q    When you said make it up on volume?

22   What does that mean?

23       A    It means that that sale was a hundred

24   thousand REC's.  You were going to sell a

25   million REC's that year or five million REC's.

Kelly Bennett - September 30, 2010

148

1    If you lost on 100,000, you had a chance to

2    make it up on the other 900,000.  And shortly

3    after that, we changed our prices and

4    increased our prices.  You will see that

5    reflected in my spreadsheet.

6        Q    During the time you were employed by

7    Sterling planet, were any of the agents who

8    did sales for the company paid any

9    commissions?

10       A    I knew that Allan Zox had been paid

11   commissions, I knew that Charles Segerman had

12   been paid commissions, I knew that Bill Bastuk

13   and Gary Skulnik and John Mc Keller were

14   asking for commissions, and they were

15   ultimately paid some commission.

16       Q    Did you ever take any action to insure

17   that an agent was paid their commission?

18       A    Yes.

19       Q    What action was that?

20       A    For Charles Segerman I went through

21   every Quickbase record, went back to the sales

22   contracts, utilized Mel's Excel spreadsheet,

23   did not have an End-User Referral Form.  There

24   was no End-User Referral Forms on any of the

25   sales that Charles Segerman executed.  And I

149

1　checked with accounts payable to see whether

2　we had received payment from those customers

3　on those sales and relied on Mel to provide to

4　me that supply cost to calculate Charles's net

5　profit and commission.  And I did the same,

6　except that I didn't have the benefit of the

7　original Excel spreadsheet from Mel for -- and

8　it wasn't as complex -- for Gary Skulnik and

9　Bill Bastuk, and John Mc Gregor -- I'm sorry

10　Mc Keller.  They had just a couple of sales.

11　But I, I went to Quickbase, I made sure the

12　record was in Quickbase, I made sure it was

13　closed.  I printed those records, and attached

14　it with an Excel spreadsheet modeled after the

15　one Mel had created for Charles for each of

16　the three of them that I submitted to Accounts

17　Payable with a check request form so they

18　could be get paid.

19　　Q　Why did you did take those actions to

20　help them get paid?

21　　A　They had followed the required process

22　for agents, which was the Quickbase account

23　and records and payment by the customer.  And

24　then we had to figure out how to deal with

25　supply costs.  That was not a known cost

Kelly Bennett - September 30, 2010

150

1  sometimes, and that was a problem.

2      Q    How was supply cost not a known cost?

3      A    As I described the supply for the sales

4  for Charles's, as well, may not have been

5  purchased, or if it had, it might not have

6  been known.  I couldn't match up that electron

7  from that product -- um, project with that

8  particular sale.  So Rob Henry, in this

9  example, had, in essence, just created an

10  place holder value, an average that he felt

11  comfortable with using.

12              MR. COSTYN:  All right.  I will

13          show you what has been previously

14          marked as Plaintiff's Deposition

15          Exhibit 6.  For the record, this is a

16          document that was provided in

17          DISCOVERY.  Like the last exhibit, it

18          does not have a Bates stamp number on

19          this copy, however, after the

20          deposition, I will provide that to

21          counsel.

22  BY MR. COSTYN:

23      Q    Ms. Bennett, do you recognize this

24  document?

25      A    I do recall this discussion about Bill

Kelly Bennett - September 30, 2010

151

1    and Gary with Val.  It reflects in writing the

2    process that I just described.  That is page

3    one and two.  I don't know who Kelly Keswick

4    is at the top of this page.  I don't recognize

5    that name from any of the documents that you

6    have provided so I, I may have -- so that's an

7    issue.  And the attachment, the Agent

8    Commission appears to be that Excel

9    spreadsheet that I just described that Mel had

10   created that I used to calculate commissions

11   for Bill with Larsen and Navalis, your page

12   four, which I don't ever recall seeing in your

13   discovery documents.  But it -- I was asked at

14   one point to create a list of known agents.

15   This may be that list.  I don't remember you

16   providing this to us, however.

17       Q   Were there any other written

18   communications that you engaged in with the

19   company to insure an agent or anyone else was

20   paid commissions as owed to them?

21                MR. WALLENDER:  Objection to the

22       form.

23       A   There were, there were similar

24   discussions with a single sale, I believe,

25   that John Mc Keller closed.  Then there are

152

1   multiple e-mails between Mel and me and Gary

2   Skulnik and Charles Segerman regarding his

3   commissions.

4       Q    You say that was Segerman and Skulnik?

5       A    Yes.

6       Q    While you were a Vice President in

7   Sterling Planet, did any agents report

8   directly to you?

9       A    I managed the agent's program.

10      Q    Can you describe what you did in that

11  role?

12      A    I sent out a contract to them, I made

13  sure the contract came back in, I trained

14  them.  If they needed training on the basics

15  of the industry, I trained them on the

16  specific products and services that we

17  offered.  I trained them on Quickbase.  I

18  explained to them the importance of Quickbase.

19  I assisted them with customers.  I went on,

20  for example, the sales calls with Bill Bastuk

21  with Larsen and Navalis, met with them.  I was

22  troubleshooting for them, took their

23  complaints and ultimately congratulated them

24  when they closed a sale and facilitated their

25  commission payment.

153

1    Q    During the time you were employed, did

2  you ever take any action to calculate or

3  estimate commission that you thought was owed

4  to you?

5                 MR. WALLENDER:  Object to the

6         form.

7    A    I had a ballpark figure in my head not

8  knowing what a supply cost could be, not

9  knowing what the net profit might be and what

10  I thought I earned from a commission

11  perspective.

12    Q    Did you have anything in writing to

13  calculate your commissions and what was due to

14  you?

15    A    I had Quickbase.  That is all in my

16  view that I needed, and I had executed sales

17  contracts.

18    Q    In Quickbase the assistance you

19  referred to, does it have an input field or --

20  I'm trying to think how to describe this --

21  any type of field that has the word

22  "commission" in it where it contains

23  commission percentages for a particular sale?

24    A    It does not have a commission field nor

25  does it have a supply price field.

154

1  Q Did you ever take any action to

2 determine what the specifics of supply costs

3 were for any transactions for which you are

4 currently claiming to be entitled to

5 commissions?

6  A I did not take action to get the final

7 supply costs.  Again, I knew from senior

8 management what the general overall profit

9 margin was, so I could in my head estimate

10 and, when appropriate, have the real number to

11 put in there.  That real number was not

12 something I controlled, that I had access to,

13 not on the company drive, not in my job

14 duties.  I had no access to supply contracts.

15 I had no supply contracts in my possession.

16  Q Did you ever request supply contract

17 pricing information in order to determine the

18 amount of commissions due to any of the agents

19 that you is supervised?

20  A I did not go to a single supply

21 contract.  I did not have access to supply

22 contracts.  I had access to the manager of

23 supply who had access to that information.

24 And when I needed that number in your exhibit

25 6, page three, and the agent commission

1    spreadsheet, the unit cost of REC's in that

2    column was provided to me by Rob Henry based

3    on a calculations known only -- well, I don't

4    know only to him, but to him and not to me.

5        Q    So whenever you needed to obtain

6    contract information, you would contact Rob

7    Henry?

8        A    Or whomever.  At this point it was Rob

9    Henry.  Prior to this point, it could have

10   been Ron Mitchell, could have been Joe

11   Barclay.  It could always be determined,

12   theoretically, so long as you had the supply

13   purchase, so long as somebody was willing to

14   give you that number.

15       Q    When you requested supply contract

16   information from Rob Henry or Ron Mitchell or

17   Joe Barclay, in what format would it have been

18   provided to you or was it provided to you?

19                   MR. WALLENDER:  Object to the

20        form.

21       A    I would have generally phoned them and

22   asked them for that information.  I might have

23   sent an e-mail to Ron or to Joe or to Rob, or

24   to Mel, perhaps.  That information would have

25   been provided to me, either verbally or in

Kelly Bennett - September 30, 2010

156

1    writing, or they could have filled out the

2    spreadsheet.  We had a verbal conversation

3    about the specifics of this, of the agent

4    commissions, those few that were paid by me,

5    via me was a broad conversation around agents

6    in general and how were we going to do this.

7        Q    It was not a specific procedure for

8    information that was used?

9        A    It was ad hoc.

10       Q    You got the information ad hoc?

11       A    Yes.

12       Q    Okay.  Are you aware whether supply

13   contract information would have been available

14   for any of the sales to which you claim

15   entitlement to a commission while you were

16   employed?

17              MR. WALLENDER:  Objection to the

18        form.

19       A    If I had a sale in reporting year 2008

20   and it was a Green-e sale, then by Green-e

21   rules that supply would have to be purchased

22   by March of 2009.  So if we follow the Green-e

23   rules, then that supply for the Green-e sale

24   would have to be purchased by that particular

25   point.  That was my understanding of the

157

1    process.  I can't tell you for certain at any

2    point whether or nor the supply was purchased,

3    whether generator attestations were delivered

4    for the supply contracts.

5        Q   You mentioned Green-e.  What is

6    Green-e.

7        A   Green-e is the Center for Resource

8    Solutions, and it's a watch dog entity in the

9    green power market for voluntary purchases.

10       Q   Is it a governmental agency or a

11   nonprofit organization?

12       A   It's a -- I think it's a nonprofit

13   organization, non-governmental.

14       Q   What do you mean by watch dog?

15       A   They publish rules for both a generator

16   and a wholesaler, for Renewable Energy

17   Certificates, that if you want to order a

18   Green-e REC, you follow their rules, and there

19   are open transparent rules where anyone can

20   see whether you are a participant in the

21   market or not.  And they have a fairly

22   rigorous auditing process to preserve the

23   integrity of the transactions in the voluntary

24   market.

25       Q   Do you ever sell any Renewable Energy

1    Credits to any of the customers that are

2    listed on this exhibit, entities to which you

3    were claiming commission you are entitled to?

4                    MR. WALLENDER:  Objection to the

5         form.

6       Q    Sorry.  Did you ever sell REC's that

7    were not Green-e?

8       A    The utility programs do not have a

9    Green-e requirement.  They have their own

10   requirements.  To the best of my knowledge,

11   without looking at every single sales contract

12   in detail, those companies that I'm claiming

13   commissions for sales I'm claiming commissions

14   for, otherwise should be Green-e sales.

15      Q    How would a sale be certified as

16   Green-e?

17      A    It's paper.  It's what we propose and a

18   pricing table, and it's what the customer

19   specifies and it's what's in the contract.

20      Q    What's your understanding of Green-e

21   rules regarding when supply for a particular

22   sale has to be purchased?

23      A    If you are buying and report in the

24   reporting year 2010, your supply can be

25   purchased from June, July 1st until July 1st,

159

1    2009 through March 31st, 2011.  You need to

2    bring a REC generated during that time period

3    to fulfill that reporting year contract.

4    Those were the rules as I understood them as

5    of July 15th, 2009 when I left employment with

6    Sterling Planet.

7        Q    To borrow on energy credits for a

8    certain reporting year according to the

9    Green-e, it's permissible to purchase REC's

10   that are generated during that year, not

11   necessarily during that year but during a

12   window that could fall during several months

13   of the previous year and several months of the

14   next year; is that correct?

15       A    That's correct.

16       Q    Do you know how many months to buy

17   REC's they were generated, that were generated

18   in the preceding year?

19       A    I'm not sure I understand the question.

20       Q    I'm not sure I understand my question,

21   either.  If you were to buy REC's for 2010, in

22   that year how many REC's back in 2009 could

23   you have generated during that time?

24               MR. WALLENDER:  Objection to the

25          form.

Kelly Bennett - September 30, 2010

160

1      Q    My understanding -- again, I will make

2   a disclaimer, this is not my side of the

3   house.

4      A    Yes.

5           My understanding in reading and knowing

6   what I know of the Green-e rules, the

7   eligibility for delivery for a reporting year

8   for a 2010 contract would be that Rob Henry

9   could buy a REC that was generated from an

10  eligible facility from July 1st, 2009 until

11  March 31st, 2011.  So you could go back six

12  months, you can buy anything that year that

13  you purchased.  Then you can go forward the

14  next month.  Oftentimes you had big purchases

15  at the end of a reporting year and also have

16  big supply purchases in March and all of your

17  supply for 2009 would need to be purchased by

18  March of 2010.

19     Q    You would go back six months and

20  forward three months basically outside of the

21  actual reporting year with the rest being

22  supplied to you?

23               MR. WALLENDER:  Objection to the

24       form.

25     A    If I, if I wanted a reporting year 2010

161

1    REC's, Green-e eligible 2010 REC, I could go

2    back six months and could go forward three

3    from that reporting area.  That is my

4    understanding.

5        Q    I think I get it now.

6            Going back to the spreadsheet that you

7    provided to Sterling Planet along with your

8    demand letter, which I believe was Exhibit

9    1 -- sorry, I believe it's Exhibit 3 -- the

10   column that's headed up as Contract Date, what

11   do those dates represent?

12       A    That is the date that the contract was

13   executed.

14       Q    Where did you obtain the information to

15   populate that column?

16       A    That information came from Quickbase.

17       Q    Who would have entered that in

18   Quickbase?

19       A    I would enter contract information,

20   sales information from my customers in

21   Quickbase.  Oftentimes, Valerie Christopher,

22   the Contract Administrator, would be the last

23   person to check that record to make sure that

24   the Quickbase record when it was closed

25   matched the final contract.  She was the last

162

1    person to put her hands on a contract.  And

2    the last thing she did was check Quickbase;

3    it's on the checklist.

4        Q    The column that's entitled Contract

5    Term, what do those numbers represent?

6        A    That represents how many years that,

7    the number of years for the contract.

8        Q    Was that information obtained from

9    Quickbase as well?

10        A    That information comes from Quickbase

11    put in by the sales rep who manages their

12    customers in Quickbase and confirms when it's

13    closed by the contract's administrator.

14        Q    Tell me about the end of your

15    employment with Sterling Planet.

16                MR. WALLENDER:  Objection to the

17        form.

18        Q    On what date did your employment with

19    Sterling Planet officially terminate?

20        A    July 15th, 2009.

21        Q    Were you terminated or did you resign?

22        A    I was terminated.

23        Q    What was the stated reason for your

24    termination?

25        A    The stated reason was my refusal to

163

```
 1   relocate to the corporate headquarters in
 2   Atlanta.
 3       Q   Were you requested to relocate to the
 4   corporate headquarters by Sterling Planet?
 5       A   It was never in any written document
 6   ever formally requested or demanded that I
 7   relocate to Sterling Planet.  I had numerous
 8   conversations about how valuable I would be to
 9   the company if I was in the Atlanta office all
10   the time.  Mel's position was it was
11   completely unnecessary, because I was so
12   externally focused.
13       Q   You are saying it was Mel's position
14   that your presence would not be required in
15   your office?
16       A   Verbally he stated that to me multiple
17   times.
18       Q   Who at Sterling Planet orally requested
19   you to move to Atlanta?
20               MR. WALLENDER:  Object to form.
21       A   Sonny Murphy had a conversation with me
22   in December of '08 that he was seriously
23   considering having folks come, external folks,
24   come down and be in Atlanta.  They were having
25   a hard time managing external people.  His --
```

Kelly Bennett - September 30, 2010

164

1    and his view was that would be an appropriate

2    and necessary step to take, to consolidate.

3        Q    Was there anyone other than Sonny

4    Murphy who you had a discussion with about

5    moving to Atlanta?

6                    MR. WALLENDER:  Object to the

7            form.

8        A    I had multiple conversations about

9    relocation with Mel, none of which required

10   me -- none of which included his demand that I

11   relocate.

12       Q    What was the substance of his

13   conversations?

14       A    "It would be great to have you here,"

15   "You know, you are always welcome here.  Your

16   family comes first.  We didn't hire you to be

17   in Atlanta.  You are doing a great job out

18   there."

19       Q    It is it correct these conversations

20   occurred towards the ends 2008?

21                    MR. WALLENDER:  Object to the

22           form.

23       A    Specify which conversations.

24       Q    The conversations with Sonny and Mel

25   about possibly relocating?

165

1    A    The conversations about, "Boy, wouldn't

2    it be great," happened fairly near to my hire,

3    within the first year, say, because I was

4    adding a lot of value.  Those were early on

5    and not frequent, but occasional.  The

6    conversation with Sonny -- there was a

7    conversation with Sonny in December '08 and it

8    was not -- it was "We really would like you to

9    think seriously about this.  You can have a

10   job or you can have a career."

11       Q    What was your response to Mr. Murphy?

12       A    My response was that because of my

13   family situation, that it prohibited me from

14   relocating to Atlanta.  I was separated, I

15   could not move my only child 1500 miles away

16   from her father.

17       Q    Are you and your husband still

18   separated?

19       A    Are we still?  Yes.

20       Q    Was there a formal divorce?

21       A    There is not a formal divorce in place.

22   We have been legally separated.

23       Q    Have there been any legal proceedings

24   that have been related to the separation?

25                 MR. WALLENDER:  Objection to

Kelly Bennett - September 30, 2010

166

1        form.

2      A    We have a legal separation.

3      Q    At any time did you ever have to fill

4  out a financial affidavit or any other type of

5  document describing your income and assets as

6  part of that separation?

7      A    I don't recall what we filled out in

8  the separation document.  I don't recall what

9  kind of financial information I had to fill

10  out.  It was very amicable.  I said I owe you

11  nothing, he owes me nothing, that's it.  I

12  honestly don't recall.  I don't have a lot of

13  assets.  It's not a big part of the

14  proceeding.

15      Q    In the lawsuit you contend Sterling

16  Planet breached a contract with you, you have

17  been damaged by that breach by Sterling Planet

18  not paying the commission.  Is the contract

19  that is referred to, there is an offer letter

20  that is Exhibit 1 in today's deposition?

21                  MR. WALLENDER:  Object to the

22        form.

23      A    I don't know what document you're

24  referring to.  Can I see a copy?

25      Q    Exhibit 1.

Kelly Bennett - September 30, 2010

167

1     A    You referred to another --

2     Q    The Complaint.  The Complaint in

3  paragraph one.

4     A    I need to see it to make sure I'm

5  answering truthfully.

6              MR. COSTYN:  Can I hand her copy

7         of this?  I believe this is a the copy

8         of the Complaint.  Do you have a copy?

9              MR. WALLENDER:  You were showing

10        me the Complaint that was an Amended

11        Verified Complaint?

12    Q    You allege that Sterling Planet

13  breached the contract with you by its failure

14  to pay you commissions; is that correct?

15    A    Yes.

16    Q    The contract that you allege had been

17  breached by Sterling Planet; is that the offer

18  letter that you signed that is Exhibit 1 in

19  today's deposition?

20              MR. WALLENDER:  Object to the

21        form.

22    A    Yes.

23    Q    Also in your lawsuit, you claim

24  Sterling Planet failed to provide you with

25  shares of stock, referring to the Plaintiff's

168

1  1; is that where you claim your stock claim?

2      A   Yes, stocks are paragraph four and

3  commissions are paragraph five.

4      Q   Are there any stock options that you

5  contend have been breached by Sterling Planet?

6      A   Unless specified in a Complaint

7  somewhere, none that I can think of,

8  commissions and stock.

9      Q   Also in your lawsuit you allege that

10  Sterling Planet breached a duty of good faith

11  in fair dealing.  On what facts do you base

12  that claim?

13      A   I'm not sure that I know the legal

14  definition of that.  Can you define those

15  terms for me?

16      Q   Well, you allege in the lawsuit --

17      A   I'm not a lawyer.

18      Q   I understand -- that Sterling Planet

19  breached a duty to act in good faith and deal

20  with you fairly.  On what facts do you base

21  that claim?  How did it breach the duty of

22  good faith in dealing to you?

23                  MR. WALLENDER:  Object to the

24          form.

25      A   I had a contract.  I had an employment

169

1    agreement with certain terms and conditions

2    that I had a reasonable expectation that I

3    would be compensated.  I was on every element

4    that I had the ability to control, whether it

5    was salary or commission -- or bonuses,

6    rather, I had good faith after multiple

7    conversations with the senior most level of

8    the company, that I had stock, that I was

9    building value, personal wealth in terms of

10   commissions, and corporate wealth, which was

11   the most important thing to me.

12          And when I was terminated and when I

13   asked for the first time in a formal way, it

14   never had an employment review, couldn't ask

15   for things formally, they didn't have the

16   process.  When I finally had the process

17   through my termination of asking for it, those

18   terms and conditions were not met.

19      Q   Are there any other facts on which you

20   base your claim for the breach of good faith

21   in fair dealing?

22                  MR. WALLENDER:  Object to the

23          form.

24      A   I think, I think I've laid out the most

25   relevant facts in our document and here today.

170

1    We had a system and a process, and I filled

2    out -- I, I met those conditions.

3        Q   When was the first time that you made a

4    request to Sterling Planet to be paid

5    commissions?

6                    MR. WALLENDER:  Object to the

7            form.

8        A   If you're referring to -- could you

9    clarify?

10       Q   Okay.  Your first oral or written

11   request to Sterling Planet to be paid

12   commissions that you felt you were owed?

13                   MR. WALLENDER:  Object to the

14           form.

15       A   I had a direct conversation with Sonny.

16   I had a follow-up conversation with Rob Henry,

17   who was acting as the HR rep for Sterling

18   Planet during my separation process.

19       Q   Do you recall when your conversation

20   with Sonny Murphy occurred?

21       A   Well, I made a demand in writing for

22   commissions and for stock.  I'm not sure

23   whether that was prior to my departure or

24   after.  I had a verbal conversation with him.

25   In one of the conversations that took place

1    between May 22nd, which was the original phone

2    call from Mel, to the last conversation I

3    would have had with Rob Henry, was post

4    termination date.  So it would have been,

5    there was conversations with Sonny before I

6    was fired, there were conversations with Rob

7    Henry after my last day.  I don't recall the

8    date of that conversation.  It was -- It was

9    an overwhelmingly administrative discussion

10   regarding sick time, commissions, stock

11   options, what do I do with my computer.

12       Q   Are you referring to a letter that you

13   wrote to Sonny, that is exhibit 3, as to your

14   position?

15       A   That was a part of it.  That was the

16   first time, I believe, I -- it was in response

17   to a voicemail that I had left to, with Rob

18   Henry asking, again, about what he learned

19   about commissions and stock and vacation and

20   sick, if any.  And Sonny sent a letter and

21   asked for -- and I mentioned on that voicemail

22   that I had documentation -- and Sonny asked

23   for it, and this was the response to Sonny.

24       Q   Did Sonny call you back after you left

25   the message with Rob?

172

1     A    Sonny sent -- Sonny did call me after I

2   left the voicemail for Rob Henry.  I remember

3   it was late on a Friday and I didn't get it.

4   And he mentioned on the voicemail that he was

5   with Martha Ann in Florida, and that he'd get

6   back to me on it, that Rob had been out of the

7   office, he would get back to me on it.  And

8   there's a letter after this, that is they will

9   get back to me on it, which was, as you know,

10  "not entitled".  His position was the company

11  never paid commissions.

12     Q    Did you engage in any other written

13  communication Sterling Planet regarding your

14  commissions?

15               MR. WALLENDER:  Object to the

16        form.

17     Q    Regarding your claim for commissions?

18     A    The written communication is what we've

19  covered here.

20     Q    When did you first -- sorry, I'll

21  rephrase that.  When did you decide to file a

22  lawsuit against Sterling Planet?

23     A    When I asked -- upon, before being

24  terminated, and in the process of being

25  terminated -- about commissions and about

173

1    stock, and my answer was that I was not

2    entitled to them, that the company had never

3    paid commissions, and that I had no stock,

4    there was no stock to anybody, that I knew I

5    needed to protect my rights and, and proceed

6    with legal action.

7    Q    Please describe the company's response

8    to your requests stating that you were not

9    entitled to commissions and there was no stock

10   to anybody.  Are you referring to Sonny

11   Murphy's letter that he wrote in response to

12   Exhibit 3 stating that position or was there

13   some other communication?

14                 MR. WALLENDER:  Objection to

15        form.

16   A    I don't recall whether the decision was

17   -- at what point in the process, the decision

18   was made.  It became clear at some point and I

19   don't know at what point that was, after what

20   specific conversation, it became clear that

21   Sterling Planet's position was not mine, and

22   that their -- they were not going to honor the

23   terms of my employment contract.

24   Q    Prior to your termination, did Sterling

25   Planet make you an offer to work as an

Kelly Bennett - September 30, 2010

174

1    independent contractor?

2       A    Yes.

3       Q    Were you not interested in accepting

4    that offer?

5                    MR. WALLENDER:  Object to form.

6       A    I did not want to leave the company.  I

7    did not want to lose my benefits.  I did not

8    want to lose my commissions, I did not want to

9    lose the opportunity to earn commissions.  So

10   the answer is no, I did not want to become an

11   independent consultant at will to the company

12   with no guaranteed 40 hours and restrictive

13   covenants.

14                    MR. COSTYN:  Can we take a

15            five-minute break real quick?

16                    MR. WALLENDER:  Sure.

17                    (At this time a recess was

18            taken.)

19                    MR. WALLENDER:  During the

20            break, I tried to find the exhibits

21            you say were produced in discovery.  I

22            want to make clear again our request

23            that you identify each of the Bates

24            stamped pages.  It's unclear to me and

25            probably not correct that things that

1          are attached as if they are put

2          together in one exhibit were, in fact,

3          attached, because I don't see them

4          attached on these exhibits.  For

5          clarity, I would appreciate that.

6                    MR. COSTYN:  Sure, and I

7          apologize for not bringing stamped

8          copies.

9                    MR. WALLENDER:  And we will do

10         the same for you.  If we have

11         exhibits, I will try to find the Bates

12         stamped copies to use tomorrow.  If

13         not, I will provide them to you.

14                   MR. COSTYN:  Sure.

15    EXAMINATION BY MR. COSTYN:

16      Q   Back on the record, Ms. Bennett, if

17    this lawsuit goes to trial, are there any

18    witnesses you intend to call to support your

19    case?

20                   MR. WALLENDER:  I will object to

21         the form.  The decisions with respect

22         to calling the witnesses are decisions

23         of counsel, not decisions of Ms.

24         Bennett.

25      Q   Are there any individuals that you are

176

1    aware of that have firsthand knowledge of your

2    claimed entitlement to commissions or stock?

3                   MR. WALLENDER:  Object to form.

4        A    We have provided contact names of key

5    Sterling Planet employees, and for sales

6    contacts, for customer contacts.

7        Q    Are there any individuals who are not

8    employees of Sterling Planet other than your

9    attorney that you've discussed your lawsuit or

10   your claims with?

11                  MR. WALLENDER:  Object to the

12            form.

13       A    I have only discussed this with my

14   attorney.  I'm under a court order and a

15   confidentiality agreement.

16       Q    Do you maintain communications with any

17   former Sterling Planet employees?

18       A    Yes.

19                  MR. WALLENDER:  Object to form.

20       Q    Which individuals that have been

21   employed by Sterling Planet do you maintain

22   contact with?

23                  MR. WALLENDER:  Object to the

24            form.

25       A    A number of them.  Dell Jones, Greg

Kelly Bennett - September 30, 2010

177

1   Chambers I have seen at conferences, Marcus

2   Krembs, Ron Mitchell, Joe Barclay.  That may

3   be all of the former employees.

4       Q   Have you maintained relationships or

5   continuing relationships with current Sterling

6   Planet employees?

7                   MR. WALLENDER:  Object to form.

8       A   No.

9       Q   Have you filed for bankruptcy within

10  the last five years?

11      A   I don't know whether it was in the last

12  five years.  I have.  I have.  I don't know

13  whether it was in the last five years.

14      Q   Do you know the approximate date or

15  just at some point?

16      A   Yes.

17      Q   Do you recall what court that was in?

18      A   Albany County.

19      Q   Was that bankruptcy filed under the

20  name you provided at the beginning of this

21  deposition?

22      A   Yes.

23                  MR. COSTYN:  That's all the

24          questions I have for you.

25                  EXAMINATION BY

Kelly Bennett - September 30, 2010

178

1   MR. WALLENDER:

2       Q   I have just a couple.  I want to direct

3   your attention to what was marked as Exhibit 2

4   in these proceedings.  Can you find that

5   document, please?

6       A   Yes.

7       Q   Do you have that document in front of

8   you?

9       A   Yes.

10              MR. WALLENDER:  Mr. Costyn, do

11          you have that copy?

12              MR. COSTYN:  I have it, yes.

13      Q   Do you recall being asked a question

14  along the lines of whether Exhibit 2 referred

15  to End-User Referral Forms?

16      A   I do, yes.

17      Q   Have you had a further opportunity to

18  look at Exhibit 2?

19      A   I have.

20      Q   And does it, in fact, refer to End-User

21  Referral Forms?

22      A   Yes.

23      Q   And can you explain how that is?

24      A   Under the detailed instructions for

25  each lead entry section, under the fourth bold

179

1  example, it talks about contact.  It says,

2  "Enter full contact information for each

3  lead."  This is the same information that was

4  required for the End-User Referral Forms.

5     Q   Why does this document refer to

6  End-User Referral Forms in the past tense?

7     A   Because Mel made the decision that we

8  were replacing End-User Referral Forms with

9  the Quickbase system.

10     Q   Do you recall being asked questions

11  about your becoming responsible for the

12  relationship with Intel Corporation?

13     A   Yes.

14     Q   And to your knowledge was your

15  responsibility for that relationship

16  communicated to Intel Corporation?

17     A   Yes.

18     Q   How was that done?

19     A   I had a conversation in Mel's office

20  with Mel and Ron Mitchell and Joe Barclay, all

21  on the phone with Marty Sedler, and it was

22  communicated in the summer of '08 that, to

23  Marty by Mel, that I was his account rep.  And

24  then, again, it was communicated directly to

25  Marty with Paul Auger and me and Joe Barclay

180

1    and Ron Mitchell and Mel Jones and others at a

2    dinner at Elway's in Denver in October 2008.

3        Q    Who is Marty?

4        A    Marty Sedler is the VP for Energy.  He

5    is our point of contact, the decision-maker

6    for the direct purchase at Intel.

7        Q    Who is Paul Auger?

8        A    Paul Auger is the global head of energy

9    for PepsiCo.

10       Q    Was it ever indicated to Paul Auger you

11   were the sales representative for the Pepsi

12   relationship?

13       A    It was communicated to Paul at that

14   same dinner at Elway's in Denver that I was

15   his account rep from that point on.

16       Q    And who communicated that information

17   at that dinner at John Elway's Restaurant?

18       A    Mel communicated that to him.

19       Q    What did Mel Jones say?

20       A    Mel said that I -- that they didn't

21   have to deal with him any more, they got to

22   deal with Kelly.  We made jokes about how

23   happy they were to be able to deal with me and

24   not Mel.

25                MR. WALLENDER:  That's all I

Kelly Bennett - September 30, 2010

181

1          have at this juncture.

2                    MR. COSTYN:   I've got no further

3          questions.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

182

1          C-E-R-T-I-F-I-C-A-T-I-O-N

2

3

4      I, JOAN A. DE CARO, Shorthand Reporter and

5   Notary Public in and for the State of New

6   York, do hereby CERTIFY that I recorded

7   stenographically the foregoing testimony taken

8   at the time and place herein stated and the

9   preceding testimony is a true and accurate

10  transcript hereof to the best of my knowledge

11  and belief.

12

13

14

15                    _____

16                         JOAN A. DE CARO

17  Dated: _____

18

19  PLEASE NOTE:  This transcript is not to be
    distributed to any third party.  You may copy
20  it or send it internally within your own
    offices and branches.  Notify this office
21  first if you need to distribute or copy any
    portion of it for any other purpose.

22  Martin Deposition Services, Inc.
    Malta Commons Business Park
23  100 Saratoga Village Boulevard
    Building 37, Suite 37C
24  Malta, New York  12020
    Toll Free:  (800) 587-6832
25  Fax:  (518) 587-1539

       Website:  www.martindepo.com
               Joan A. DeCaro
       Martin Deposition Services, Inc.
                (518) 587-6832

183

1   STATE OF NEW YORK

2        ss:

3   COUNTY OF

4

5

6        I, KELLY BENNETT, having been duly

7   sworn, do hereby certify that the foregoing

8   typewritten transcript of the testimony, with

9   corrections, if any, constitutes a true, full

10  and accurate transcript of the testimony given

11  by me in the above-entitled action.

12

13

14

15        _____

16                  KELLY BENNETT

17  Sworn to before me this _____

18  day of _____, 2010

19

20  _____

21  NOTARY PUBLIC

22

23  My Commission Expires:

24  _____

25

## $

**$100,000 (3)**
58:25;59:24;64:21
**$2500 (4)**
129:1,1,8,10
**$5,000 (2)**
65:2,3
**$5,000,000 (2)**
63:16,20
**$5,154,760 (4)**
125:9,15;126:4,9
**$500,000 (1)**
121:24

## 0

**05 (1)**
60:25
**06 (1)**
95:23
**07 (1)**
78:16
**08 (7)**
36:6,16;114:4,18;
163:22;165:7;179:22

## 1

**1 (8)**
60:19;70:22;77:11;
161:9;166:20,25;
167:18;168:1
**1:41 (1)**
137:9
**10 (1)**
35:23
**100% (3)**
52:21;54:19;93:15
**100,000 (1)**
148:1
**101 (1)**
27:12
**111 (2)**
132:7,11
**12 (1)**
101:19
**12110 (2)**
6:4;9:14
**12201 (1)**
2:6
**139 (1)**
4:5
**13th (4)**
62:15,16,20,24
**15 (1)**
144:23
**1500 (1)**
165:15
**15th (2)**
159:5;162:20
**174 (1)**

## 4:6

**17th (2)**
2:15;63:6
**18 (1)**
144:23
**1900 (1)**
2:16
**1987 (1)**
10:10
**1991 (1)**
10:13
**1st (5)**
97:3,4;158:25,25;
160:10

## 2

**2 (5)**
64:18;91:17;178:3,14,
18
**20 (2)**
6:3;9:14
**2005 (7)**
19:8,9,20;20:13,19,24;
53:21
**2006 (19)**
23:10;24:8;25:12,12;
58:21;62:15,18;63:7,18,
22;69:1;70:12,18,24;
83:16,17,19;128:21;
138:19
**2007 (6)**
24:7;25:19;59:4;
61:12;113:7;144:24
**2008 (14)**
49:2;61:13,15;99:6;
113:9;116:11,24;117:10,
15;118:18;145:1;
156:19;164:20;180:2
**2009 (14)**
90:20;97:3,4;116:12;
117:7,16;125:8;156:22;
159:1,5,22;160:10,17;
162:20
**2010 (6)**
158:24;159:21;160:8,
18,25;161:1
**2011 (2)**
159:1;160:11
**20th (2)**
62:18,23
**22nd (1)**
171:1
**25 (2)**
87:19,21
**25,000 (1)**
72:20
**27 (2)**
63:18,21
**271 (1)**
2:15
**2nd (2)**
70:18,24

## 3

**3 (4)**
96:17;161:9;171:13;
173:12
**30363 (1)**
2:17
**30-E (3)**
4:17;5:2,19
**31st (2)**
159:1;160:11

## 4

**4 (2)**
137:13;143:11
**40 (1)**
174:12
**404 (1)**
2:21

## 5

**5 (2)**
4:5;139:5
**5,000 (1)**
87:7
**500 (1)**
87:19
**5000 (1)**
41:1
**518-782-1931 (1)**
9:22
**540 (1)**
2:5
**55 (1)**
98:24
**550 (3)**
100:13;104:4;112:5
**57 (2)**
137:24;138:2

## 6

**6 (2)**
150:15;154:25
**60 (1)**
98:24
**65 (1)**
99:1

## 7

**70 (1)**
98:25

## 8

**8,333 (1)**
72:1
**85 (1)**
98:25

## 888-3811 (1)
2:21
**8th (1)**
138:19

## 9

**900,000 (1)**
148:2
**94 (1)**
10:15

## A

**AASHE (2)**
41:13;130:24
**ability (5)**
7:24;88:21,23;89:20;
169:4
**able (7)**
46:9;48:17;88:12;
138:1;147:17,19;180:23
**above (1)**
73:2
**abreast (1)**
27:20
**abrogates (1)**
80:22
**absence (1)**
15:15
**absolutely (1)**
27:3
**acceptable (2)**
5:14;71:12
**accepted (1)**
20:21
**accepting (1)**
174:3
**access (14)**
87:25;88:11;89:6,9,
12,13;90:5,8;91:2;
154:12,14,21,22,23
**according (3)**
94:8;141:16;159:8
**account (21)**
40:10;54:1;88:4,5;
90:24,25;103:4,22;
104:2;109:5;110:12,14;
113:18,23;115:1;118:3;
130:16;141:19;149:22;
179:23;180:15
**accounting (6)**
47:7;55:1;57:2,9,14,
15
**accounts (4)**
37:21;130:5;149:1,16
**accurate (6)**
70:18,20;91:1;126:19;
127:5;138:20
**accurately (1)**
85:12
**acknowledgment (1)**
32:5

## 888-3811

(see above)

**ACORE (11)**
23:22;103:5,8,17,22;
106:8,14,17;107:3;
112:6;126:16
**across (1)**
59:7
**act (1)**
168:19
**acted (1)**
105:13
**acting (2)**
55:20;170:17
**action (2)**
56:12;148:16,19;
153:2;154:1,6;173:6
**actions (2)**
75:3;149:19
**actively (2)**
37:19;44:2
**activities (7)**
29:10;31:16;37:14,16;
40:5,21;110:13
**actual (4)**
42:3;74:8;122:3;
160:21
**actually (5)**
19:11;37:7;64:1;
109:17;131:4
**ad (3)**
115:8;156:9,10
**add (2)**
30:23;55:14
**added (3)**
40:20;85:1,6
**adding (1)**
165:4
**addition (1)**
29:23
**additional (16)**
40:25;50:21;65:3;
70:13;72:2;77:15,15,18;
78:1;84:24;85:1;98:2;
110:5;112:14,16;135:7
**additive (1)**
53:20
**address (3)**
6:1;9:13;90:3
**administrative (6)**
54:2;78:22;88:9;
91:10;142:14;171:9
**administrator (4)**
96:5;99:19;161:22;
162:13
**advance (1)**
13:21
**advice (1)**
124:14
**advocate (1)**
127:25
**advocating (1)**
14:7
**affairs (3)**
26:16;27:14;30:18

**Bennett v.**
**Sterling Planet**

**Kelly Bennett**
**September 30, 2010**

**affect (2)**
7:24;11:22
**affected (2)**
27:14;30:22
**affidavit (1)**
166:4
**again (30)**
14:5;16:16;21:24,25;
38:10;39:24;48:23;
50:12;74:11;76:5;78:3,
24;80:10;92:20;95:18;
110:21;113:4,16;
114:23;115:16;123:16;
127:17;129:12;134:2,7;
154:7;160:1;171:18;
174:22;179:24
**against (6)**
6:8,14;65:9;97:23;
123:7;172:22
**agency (1)**
157:10
**agency's (2)**
28:19;41:9
**agenda (1)**
13:24
**agent (21)**
52:13,17,18;53:3,11,
17;56:8;58:3;93:14;
105:4,9,14;113:21,22;
131:17,20;148:17;151:7,
19;154:25;156:3
**agent/manager (1)**
132:22
**agents (44)**
53:5,9,12,15,17;54:11,
14,15,16;55:17;56:1;
57:20;58:1,9;69:12,14,
15,17,21,23;70:2,7;
82:11,14,15;85:7;88:19;
89:1,10;90:14,14,22;
93:23;94:5,11;95:19;
109:21;123:18;148:7;
149:22;151:14;152:7;
154:18;156:5
**agent's (2)**
54:18;152:9
**aggregator (5)**
55:10;58:4;127:15,16,
17
**aggregators (1)**
94:5
**ago (1)**
94:24
**agree (2)**
5:16;47:4
**AGREED (1)**
4:10
**agreement (12)**
55:10;56:2;61:12,17;
62:14;64:15;73:2;80:21,
23;138:21;169:1;176:15
**air (2)**
12:3;13:12

**Alan (3)**
69:20;84:8;113:20
**Albany (3)**
2:6;10:14,15,20;
17:17,20;18:9;38:17;
60:6,11;177:18
**Alden (10)**
49:2;51:7,9,15,22,23;
85:6,16,22;96:8
**aligned (1)**
138:8
**aline (1)**
32:18
**Allan (1)**
148:10
**allegations (1)**
6:16
**allege (4)**
167:12,16;168:9,16
**allowed (1)**
5:8
**Allsteel (8)**
101:10,11,15;102:8,
12;103:24,25;112:5
**almost (1)**
10:12
**along (10)**
14:9;20:17;31:22;
32:21;66:22;80:3;134:1;
137:2;161:7;178:14
**although (11)**
21:2;22:6;24:6;37:18;
39:25;44:14;45:15;48:3;
92:11;112:13,15
**always (9)**
13:4,10;33:1;42:21,
25;96:14;123:3;155:11;
164:15
**amalgam (1)**
41:6
**amenable (1)**
59:17
**Amended (1)**
167:10
**American (1)**
103:4
**amicable (1)**
166:10
**amount (9)**
117:7;121:21;125:7,
11;126:9,9;134:25;
145:19;154:18
**amounts (2)**
56:3;99:14
**ancillary (1)**
127:18
**and/or (6)**
27:22;33:2;66:18;
94:5;106:7
**Andrew (1)**
128:13
**Ann (1)**
172:5

**anniversary (1)**
65:4
**announce (2)**
36:18;121:19
**announced (1)**
116:23
**announcement (3)**
37:7;114:8;121:1
**announcing (2)**
91:21;115:4
**annual (1)**
128:22
**answered (2)**
124:19;125:1
**anticipated (1)**
64:10
**AP (1)**
57:2
**apologize (2)**
74:13;175:7
**apparently (1)**
36:5
**appear (2)**
22:7;70:22
**A-P-P-E-A-R-A-N-C-E-S (1)**
2:1
**appears (2)**
138:25;151:8
**appreciate (1)**
175:5
**appropriate (6)**
22:5;125:5;136:14;
142:15;154:10;164:1
**appropriately (1)**
85:11
**approval (1)**
67:18
**approved (2)**
36:20;54:3
**approximate (1)**
177:14
**approximately (7)**
19:5;20:21;25:17;
59:24;60:1;96:25;
147:15
**April (4)**
69:1;70:12;95:23;
138:18
**architect (2)**
83:25;100:16
**area (5)**
27:16;115:14,15;
138:4;161:3
**around (21)**
24:9;25:12;31:6;
36:16;40:12;46:4,4;
71:8;75:3;76:2;77:21;
80:16;115:5,7,15,18,22;
143:3;145:7;146:19;
156:5
**arrive (1)**
125:12
**arrived (2)**

26:23,24
**article (1)**
131:1
**articulated (1)**
46:11
**Ashford (1)**
48:5
**aside (1)**
71:22
**assessment (1)**
14:1
**asset (2)**
18:21;46:21
**assets (5)**
35:11;46:25,25;166:5,
13
**assign (1)**
87:2
**assigned (5)**
87:14;130:3;131:11;
132:20;136:3
**assistance (4)**
103:21;118:2;119:12;
153:18
**assisted (2)**
119:9;152:19
**assisting (1)**
141:18
**associated (1)**
100:17
**Associates (1)**
133:24
**Association (10)**
11:9;13:16;15:20;
23:23;24:16;29:6,8;
34:7;103:9;128:24
**associations (2)**
11:18;28:9
**assumed (2)**
22:5;48:25;49:7;
63:23;64:14;80:12;
96:10;145:14
**assuming (1)**
25:23
**assumption (1)**
144:7
**assumptions (1)**
80:12
**Atlanta (17)**
2:17;38:23;44:18,20;
69:6;79:10;135:21;
136:6,8,9;163:2,9,19,24;
164:5,17;165:14
**attached (6)**
92:21;141:10;149:13;
175:1,3,4
**attachment (7)**
97:9,10;121:22;139:9,
17;141:14;151:7
**attained (1)**
122:1
**attempted (2)**
14:17;56:13

**attend (1)**
129:11
**attended (1)**
30:3
**attendee (2)**
109:15,17
**attention (2)**
110:16;178:3
**attestations (1)**
157:3
**attorney (6)**
6:6;7:11;9:2,7;176:9,
14
**Attorneys (3)**
2:4,14;9:1
**attribute (2)**
15:1;22:21
**attributes (1)**
15:4
**auditing (1)**
157:22
**Auger (5)**
113:6;179:25;180:7,8,
10
**August (2)**
97:2,4
**authority (3)**
67:16;121:3,12
**Av (1)**
9:14
**available (1)**
54:15;74:25;156:13
**Avenue (1)**
6:3
**average (1)**
150:10
**avoidance (1)**
25:2
**awarded (2)**
121:13,16
**aware (31)**
17:2;20:10;40:4;
41:18;52:11;66:24;
73:22;74:6,10,15,18,21,
22,23,24;75:14,15;93:1,
4,8;94:24;95:2,9,24;
96:4;133:7,11,21,22;
156:12;176:1
**away (2)**
114:19;165:15
**awhile (5)**
9:17,18;17:22;18:2;
130:9
**Aztech (1)**
134:17

**B**

**BA (1)**
10:14
**back (20)**
36:2;59:20;61:5;
71:16;83:7;101:2;113:1;

131:7;148:21;152:13;
159:22;160:11,19;161:2,
6;171:24;172:6,7,9;
175:16
**background (7)**
10:8;11:24;12:8;
16:11,24;17:13;18:13
**bad (1)**
115:18
**ballpark (1)**
153:7
**bankruptcy (2)**
177:9,19
**Barclay (13)**
48:2,9;84:9;94:2;
116:25;117:18;119:13;
130:16;155:11,17;
177:2;179:20,25
**base (4)**
55:16;168:11,20;
169:20
**based (5)**
66:8;95:20;99:11;
144:8;155:2
**baseline (1)**
46:14
**basic (2)**
35:16;68:12
**basically (1)**
64:19;160:20
**basics (2)**
27:12;152:14
**basis (8)**
26:21;44:8,10,11;
52:4;54:12;66:6;94:10
**Bastuk (5)**
54:24;131:21;148:12;
149:9;152:20
**B-A-S-T-U-K (2)**
131:21,22
**batch (2)**
86:15;138:24
**Bates (6)**
4:4;140:5;141:5;
150:18;174:23;175:11
**Bate's (1)**
140:2
**BD (5)**
41:2,4;50:25;51:16;
142:7
**Beacon (4)**
112:23;135:14,15;
136:5
**became (3)**
17:2;173:18,20
**Beck (1)**
9:12
**B-E-C-K (1)**
9:12
**become (3)**
17:15;22:17;174:10
**becoming (1)**
179:11

**Beebe (2)**
83:25;86:15
**beforehand (1)**
7:14
**beginning (5)**
12:12,15;17:1;143:18;
177:20
**behalf (2)**
29:9;85:22
**behind (1)**
55:16
**Ben (2)**
129:17;135:6
**beneficial (1)**
85:24
**benefit (3)**
15:12,13;149:6
**benefits (2)**
14:8;174:7
**Bennett (11)**
5:5,21;6:3,5;58:19;
96:17;137:11,14;
150:23;175:16,24
**besides (4)**
48:20;78:10;101:5;
119:6
**best (11)**
19:17;20:9;25:11;
36:17;52:25;61:15;
70:19;79:11;83:1;127:4;
158:10
**bifurcated (3)**
34:13;40:6;102:18
**Bifurcation (1)**
39:24
**big (11)**
19:25;40:10;41:1,4;
42:11;46:6;110:25;
127:25;160:14,16;
166:13
**bigger (1)**
42:24
**biggest (2)**
42:22;46:5
**Bill (9)**
54:24;68:15;125:8;
131:21;148:12;149:9;
150:25;151:11;152:20
**billable (1)**
47:9
**Binghamton (1)**
10:13
**bit (1)**
12:6
**blue (1)**
37:20
**board (14)**
17:10,23;44:1;59:8;
67:11;76:2,13;80:13;
103:13,17;119:23;
133:23;141:23;142:3
**Bob (5)**
30:8;84:10;108:25;

**119:9,11
body (1)**
35:17
**bold (1)**
178:25
**Bonus (3)**
65:1,2;78:12
**bonuses (1)**
169:5
**booked (1)**
27:1
**borrow (1)**
159:7
**both (17)**
27:21;31:7,13;35:7;
41:7;42:12;48:13;59:21;
61:4;76:13;94:14;
103:11;121:17;131:18;
134:18;135:4;157:15
**bottom (2)**
98:20;139:6
**bought (7)**
34:16;55:5;105:5;
110:20;131:4;137:4;
145:2
**box (1)**
68:14
**boxed (1)**
51:25
**Boy (1)**
165:1
**Boyd (2)**
134:15;137:1
**brand (2)**
55:17,18
**branding (1)**
113:11
**breach (3)**
166:17;168:21;169:20
**breached (6)**
166:16;167:13,17;
168:5,10,19
**break (3)**
58:14;174:15,20
**breakdown (1)**
42:8
**breaking (1)**
137:6
**bring (3)**
18:11;135:8;159:2
**bringing (2)**
83:21;175:7
**broad (6)**
11:24;12:8;28:13,21;
37:18;156:5
**broadcast (1)**
36:22
**broader (3)**
23:17,23;117:22
**Broadly (2)**
33:6;74:24
**Broadway (1)**
2:5

**broker (5)**
39:4,12,13,15;40:1
**brokers (4)**
35:8;39:17,23;40:3
**broker's (1)**
66:17
**brought (4)**
6:8;25:20;110:4;
135:10
**brown (1)**
15:14
**bugs (1)**
86:18
**build (1)**
59:21
**building (6)**
64:7;78:3;80:4;
100:17,20;169:9
**Business (48)**
11:9;13:9,15,22;18:9;
21:6,8;22:7,8;23:3,6,12,
17,22;24:1;25:5;27:23;
39:14;47:15;48:6;49:1,
3,4,5;51:8,17;54:1;64:7;
76:9,11;83:18;84:3,13;
85:3,24;86:23;90:22;
91:13;94:16;96:9;110:5;
117:21;127:17;128:23;
133:23;140:13;142:4,6
**busy (1)**
143:9
**buy (20)**
31:9,11;33:18;46:25;
50:3,6;68:5,6;72:12;
73:14;105:8;110:21;
118:14;120:18;131:7;
132:10;159:16,21;160:9,
12
**buyer's (1)**
36:1
**buying (5)**
49:22,23;130:11;
131:6;134:20;158:23

**C**

**calculate (13)**
15:11,13;46:11;55:2;
82:14,15,16;144:20;
145:2;149:4;151:10;
153:2,13
**calculated (4)**
54:23,25;66:17;
144:14
**calculating (1)**
54:21
**calculation (1)**
46:13
**calculations (1)**
155:3
**California (1)**
110:11
**call (14)**

**19:14;33:12;47:16;
55:9,24;84:17;114:20;
136:5,7;142:4;171:2,24;
172:1;175:18
called (8)**
15:1;18:15,18,19;
29:7;41:2;135:20;136:9
**calling (2)**
26:25;175:22
**calls (5)**
142:7,7,8,16;152:20
**came (47)**
17:14,17,20;21:19;
35:20;36:6;42:10;53:18;
54:4;67:11;69:4;74:19;
76:2;77:18;80:13;85:5;
86:16;90:13,14;96:8;
97:2;99:17,18;101:15;
103:6,10,10;117:9;
119:21;127:11,13;128:7,
7,8,10,13;129:16;131:8,
17;132:6;135:15,17;
136:8,8,13;152:13;
161:16
**Campus (2)**
130:19;131:3
**can (77)**
7:15;12:6;14:21;15:8;
17:1,8;18:25;20:3,8;
25:22;26:1,18,21;27:2,
15;34:5;35:12;37:16;
44:25;53:23;55:6;58:14;
60:23;62:19;63:9;71:17;
74:12;77:6;80:20;81:21;
91:19;92:19;94:6;96:20;
97:8;101:10;103:5,13;
104:25;105:17;111:23;
117:8;121:5;124:16;
127:9;128:3;129:14,24;
130:19;131:14;132:5;
134:13;135:2,6,8,13;
136:11,24;137:16;
138:3;140:6;141:24;
143:6;152:10;157:19;
158:24;160:12,13;165:9,
10;166:24;167:6;168:7,
14;174:14;178:4,23
**Canave (2)**
107:19;109:12
**cancelled (1)**
123:9
**capability (1)**
55:15
**capacity (1)**
11:10
**carbon (34)**
14:19;22:17,19,25;
24:10,12,13,18;25:2,3;
26:9;31:20,23;32:9;
33:4,5,8,9,12,13,17,19,
20,23,25;34:1,2;36:9,10;
41:7;46:4,4;48:5;130:6
**card (1)**

22:7
**cards (1)**
54:1
**care (3)**
19:23;78:10;145:9
**career (3)**
12:14,20;165:10
**Carney (1)**
49:11
**case (6)**
6:20;8:17;37:1;
105:24;122:3;175:19
**ceased (1)**
97:6
**cell (3)**
18:19,20,20
**center (2)**
138:4;157:7
**Central (1)**
76:10
**certain (12)**
45:22;65:11;67:4;
68:16;71:21;96:7;
106:23;130:5;134:11;
157:1;159:8;169:1
**certainly (7)**
15:25;36:22;42:12;
75:7;91:10;107:20;
146:24
**Certificate (6)**
15:2,3;27:15;31:9,11;
33:21
**certificates (10)**
14:18;24:6;25:13;
26:9;27:9;42:20;114:12;
115:22,24;157:17
**certified (2)**
100:25;158:15
**CFO (5)**
48:1;90:23;146:19;
147:1,3
**chain (1)**
127:25
**chair (1)**
44:1
**Chairman (3)**
43:24,25;120:24
**challenge (1)**
94:3
**challenges (2)**
27:21;114:10
**challenging (1)**
20:9
**Chamber (3)**
134:14,19,21
**Chambers (7)**
76:10;84:7;94:15;
110:8,9;143:20;177:1
**Chamber's (1)**
137:2
**chance (1)**
148:1
**change (14)**

18:2;21:24;23:14;
25:20;31:21;32:3,4,17;
36:6,19;59:1;67:13,14,
19
**changed (7)**
21:25;22:11;23:10;
49:8;90:13;118:14;
148:3
**changes (7)**
27:20,20,21;28:3;
30:18;67:16;89:20
**characterized (1)**
78:19
**charge (1)**
102:23
**Charles (8)**
54:25;56:9,17;148:11,
20,25;149:15;152:2
**Charles's (2)**
149:4;150:4
**chart (3)**
98:21;99:21;125:14
**chat (1)**
80:15
**check (5)**
54:8;68:14;149:17;
161:23;162:2
**checked (2)**
138:14;149:1
**checklist (1)**
162:3
**child (1)**
165:15
**chip (1)**
37:21
**chose (1)**
115:12
**Chris (1)**
78:17
**Christopher (4)**
85:4;101:7;102:9;
161:21
**Chronologically (1)**
20:15
**circumstance (1)**
124:4
**circumstances (2)**
33:16;123:15
**CISCO (2)**
49:22;111:18
**cities (1)**
41:13
**City (5)**
15:17;78:17,20;
106:11,23
**Civil (1)**
4:14
**claim (17)**
98:3,7;116:11,12;
119:19;123:7,10,23;
124:10;156:14;167:23;
168:1,1,12,21;169:20;
172:17

**claimed (2)**
65:10;176:2
**claiming (13)**
66:1,25;97:19;98:11,
13,15;112:12;117:7;
124:5;154:4;158:3,12,13
**claims (6)**
66:7;96:23;114:16;
115:16,18;176:10
**clarification (1)**
139:19
**clarify (2)**
34:24;170:9
**clarity (1)**
175:5
**classmate (1)**
118:7
**clean (13)**
11:23;13:12;15:15;
104:24;105:3,12,13;
106:8,14,19;119:11,15;
126:16
**clear (3)**
173:18,20;174:22
**clearly (1)**
111:19
**clicked (1)**
89:24
**clients (1)**
97:12
**climate (5)**
24:17,17;41:10,12,14
**close (4)**
60:11;80:6;117:19;
127:3
**closed (7)**
63:20;104:13;149:13;
151:25;152:24;161:24;
162:13
**closely (2)**
55:23;127:14
**closing (2)**
16:17;63:16
**Cohoes (1)**
108:7
**C-O-H-O-E-S (1)**
108:11
**colleague (1)**
17:15
**colleagues (4)**
30:5,6;80:11;94:16
**college (10)**
10:11,22;13:1;41:12;
129:24;130:3,7,18;
132:16,17
**colleges (4)**
87:20,21;132:18;
133:25
**Color (2)**
112:22;135:3
**Colorado (1)**
38:19
**column (16)**

97:17;98:23;99:15,20,
21;100:6;106:2;111:22;
121:24;125:9;138:5,6;
155:2;161:10,15;162:4
**columns (2)**
104:10;138:8
**comfortable (3)**
45:3;48:15;150:11
**coming (4)**
11:5;57:9;118:25,25
**comment (2)**
28:23;101:25
**comments (5)**
28:25;29:1,4,6,21
**Commerce (1)**
134:14
**commercial (1)**
68:11
**Commission (58)**
29:16,16;37:23,24;
38:1;52:4;54:19;57:19;
65:8,14,19,25;66:4,5,7,9,
12,14;71:1;78:12;93:24;
94:10;95:20;96:23;98:4;
103:21;104:2,8,9;116:9,
11,12;118:2;122:15,21;
123:11,19,24;124:11;
138:7,12,13;147:19;
148:15,17;149:5;151:8;
152:25;153:3,10,22,23,
24;154:25;156:15;
158:3;166:18;169:5
**commission-based (1)**
38:5
**commissioned (2)**
52:21;93:15
**commissions (95)**
38:13;54:22,23,25;
55:2;56:3;57:12;65:11,
16;66:1;71:10;77:23;
82:8,14,15,16,20;83:1,6;
92:6,20,24;93:10,18,20;
94:7,18,19,21,22;95:1,3,
10,14,22;96:1;97:20;
98:8,11,12,16;104:16;
117:8;123:1;124:6,24;
138:16;144:5,7,8,14,15,
25;145:6,8,11,18,19,21,
24;146:1,3,5,8;148:9,11,
12,14;151:10,20;152:3;
153:13;154:5,18;156:4;
158:13,13;167:14;168:3,
8;169:10;170:5,12,22;
171:10,19;172:11,14,17,
25;173:3,9;174:8,9;
176:2
**commitment (1)**
41:14
**Committee (2)**
12:17;103:18
**common (3)**
67:19;75:7;80:10
**communicate (1)**

38:20
**communicated (8)**
59:7;118:24;179:16,
22,24;180:13,16,18
**communicating (2)**
45:3;114:10
**communication (10)**
32:7,8;44:6,13;81:23;
119:25;120:3;172:13,
18;173:13
**communications (4)**
93:23;102:17;151:18;
176:16
**communities (1)**
16:21
**Community (4)**
121:15,17;132:15,17
**companies (8)**
11:16;41:6,19;42:15,
16;55:11;67:22;97:18;
100:5;107:13;126:14,19,
25;127:2,24;128:6;
133:9;158:12
**company (78)**
6:14;13:6,6,24;14:2,
10;17:13,24,24;18:17;
20:3;21:3;22:23;24:10;
26:13;33:7,12;36:23;
37:9,23;38:6,12;41:21;
42:5;44:4;45:9;46:9,22;
53:18;54:20;55:13;
56:22;57:20;58:24;
59:19;70:14;71:3,8;
72:4,25;73:13,15;75:1,
12,13;76:19;78:4,5,6;
80:4,5;86:1,5;87:6,12,
13;89:5;97:17;99:11;
101:17;112:2;116:16;
127:9;129:10;131:16;
133:3;134:17;141:21;
144:4;148:8;151:19;
154:13;163:9;169:8;
172:10;173:2;174:6,11
**company's (3)**
39:14;53:25;173:7
**company-wide (1)**
59:6
**compensated (7)**
38:8;39:20;52:3;74:8,
17;94:9;169:3
**compensation (10)**
20:6;38:5;54:18;
61:19,24;62:8,11;77:22,
22;78:2
**competitor (1)**
121:14
**competitors (5)**
42:15,23,24;43:1,4
**complaint (8)**
6:16;8:17;167:2,2,8,
10,11;168:6
**complaints (1)**
152:23

**complementary (1)**
127:19
**complete (6)**
92:21;98:15;120:10;
138:3;143:9,13
**completed (1)**
143:15
**completely (1)**
163:11
**complex (2)**
111:3;149:8
**compliance (1)**
27:12;31:8;50:4;
132:11
**component (3)**
13:10;18:5;31:12
**components (1)**
14:24
**compound (4)**
7:8;74:11;93:5;108:1
**comprehensive (1)**
98:6
**Comptroller (1)**
141:17
**computer (1)**
171:11
**computers (1)**
84:21
**Con (1)**
49:15
**concept (5)**
14:6;15:11;17:25;
18:1,11
**concern (4)**
47:3;85:21;140:25;
147:12
**concerned (2)**
47:13;147:16
**concerning (1)**
80:9
**concerns (1)**
48:9
**conditions (8)**
61:8;62:4,7;64:15;
73:16;169:1,18;170:2
**conduct (1)**
84:24
**conduit (1)**
119:18
**conference (12)**
27:8;38:24;44:21;
84:17;87:1;91:25;
106:21;109:16;128:21,
22;129:11;135:19
**conferences (4)**
30:4;40:21;114:23;
177:1
**confidentiality (3)**
61:12,17;176:15
**confirm (1)**
63:12
**confirms (1)**
162:12

**confuse (1)**
128:6
**confusing (1)**
66:11
**congratulated (1)**
152:23
**conjunction (1)**
82:21
**Connecticut (6)**
29:2,3,18;118:17;
119:10,14
**connection (1)**
96:1
**connects (1)**
95:14
**Conservation (1)**
12:17
**consider (3)**
24:16;26:14;43:2
**considerable (1)**
82:3
**considered (1)**
13:22
**considering (3)**
44:15;59:16;163:23
**consistency (1)**
20:1
**consistently (1)**
85:12
**consolidate (1)**
164:2
**consortium (1)**
133:24
**consultant (2)**
58:4;174:11
**consulting (1)**
47:5
**consumers (1)**
42:16
**contact (19)**
101:22;113:25;
117:20;118:6,8;119:3,4,
18;131:4;134:4,19;
136:19;143:14;155:6;
176:4,22;179:1,2;180:5
**contacted (5)**
105:7;118:13;128:14;
129:18;132:10
**contacts (2)**
176:6,6
**contain (2)**
61:18;141:5
**contained (2)**
67:15;71:1
**contains (1)**
153:22
**contend (2)**
166:15;168:5
**contending (1)**
116:8
**contention (4)**
65:13;73:23;81:23;
125:15

**context (7)**
39:13;49:8;82:8;
92:25;93:10;95:1,11
**contingent (1)**
63:15
**continue (1)**
31:17
**continued (2)**
117:19;137:9
**continuing (1)**
177:5
**continuously (1)**
40:20
**contract (86)**
21:1;38:6,11;39:16;
50:5;53:3;59:15,23;
66:16,16,22,25;67:5,6,9,
20;71:14,25;72:3;73:24;
74:3;76:19;80:21;99:15,
25;101:8;102:1,3,4,6,25;
105:11;110:17;112:13,
16,19,20;121:23;122:3,
5,6,7,7,12,13,16;123:5;
125:9;126:10;128:20;
129:3,4;137:18;144:17,
18,19;145:13;146:22;
147:8,11,13;152:12,13;
154:16,21;155:6,15;
156:13;158:11,19;
159:3;160:8;161:10,12,
19,22,25;162:1,4,7;
166:16,18;167:13,16;
168:25;173:23
**contracted (1)**
58:3
**contractor (1)**
174:1
**contractors (7)**
52:24;53:3;57:24,25;
58:2,5;91:11
**contractor's (1)**
102:9
**contracts (19)**
34:16;62:6;66:21;
67:1;76:21,23;99:18;
111:3;123:9;129:22;
133:16;145:15;146:21;
148:22;153:17;154:14,
15,22;157:4
**contract's (1)**
162:13
**contractual (1)**
61:7
**contrary (1)**
122:22
**control (1)**
169:4
**controlled (1)**
154:12
**conversation (33)**
19:6;25:10;39:3;
56:25;59:10;77:13,17,
20;78:14;79:5,7;80:14;

82:20;85:14,18;104:22;
114:9;125:1;140:11;
145:20;156:2,5;163:21;
165:6,7;170:15,16,19,
24;171:2,8;173:20;
179:19
**conversational (1)**
45:20
**conversations (24)**
18:8;30:4;45:19;80:9;
94:23;99:12;114:13;
118:12;143:1;144:6,9;
145:7,21;163:8;164:8,
13,19,23,24;165:1;
169:7;170:25;171:5,6
**convert (1)**
77:25
**cooler (3)**
80:14,15,17
**coordination (1)**
32:25
**copies (4)**
61:4;69:5;175:8,12
**copy (9)**
70:23;140:1;141:3;
150:19;166:24;167:6,7,
8;178:11
**core (3)**
12:11;47:15;106:4
**Corin (1)**
119:2
**corporate (7)**
18:7;38:22;79:11;
108:6;163:1,4;169:10
**Corporation (2)**
179:12,16
**corporations (3)**
18:5;67:22,24
**correctly (1)**
65:22
**correspond (1)**
138:22
**corresponded (1)**
68:25
**correspondence (2)**
57:12;145:23
**cost (12)**
40:1;47:11;66:17;
68:12;122:23;144:20;
149:4,25;150:2,2;153:8;
155:1
**costs (7)**
66:18;144:22;147:10,
16;149:25;154:2,7
**COSTYN (33)**
2:19;5:4,20,25;6:5;
17:8;47:23;58:14,18;
77:10;86:9;124:20;
125:3,6;137:5,10;
139:12,20,25;140:6;
141:1;142:23;150:12,
22;167:6;174:14;175:6,
14,15;177:23;178:10,12;

181:2
**COUCH (1)**
2:3
**Council (1)**
103:4
**counsel (7)**
4:12;100:21;124:15;
125:2;141:7;150:21;
175:23
**County (11)**
107:23;112:23;
120:12,13,24;121:8,10,
24;126:18;134:14;
177:18
**couple (7)**
6:15;10:7;21:21;
78:18;137:3;149:10;
178:2
**course (4)**
10:20;33:1;40:20;
142:16
**court (4)**
6:23;7:3;176:14;
177:17
**covenants (1)**
174:13
**cover (1)**
127:8
**covered (2)**
126:14;172:19
**create (5)**
30:15;35:18;75:11;
135:8;151:14
**created (12)**
31:3;35:14;41:1;
50:23;51:1;97:14;99:2;
116:4;125:14;149:15;
150:9;151:10
**creating (2)**
44:3;134:22
**creation (1)**
97:11
**credit (2)**
100:18,19
**credits (18)**
11:23;14:15,22;24:21;
25:8;30:23;34:22,23;
35:4,5,13;42:16;49:25;
107:4,8;108:14;158:1;
159:7
**critical (1)**
18:5
**CRM (2)**
83:9,24
**cross-examination (1)**
5:7
**Crystal (1)**
57:1
**culture (1)**
44:4
**cumbersome (2)**
69:25;143:22
**current (6)**

9:13,21;53:20;90:18;
106:5;177:5
**currently (1)**
154:4
**Currents (8)**
104:25;105:3,12,13;
106:8,14,19;126:16
**curve (1)**
30:9
**Cusack (1)**
133:22
**customer (57)**
33:18;44:22;46:12,13,
15,23;49:20;55:16;67:4,
13,14;83:10;101:3;
102:21,21;103:3;105:3;
108:19,25;110:20,23,24;
111:2,9,16;112:6,7,8,8,9,
10,11,11;113:17;114:23;
116:18;117:4,13,14,15;
122:13;123:2,6;126:1;
130:1,2,10,12,21,23;
132:13;133:4;134:10;
138:17;149:23;158:18;
176:6
**customers (48)**
24:9;27:24;28:1;30:5,
17;31:2;33:17,22;40:9,
22,23;42:4,8,9;49:13,20,
24;50:2,2,21;56:16;67:2,
19;68:10,11;97:12,16;
98:2;110:1,15,15;
111:18,24,24;117:25;
121:9;123:8,20;127:7,
21;132:19;133:5;136:4;
149:2;152:19;158:1;
161:20;162:12
**customer's (1)**
110:25

**D**

**daily (1)**
44:8
**damaged (1)**
166:17
**Danny (1)**
90:16
**Dara (6)**
49:11;50:8;51:19,22;
52:2,8
**data (13)**
86:13,19,21;87:16;
88:12,15;92:3;97:14;
99:16,17,18;114:17;
144:16
**date (19)**
19:5,7;20:24;25:17;
62:15;63:10,14;64:1,6;
70:18;78:15;138:18,20;
161:10,12;162:18;171:4,
8;177:14
**dated (1)**

97:1
**dates (1)**
161:11
**Dave (1)**
114:6
**day (5)**
43:15;63:6;120:25;
129:7;171:7
**day-to-day (1)**
51:4
**DC (2)**
106:18;107:2
**deal (8)**
116:20;117:4;125:11;
149:24;168:19;180:21,
22,23
**dealing (4)**
33:22;168:11,22;
169:21
**deals (1)**
72:24
**dealt (3)**
52:20;53:2;131:10
**December (6)**
10:15;20:19;60:25;
64:11;163:22;165:7
**decide (3)**
72:25;111:10;172:21
**decided (2)**
81:14;115:6
**deciding (1)**
119:14
**decision (12)**
32:13;36:11;46:7;
48:4;77:21;83:23,24;
120:18;143:23;173:16,
17;179:7
**decision-maker (1)**
180:5
**decision-making (1)**
31:7
**decisions (3)**
175:21,22,23
**decrease (1)**
147:14
**Defendant (2)**
2:4;10:3
**Defendant/Counterclaim (1)**
2:14
**define (1)**
168:14
**defined (1)**
35:17
**definitely (1)**
16:23
**definition (3)**
14:4;35:25;168:14
**definitional (1)**
75:23
**delete (1)**
88:23
**deliver (1)**
120:20

**delivered (2)**
34:15;157:3
**delivering (2)**
55:15,19
**delivery (1)**
160:7
**Dell (1)**
176:25
**demand (4)**
146:25;161:8;164:10;
170:21
**demanded (1)**
163:6
**demanding (1)**
146:1
**Denver (3)**
38:19;180:2,14
**Department (2)**
29:15;120:15
**departure (1)**
170:23
**depend (2)**
35:19;123:14
**depended (6)**
27:8;35:24,25,25;
53:17;88:16
**dependent (1)**
20:7
**depending (2)**
111:10;145:1
**depends (5)**
35:15;110:23,24,24,25
**deponent (1)**
4:15
**deposition (17)**
5:5;6:9,12;8:1,22,25;
9:6,8,24;137:9;141:4,8;
150:14,20;166:20;
167:19;177:21
**depositions (1)**
6:22
**depositive (1)**
15:5
**Deputy (1)**
11:7
**describe (30)**
15:8;17:1;27:15;
35:12;37:16;44:25;
91:19;96:20;97:8;
101:10;103:5;104:25;
105:17;117:9;121:5;
127:10;128:4;129:25;
130:19;131:15;132:5;
134:13;135:2,13;136:11,
25;137:16;152:10;
153:20;173:7
**described (9)**
12:10;31:17;92:17;
143:2;146:15;147:6;
150:3;151:2,9
**describes (1)**
62:3
**describing (2)**

35:3;166:5
**description (4)**
12:7;25:23;92:5;123:4
**designated (1)**
4:13
**desk (1)**
16:19
**destruction (1)**
25:2
**detail (3)**
78:25;136:10;158:12
**detailed (2)**
123:4;178:24
**details (4)**
75:8;118:21;119:17;
129:2
**determine (4)**
50:19;66:18;154:2,17
**determined (1)**
155:11
**developed (1)**
87:5
**developing (1)**
18:15
**development (34)**
11:13;13:9;21:6,8;
22:9;23:3,6,12,18;24:2;
25:6;29:24;49:1,3;51:8;
64:7;76:9,11;83:14,18;
84:3,13;85:3,25;86:23;
90:23;91:14;94:16;
96:10;110:5;117:21;
140:13;142:4,7
**developments (1)**
30:1
**difference (4)**
24:24,25;27:11;49:12
**differences (1)**
72:11
**different (13)**
31:24;34:9;49:16,16,
22,23;89:11;101:22;
106:11;117:10;122:12;
127:24;131:8
**ding (2)**
110:18;114:21
**dinner (3)**
180:2,14,17
**direct (10)**
44:5;56:6;63:24;
92:10;119:18,25;120:3;
170:15;178:2;180:6
**directed (1)**
117:17
**directing (2)**
44:3;45:7
**direction (2)**
45:12;50:15
**directives (1)**
45:19
**directly (17)**
18:19;28:18;32:23;
41:17;43:18;50:4,6,10;

56:25;58:6;114:13;
118:13;128:14;131:9;
133:11;152:8;179:24
**Director (16)**
11:8;15:20,21,22;
21:6,8,18,22;22:4,6,8;
23:3,12;32:20;34:6;
131:2
**dirty (1)**
15:15
**disagree (2)**
48:4;125:4
**disagreed (3)**
46:3;47:25;48:1
**disagreement (2)**
46:5,16
**disagreements (4)**
45:25;47:17,24;57:23
**disappointed (1)**
48:3
**discipline (2)**
38:25;85:13
**disciplined (2)**
39:5,5
**disclaimer (1)**
160:2
**discovery (14)**
5:6;8:4,13,18;37:1;
124:8;129:4;139:23;
140:1,23;141:2;150:17;
151:13;174:21
**discuss (2)**
56:10;82:7
**discussed (12)**
9:6;61:24;62:7;64:3,5;
82:25;92:24;93:9;
118:20;141:24;176:9,13
**discusses (4)**
94:25;95:3,10,25
**discussing (1)**
129:24
**discussion (14)**
19:3;40:12;92:6;94:1;
114:11;115:3,7,10,21;
120:19;140:13;150:25;
164:4;171:9
**discussions (16)**
24:8;45:24;54:14;
57:16;71:7;79:18,25;
82:11,12,12;94:14;
117:6;142:5,18;143:3;
151:24
**disparate (1)**
32:10
**dispute (1)**
57:19
**distance (1)**
44:16
**distinct (1)**
102:19
**distinction (2)**
75:21;105:2
**distraction (1)**

47:14
**divorce (2)**
165:20,21
**Document (38)**
4:2,5;36:25;60:21;
61:22;62:3;66:6,15;
70:21;81:2,19,22;86:4;
91:17;92:20;93:1,8;
95:2,4,9,10,25;96:18;
99:2;137:20;139:22;
140:22;141:1,17;150:16,
24;163:5;166:5,8,23;
169:25;178:5,7;179:5
**documentation (5)**
8:3;74:2;81:13;96:23;
171:22
**DOCUMENTS (16)**
4:1;8:2,6,13;61:7,16;
73:22;90:17;129:4;
137:13,17;139:1;
140:15;141:19;151:5,13
**dog (2)**
157:8,14
**dollars (2)**
16:17;147:15
**donations (1)**
113:11
**done (8)**
12:20;20:4;29:3;
77:10;84:14,16;123:3;
179:18
**door (3)**
50:22,22;51:7
**double (3)**
27:1;59:16;64:20
**down (9)**
6:24;47:5,10;51:8;
86:18;98:20;134:23;
139:6;163:24
**DPUC (4)**
29:3,13,14,18
**draft (2)**
37:6;145:22
**drafted (3)**
67:1,3,9
**Drane (1)**
57:1
**drive (5)**
84:2;87:12,13;134:22;
154:13
**driven (1)**
147:13
**driver (3)**
33:22,25;34:1
**drivers (3)**
31:7,13;111:1
**drugs (1)**
7:20
**due (2)**
153:13;154:18
**duly (1)**
5:22
**Dupli (14)**

105:17,18;106:8,9,14,
25;107:10;111:15;
112:7;126:16;128:7,8,
12,13
**duplication (1)**
87:23
**during (19)**
18:9;25:5;39:9;50:23;
52:6;59:2;93:21;119:3;
142:19;148:6;153:1;
159:2,10,11,11,12,23;
170:18;174:19
**duties (4)**
23:4,13;31:21;154:14
**duty (3)**
168:10,19,21

**E**

**E-4 (2)**
128:21,22
**Eagle (4)**
112:6;127:9,11,21
**earlier (9)**
31:17;34:4;36:7;
60:13;64:18;76:1;87:4;
92:1,23
**early (12)**
12:25;18:23;19:8;
24:6;26:24;27:8;34:8;
57:6;83:15,15;95:23;
165:4
**earn (4)**
59:19;66:14;138:16;
174:9
**earned (4)**
25:21;37:22,24;
153:10
**Eastwood (4)**
112:8;128:3,5,13
**easy (1)**
110:15
**EBA (11)**
13:17,18;15:17;16:12;
17:10;18:1,10;19:21;
20:5;63:6;119:23
**Ed (6)**
16:4,13,15,18,19;
18:12
**Edison (1)**
49:15
**edit (2)**
88:15;89:2
**educated (2)**
30:11,12
**education (5)**
10:25;12:10;18:4;
53:16;131:1
**educational (2)**
10:8,22
**efficiency (19)**
14:18;15:10;22:18,19;
23:1;25:8,13;26:8;

31:21,23;32:10;33:4,8,
21;34:2;36:9,10;114:12;
115:22
**efficiently (1)**
33:13
**efforts (1)**
40:23
**either (15)**
8:19;31:13;36:25;
37:1;46:24;66:17;74:5;
93:1,8;105:13;114:13;
122:2;123:8;155:25;
159:21
**electric (1)**
55:14
**electricity (4)**
68:12,13;121:13;
122:11
**electron (4)**
14:25;15:13,14;150:6
**electronic (3)**
70:1;83:9;84:19
**electronically (2)**
84:15;143:25
**element (2)**
71:13;169:3
**eligibility (1)**
160:7
**eligible (7)**
35:23;66:13;122:20;
138:15,15;160:10;161:1
**Elizabeth (6)**
17:15;74:20;76:12;
84:7;94:15,23
**else (25)**
8:9;14:5;30:8;36:23;
38:18;39:9;43:12,20;
52:9;56:22;71:8;79:4,
16;89:21;101:4;102:7;
116:14;119:5;120:4;
129:19;144:4;145:5,12,
17;151:19
**else's (1)**
38:11
**Elway's (3)**
180:2,14,17
**E-mail (49)**
28:5;36:18,24;37:6,6;
38:21;54:1;57:11,16;
69:1,5;89:23;90:3,20;
91:20,24;92:5;93:9,14,
20;94:1,25;95:21;
100:16,23;101:17,23;
102:20,22;103:3,10,12;
106:7;114:12,14;139:6,
8,17;140:7,10,16,19;
141:10;142:12;145:22;
146:1,2,4;155:23
**e-mailed (2)**
60:25;61:1
**e-mails (12)**
82:3,7,19,22,24;92:24;
95:18;101:21;102:12,13,

24;152:1
**emerging (2)**
22:20;26:7
**emissions (3)**
25:3,4,4
**Empire (8)**
21:6,9,11;22:9;23:4,8;
24:2;25:6
**employed (11)**
37:23;48:21;52:22;
64:16;72:2;144:2;
145:24;148:6;153:1;
156:16;176:21
**employee (13)**
38:9;43:5;61:13;73:8,
19;74:6,15;75:5;85:5;
90:2;109:2;113:21;
133:12
**employees (29)**
37:8;40:7;41:16;53:2;
71:22;74:25;75:16,24;
76:14,19;79:20;80:10;
84:4;85:14;89:5,12;
90:13,14;91:2;94:10;
102:12,18;109:21;
128:17;176:5,8,17;
177:3,6
**employment (40)**
6:18;12:24;16:25;
17:3;18:10;19:2,4,11,16;
20:16,21,25;21:14,24;
30:25;38:11;43:3,3,16;
46:2;59:2,22;61:9;62:4,
8,14;63:15;64:15;68:22;
74:3;97:5;122:16;
137:18;144:19;159:5;
162:15,18;168:25;
169:14;173:23
**empowered (1)**
45:10
**end (13)**
8:11,12;20:23;21:1;
24:8;42:17;43:16;46:2;
99:9;101:8;129:7;
160:15;162:14
**ends (2)**
110:17;164:20
**End-User (43)**
66:15;68:23,24;69:3,
4,12,13,16,19,23;70:7,
10,13;80:22;81:3,5,7,8,
12,16,25;92:7,11,18;
95:22;100:4,10,12;
137:20,21;140:12;
141:24;142:6,19;143:1,
4;148:23,24;178:15,20;
179:4,6,8
**energy (62)**
11:23,23;12:1,11,14;
14:15,17,22,24;15:2,5,
10,10,12,14,15,16;
16:20;24:5;25:1,8,13;
26:8;27:9,15;29:7;30:2,

23;31:9,11;34:22;35:10,
11,13,16,19;42:20;
49:25;55:4,4,13,14,19;
103:5;107:4,7;108:13;
109:7;114:11;115:22,
23;121:15,18;127:13;
134:16;135:17;137:1;
157:16,25;159:7;180:4,8
**engage (4)**
44:5;57:11;110:13;
172:12
**engaged (2)**
51:19;151:18
**Engineers (1)**
26:22
**Engineers (1)**
131:14
**enlist (2)**
119:12,16
**enough (3)**
16:11,23;110:19
**enter (3)**
102:3;161:19;179:2
**entered (2)**
122:13;161:17
**entire (3)**
12:14;89:2;137:21
**entities (3)**
41:11;52:15;158:2
**entitled (23)**
39:17;71:18;72:14;
97:19;98:3,21;99:15,20;
100:6;111:22;116:9;
117:8;122:15;123:10;
124:21,24;138:5;154:4;
158:3;162:4;172:10;
173:2,9
**entitlement (4)**
65:10;124:10;156:15;
176:2
**entity (3)**
28:21;127:18;157:8
**entries (2)**
101:9;104:24
**entry (1)**
178:25
**Envelope (3)**
105:17;112:7;127:9
**environment (4)**
27:25;31:2,4;45:14
**Environmental (21)**
10:21;11:8,25;12:7,
11,14,16,18;13:15;15:1,
4,12;22:21;23:22;41:8;
46:21,24,25;128:23;
130:19;133:23
**EPA (2)**
24:17;41:10
**equity (1)**
59:18
**errors (1)**
85:19
**escapes (1)**

108:4
**especially (1)**
26:24
**ESQ (3)**
2:8,9,19
**essence (4)**
55:10;130:3,25;150:9
**essentially (1)**
24:21
**estimate (3)**
99:9;153:3;154:9
**even (7)**
12:13;33:20;49:8;
75:10;88:22;103:25;
120:16
**event (3)**
27:1;44:24;121:19
**events (2)**
7:24;18:10
**eventually (3)**
17:15;58:12;131:7
**ever-evolving (1)**
26:19
**everybody (6)**
16:22;74:19;89:1,18,
19;116:16
**everyone (1)**
90:4
**evolution (1)**
33:24
**exact (6)**
19:7;76:20;81:10;
118:22;140:16;145:19
**exactly (1)**
102:15
**EXAMINATION (3)**
5:24;175:15;177:25
**examined (1)**
5:23
**example (13)**
54:5;85:3;88:19;
89:22;102:16;111:16;
130:1;132:18;134:3;
146:20;150:9;152:20;
179:1
**exceeded (1)**
147:10
**Excel (14)**
68:25;69:2;86:3,4;
87:23;92:22;97:10;
122:4;137:25;143:25;
148:22;149:7,14;151:8
**except (2)**
90:20;149:6
**exclusive (1)**
23:17
**exclusively (2)**
16:6;109:13
**execute (3)**
61:3,6;102:1
**executed (11)**
20:25;61:22;68:23;
69:9,16;100:4;144:17,

18;148:25;153:16;
161:13
**Executive (7)**
11:8;15:19,21,22;
120:25;132:7,11
**executives (1)**
91:7
**Exhibit (28)**
4:5;60:19;70:22;
77:11;91:16;96:16;
137:12,17;139:4,11;
141:4,22;143:11;150:15,
17;154:24;158:2;161:8,
9;166:20,25;167:18;
171:13;173:12;175:2;
178:3,14,18
**exhibits (3)**
174:20;175:4,11
**exist (5)**
5:8;30:13;69:18;70:8;
87:8
**existed (2)**
31:1;67:11
**existence (1)**
93:4
**existing (22)**
40:23;46:15;55:16;
88:15;90:1;102:1,2;
108:24;112:1,10,10,11,
15,18,18,19,20,21;
113:17;114:23;121:11;
130:21
**expanded (3)**
23:14,16;40:18
**expanding (1)**
57:9
**expansion (1)**
76:17
**expectation (1)**
169:2
**expected (3)**
143:12,13;145:13
**experience (3)**
10:23;12:9,23
**expert (4)**
13:6;26:15;27:13,19
**expertise (6)**
11:21;27:16,17;32:5;
115:13,15
**explain (5)**
14:21;26:1;27:17;
143:6;178:23
**explained (2)**
10:23;152:18
**explicit (2)**
93:22;96:4
**explicitly (6)**
93:19;94:25;95:2,25;
104:8;127:3
**exposure (1)**
115:11
**express (9)**
46:16;48:9;107:3,5,7,

9,11;108:12;113:4
**expressed (1)**
64:19
**expressly (1)**
127:3
**extended (2)**
112:13,16
**extensively (1)**
134:22
**external (11)**
11:16;13:5;16:2;
23:21;30:5;32:3,6,7;
52:12;163:23,25
**externality (1)**
15:6
**externally (1)**
163:12
**eye (1)**
16:2

# F

**face (1)**
13:5
**facilitate (1)**
39:15
**facilitated (2)**
40:3;152:24
**facility (2)**
113:8;160:10
**fact (3)**
87:5;175:2;178:20
**facts (4)**
168:11,20;169:19,25
**failed (1)**
167:24
**failure (1)**
167:13
**fair (6)**
14:1;47:11;61:21;
123:20;168:11;169:21
**fairly (6)**
89:16;134:21;138:3;
157:21;165:2;168:20
**faith (5)**
168:10,19,22;169:6,20
**fall (5)**
19:20;20:11;83:17,19;
159:12
**family (3)**
19:24;164:16;165:13
**far (6)**
19:15;38:9;43:25;
62:8;92:18;106:6
**fashion (1)**
101:16
**father (1)**
165:16
**February (8)**
62:15,16,20,23;64:11,
12;114:4;116:24
**Federal (5)**
4:14;5:8,9,17;29:21

**Federation (2)**
112:25;136:24
**fee (3)**
39:19,22,25
**feedback (1)**
143:16
**feel (3)**
7:5,10;48:15
**fees (1)**
66:18
**felt (5)**
47:1;78:2;143:21;
150:10;170:12
**female (2)**
26:11,12
**few (5)**
97:4;127:8;156:4
**field (8)**
11:22;12:1,15;101:24;
153:19,21,24,25
**figure (12)**
18:25;57:2;79:1;
121:25;122:1;125:12,18,
19,22,24;149:24;153:7
**figured (1)**
24:20
**figures (3)**
98:22,22;99:1
**file (2)**
39:7;122:6;126:1;
172:21
**filed (4)**
65:9;97:22;177:9,19
**fill (3)**
143:24;166:3,9
**filled (5)**
13:1;27:4;156:1;
166:7;170:1
**filling (1)**
27:5
**final (3)**
134:5;154:6;161:25
**finalized (1)**
123:25
**Finally (2)**
136:23;169:16
**financial (2)**
166:4,9
**financially (2)**
19:24,24
**find (4)**
30:12;174:20;175:11;
178:4
**fine (2)**
7:7
**fired (2)**
110:10;171:6
**firm (1)**
13:13
**first (44)**
5:22;10:5,12;14:2,10;
17:2;19:6;21:4;25:9;
26:12;31:25;32:1;35:14;

42:23,25;43:9;56:14;
58:23;67:17;68:21;69:2;
70:10;71:5;72:18;79:8;
83:7;88:7;100:13;
101:16,18;113:6;114:3,
8;115:2;130:17;138:23;
144:24;164:16;165:3;
169:13;170:3,10;
171:16;172:20
**firsthand (3)**
63:25;141:22;176:1
**fish (1)**
40:11
**five (15)**
9:16;16:14;58:15;
60:14,16;65:8,14;66:9;
98:22;101:9;147:25;
168:3;177:10,12,13
**five-minute (1)**
174:15
**flat (2)**
39:19,22
**flipped (2)**
35:21,22
**Florida (1)**
172:5
**flux (1)**
90:15
**focus (16)**
12:1,12,13;24:10;
28:21;32:3,9,10;49:3,5;
51:13,14,15,16;117:21,
22
**focused (5)**
12:2;16:6;33:17;
50:17;163:12
**folks (3)**
113:10;163:23,23
**follow (4)**
5:17;27:19;156:22;
157:18
**followed (1)**
149:21
**following (1)**
97:2
**follows (3)**
5:23;139:9,17
**follow-up (2)**
115:10;170:16
**footprint (1)**
46:12
**FORD (2)**
2:13;6:6
**forecast (1)**
111:12
**foregone (1)**
69:25
**forgiveness (1)**
45:13
**form (113)**
5:11;17:6;41:23;43:7;
47:19;48:18;53:14;
57:22;62:2,10;65:18;

66:3,16;70:6;73:6;74:1;
75:19;76:7;77:3;79:22;
81:1,6,7;82:2,10,23;
83:4;86:8;87:11;89:8;
90:11;91:5;92:9;93:13;
94:13;95:6,13,17;96:3;
97:25;98:9;99:4,23;
100:5,9;101:1,14;
102:14;104:12;105:16;
106:3,13;107:17;108:16,
23;109:4,24;112:4;
116:10,22;117:12;
119:8;120:2,7;123:13;
124:3,13,19;125:17;
126:12,23;127:7;
133:15;136:1;137:20,
20;138:9;140:21;142:2,
10,22;143:10,13;146:10;
148:23;149:17;151:22;
153:6;155:20;156:18;
158:5;159:25;160:24;
162:17;163:20;164:7,
22;166:1,22;167:21;
168:24;169:23;170:7,
14;172:16;173:15;
174:5;175:21;176:3,12,
19,24;177:7
**formal (5)**
 10:24;45:16;165:20,
 21;169:13
**formally (5)**
 39:4,5;46:10;163:6;
 169:15
**format (1)**
 155:17
**former (2)**
 176:17;177:3
**Forms (41)**
 68:23,24;69:4,4,9,12,
 13,17,19,23;70:8,10,13;
 80:23;81:3,9,12,17,25;
 92:7,11,18;95:23;
 100:10,12;137:22;
 138:5;140:12;141:24;
 142:6,19;143:1,4,9,24;
 148:24;178:15,21;179:4,
 6,8
**for-profit (2)**
 18:7;41:11
**forward (5)**
 20:11;127:4;160:13,
 20;161:2
**found (3)**
 42:9;51:23;125:18
**four (13)**
 71:15,17;72:14,24;
 73:12,16,17,18,23;
 76:20;143:19;151:12;
 168:2
**fourth (1)**
 178:25
**frank (1)**
 135:19

**Frankly (3)**
 80:15;128:8;136:10
**free (2)**
 7:5,10
**frequent (1)**
 165:5
**Frequently (3)**
 44:7;85:19;86:19
**freshman (1)**
 12:25
**Friday (1)**
 172:3
**friend (1)**
 128:1
**Frito (1)**
 113:12
**front (4)**
 16:19;137:25;140:14;
 178:7
**frustration (1)**
 58:8
**FTC (2)**
 114:15;115:18
**Fugere (2)**
 69:20;84:8
**fulfill (1)**
 159:3
**full (2)**
 6:1;179:2
**function (1)**
 17:11
**functions (1)**
 54:2
**fundamentally (1)**
 32:2
**funding (4)**
 20:8;63:17,21;64:1
**funds (1)**
 122:17
**Furnish (1)**
 4:4
**FURTHER (3)**
 4:15;178:17;181:2

**G**

**Gary (9)**
 54:23;105:7,9,12,13;
 148:13;149:8;151:1;
 152:1
**Gas (4)**
 32:20;33:19;34:7;
 46:12
**gave (3)**
 45:11,12;53:24
**general (13)**
 6:17;30:2,23;44:25;
 48:19;77:23;91:11;
 92:13;99:5;123:16;
 142:5;154:8;156:6
**generally (2)**
 119:17;155:21
**generate (1)**

 40:25
**generated (7)**
 40:16;159:2,10,17,17,
 23;160:9
**generating (1)**
 46:19
**generator (2)**
 157:3,15
**generators (1)**
 35:10
**geographic (1)**
 44:15
**Geography (1)**
 10:17
**George (10)**
 105:18;108:3,21;
 109:9;127:12,22;128:1;
 129:17;135:6,16
**Georgia (1)**
 2:17
**gets (2)**
 123:2;130:8,9,10,10
**girl (2)**
 104:15,19
**given (16)**
 8:19;18:12;26:1,3;
 40:17;50:24;68:24;
 81:19;86:22;110:10,10;
 130:6,7;137:19,22;
 143:11
**giving (1)**
 7:18
**global (1)**
 180:8
**goal (2)**
 33:19,20
**goes (2)**
 62:8;175:17
**good (18)**
 5:20;45:2,14;47:7;
 53:18;55:3,19;64:9,13;
 65:23;95:8;104:14;
 128:1;168:10,19,22;
 169:6,20
**Gordon (3)**
 134:15;135:17;137:1
**gosh (2)**
 118:18;135:16
**go-to (1)**
 32:22
**governed (1)**
 26:17
**government (2)**
 13:14;41:8
**governmental (1)**
 157:10
**graduated (3)**
 10:10,12,15
**granted (1)**
 77:14
**great (7)**
 18:21;30:8;53:22;
 131:5;164:14,17;165:2

**green (20)**
 15:2,2;17:17;18:13;
 33:25;41:9;55:15;68:4,
 13,18;100:20;111:14,15;
 114:15;115:19;121:11,
 14;127:25;135:9;157:9
**Green-e (17)**
 114:11;156:20,20,22,
 23;157:5,6,7,18;158:7,9,
 14,16,20;159:9;160:6;
 161:1
**greenhouse (5)**
 25:4;32:20;33:19;
 34:6;46:12
**Greg (10)**
 74:20;76:10;84:7;
 94:14,23;110:8,9;
 142:16;143:20;176:25
**Gregor (1)**
 149:9
**Grenier (1)**
 136:14
**Grossman (7)**
 112:9;129:14,16,18;
 135:5,6,12
**group (7)**
 36:12,13;76:16;
 127:14;129:14;135:5,7
**guarantee (1)**
 117:16
**guaranteed (1)**
 174:12
**guess (2)**
 75:9;147:20
**guessed (1)**
 99:9
**Guide (2)**
 61:15,18
**guy (3)**
 55:12;86:12;101:24
**guys (1)**
 38:20
**guy's (1)**
 120:17

**H**

**hall (1)**
 51:8
**Hamilton (5)**
 112:9;129:24;130:3,7,
 14
**hand (7)**
 60:18;96:15;137:11;
 139:3;143:12,24;167:6
**handbook (2)**
 61:13,17
**handed (4)**
 91:15;135:23;136:2;
 143:10
**handing (1)**
 77:12
**handle (1)**

 32:23
**handled (1)**
 32:16
**handling (1)**
 47:25
**hands (3)**
 16:9;120:22;162:1
**handwritten (2)**
 143:14,15
**happen (1)**
 56:5
**happened (4)**
 19:15;20:15;56:6;
 165:2
**happy (1)**
 180:23
**hard (2)**
 98:20;163:25
**HARRISON (2)**
 2:13;6:6
**Hartwick (5)**
 112:10;130:18,20;
 131:12;134:3
**Hathaway (3)**
 49:2;85:6,16
**head (4)**
 6:22;153:7;154:9;
 180:8
**headed (2)**
 97:17;161:10
**heading (1)**
 92:13
**headquarters (4)**
 69:6;108:6;163:1,4
**Heads (2)**
 118:14,22
**heard (2)**
 17:25;57:23
**heavily (2)**
 116:19;130:24
**held (1)**
 85:10
**help (5)**
 46:24;51:16;55:25;
 136:15;149:20
**Henry (11)**
 150:8;155:2,7,9,16;
 160:8;170:16;171:3,7,
 18;172:2
**HEREBY (1)**
 4:10
**herein (2)**
 4:12;5:22
**here's (2)**
 87:19;118:15
**hierarchy (1)**
 86:6
**high (8)**
 10:9,10;26:4;32:4;
 37:20;50:16;94:22;
 118:20
**higher (3)**
 89:9,14;130:25

highest (1)
88:25
hill (1)
17:21
hire (4)
48:5;64:6;164:16;
165:2
hired (9)
37:25;38:1;45:11;
63:23;76:8;94:17;
138:23;141:16;142:17
Hiring (1)
65:1
Historic (1)
132:4
history (3)
26:13;96:12;109:25
hit (1)
27:2
hoc (2)
156:9,10
hold (1)
11:3
holder (2)
99:8;150:10
home (4)
9:22;60:5,13;80:17
honestly (2)
120:15;166:12
honking (2)
41:2,4
honor (1)
173:22
horizontals (2)
50:17,18
hostile (2)
143:4,7
hour (2)
15:9;25:1
hours (2)
47:9;174:12
house (6)
34:11;39:25;40:6;
90:24;130:15;160:3
household (1)
68:18
houses (1)
23:20
HR (2)
38:10;170:17
huh (1)
80:18
hundred (2)
11:14;147:23
Hundreds (2)
34:20;35:2
hunt (1)
28:14
hunting (1)
28:16
hurdles (1)
111:20
hurt (1)

147:18
husband (1)
165:17
Huttu (1)
49:11
hypothetical (1)
77:4

I

I' (1)
80:2
idea (1)
105:21
identified (3)
6:16;65:12;70:22
identify (4)
80:21;81:22;111:23;
174:23
identifying (2)
16:3;140:24
imagine (3)
117:3;122:25;129:21
immediate (1)
18:24
immediately (2)
11:6,7
impact (1)
114:15
implement (1)
84:2
imply (1)
93:16
import (8)
81:9;86:19,21,24,25;
87:1;92:3;122:3
importance (2)
82:4;152:18
important (9)
19:23;23:24;26:10;
34:2;78:7;111:2;116:18;
117:5;169:11
imported (4)
51:1;69:18;86:13,15
inappropriate (1)
75:9
include (3)
46:22;52:13,14
included (12)
12:1;23:18;53:16;
84:7;90:21,21,22,23,24,
24;139:7;164:10
includes (1)
92:14
including (6)
26:5;30:6,7,7;120:23;
144:10
income (3)
144:20;145:3;166:5
Incorporated (2)
101:10;128:3
increase (1)
78:4

increased (2)
77:22;148:4
increasingly (3)
26:4,6,10
independent (3)
52:23;174:1,11
in-depth (1)
96:13
indicated (4)
64:6,13;147:10;
180:10
indicates (2)
70:17;138:10
indicating (1)
141:6
indication (2)
59:9;139:24
individual (3)
40:14;49:18,19;53:12
individuals (14)
51:18;52:18,22;55:11;
67:25;76:1,5,18;88:11;
90:8;106:12;175:25;
176:7,20
industry (3)
29:24;30:19;152:15
inform (1)
30:17
information (28)
17:13;92:13;99:25;
114:22;115:17;125:13;
136:19;141:25;143:15;
154:17,23;155:6,16,22,
24;156:8,10,13;161:14,
16,19,20;162:8,10;
166:9;179:2,3;180:16
informed (1)
30:1
infrequent (1)
19:18
in-house (1)
85:3
initial (10)
76:17;84:6,11;86:15,
24;110:7;116:23;
118:11;131:4;137:18
initially (5)
22:3;30:10;40:17;
53:16;64:22
initiatives (1)
130:25
inordinately (1)
111:4
in-person (3)
84:14;105:22,25
input (5)
87:7,16;88:12;125:23;
153:19
inputted (1)
125:19
inquiring (1)
101:18
inquiry (1)

136:13
inserted (1)
99:24
instead (3)
50:17,18;62:23
Institute (1)
112:24;135:14
institution (3)
13:18;134:5,7
instructed (2)
49:3;114:24
instruction (1)
92:21
instructions (1)
178:24
instrumental (1)
83:21
insure (2)
148:16;151:19
integrity (1)
157:23
Intel (27)
31:10;49:21;107:21;
111:19;112:11;113:24,
25,25;114:6;115:5,6,24;
116:7,15,19;117:13;
118:3;125:7,8,11,25;
126:3,10,17;179:12,16;
180:6
intend (1)
175:18
intent (1)
123:1
interacting (1)
23:21
interaction (1)
108:20
interactions (4)
19:15;101:11;102:8;
146:19
interest (2)
130:6;137:6
interested (12)
17:24;18:3,6;19:2;
20:2;52:19;77:24;
119:10;128:14;131:6;
134:20;174:3
interface (2)
11:15,17
interfaced (1)
53:1
interim (1)
22:3
internal (9)
32:8,22;54:2;85:2;
87:12;94:1;117:6;
120:14;141:18
internally (5)
26:11;32:10;41:3;
63:2;115:6
internet (1)
84:22
interrupt (1)

7:6
into (16)
18:6;25:16;33:5;
35:23;51:2;81:10;86:14,
19;87:2,8,16;92:3;
102:3;122:13;125:20,23
introduced (5)
109:1,8;113:24;114:2,
3
inundated (1)
143:8
investor (1)
44:21
investors (1)
78:20
invitation (3)
84:8;85:9;89:24
invite (7)
88:3,6,8,10;89:25;
90:1,3
invited (1)
89:21
invoiced (1)
126:8
invoices (1)
125:25
involved (52)
10:1;12:22;13:8,11;
15:24,25;16:9;18:17,18,
25;19:1;24:13;25:7;
26:4,6;28:9;29:5,6,12;
31:23;37:13,19;39:25;
40:1;41:16;44:2;53:4;
57:7;58:6;102:4;102:8;
103:25;106:16;109:7,
21;116:14,19,25;117:2,
18,23;119:5;120:4,8,9;
128:17;129:20;130:24;
131:23;133:13,24;
144:16
involvement (3)
29:17;43:22;114:15
Ira (2)
15:19;16:8
Island (2)
121:3,12
issue (10)
14:7,7;32:11,12,12;
56:21;57:5;64:3;79:9;
151:7
issues (11)
12:2,19;26:6,8;28:13,
14;30:22;58:7;63:2;
74:4;118:20

J

Jackson (1)
90:16
January (4)
63:17,21;70:18,24
Jersey (2)
21:12;130:4;133:25

**Jewish (2)**
112:25;136:23
**Jo-Ann (1)**
115:17
**job (18)**
11:6;12:21;13:4;21:5,
13,17;22:15,24;23:4,13;
30:24;53:20;63:4;69:24;
104:14;154:13;164:17;
165:10
**jobs (1)**
94:17
**Joe (13)**
84:9;94:2;114:19;
116:25;117:17;119:13;
130:16;155:10,17,23;
177:2;179:20,25
**John (14)**
54:24;85:7;118:6,7,8,
17,19,23,24;133:22;
148:13;149:9;151:25;
180:17
**Johnson (5)**
49:11;85:4;101:2,6;
102:22
**join (2)**
16:3;89:22
**joining (1)**
20:2
**jokes (1)**
180:22
**Jones (23)**
17:7,10;26:25;43:11,
14;44:6;45:1;46:1,17;
48:10;56:23;60:25;69:9;
71:8;77:14;119:6;
130:17;144:4;145:5,11;
176:25;180:1,19
**JOSEPH (3)**
2:19;6:5;48:2
**Journal (1)**
115:8
**July (6)**
25:19;158:25,25;
159:5;160:10;162:20
**juncture (1)**
181:1
**June (2)**
144:24;158:25

**K**

**Kaprowicz (1)**
76:12
**Kasprowicz (3)**
17:16;84:7;94:15
**keep (6)**
27:20;29:25;97:11;
104:14;117:14,24
**keeping (3)**
23:19;85:22;94:3
**keeps (1)**
130:10

**Keller (5)**
54:24;85:7;148:13;
149:10;151:25
**Kelly (8)**
5:5,21;6:3;9:12;80:4;
114:20;151:3;180:22
**Kemper (1)**
105:20
**Kennebunk (2)**
136:12,17
**kept (2)**
86:11;144:12
**Kessel (1)**
120:24
**Keswick (1)**
151:3
**key (3)**
31:12;97:12;176:4
**kind (8)**
6:19;26:16;48:16;
55:20;106:16;122:12;
129:7;166:9
**kinds (2)**
80:9;118:20
**knew (15)**
17:22;38:10;58:9;
69:16;74:24;75:24,25;
86:18;103:19;141:17;
148:10,11,12;154:7;
173:4
**knock (1)**
50:22
**knocking (1)**
50:21
**knowing (9)**
24:14,15;27:19;46:22;
77:25;146:16;153:8,9;
160:5
**knowingly (1)**
124:5
**knowledge (24)**
29:23;30:21;31:6;
52:25;53:19;56:7,20;
57:18;63:19,24,25;68:1;
75:7;80:10;83:2;96:13;
99:5;115:16,24,25;
126:2;158:10;176:1;
179:14
**known (11)**
9:11;14:18;66:17;
119:22;144:19,22;
149:25;150:2,6;151:14;
155:3
**Krembs (11)**
30:7;32:18;34:4;
36:15;37:13;48:21;52:7;
76:12,15;84:9;177:2

**L**

**lag (1)**
146:15
**laid (1)**

**169:24**
**Lake (2)**
130:18;131:3
**language (7)**
61:19;71:24;72:3;
73:9;75:23;76:20;77:7
**large (8)**
40:13;53:9;67:23,24;
87:5;91:9;117:4;144:24
**larger (2)**
40:11;121:16
**largest (2)**
42:19,22
**Larsen (7)**
112:12;131:14,16,18,
23;151:11;152:21
**last (16)**
57:4;63:6;70:16;
72:23;99:20;108:4;
141:11;150:17;161:22,
25;162:2;171:2,7;
177:10,11,13
**late (3)**
25:12;49:1;78:16;
83:15;173:3
**later (5)**
35:24;62:16;65:13;
87:3;131:3
**Latham (3)**
6:4;9:14;60:8
**L-A-T-H-A-M (1)**
60:10
**laundry (1)**
90:12
**lawsuit (16)**
6:7,14,17;10:2;65:9;
66:1;97:22;123:7;
124:22;166:15;167:23;
168:9,16;172:22;
175:17;176:9
**lawyer (1)**
168:17
**Lay (1)**
113:12
**lead (15)**
40:15;49:6,7;50:24;
69:1,2;81:10;82:5;
86:11;88:22,23;101:16;
129:16;178:25;179:3
**leaders (3)**
24:17,17;41:10
**leads (27)**
16:18;40:25;50:16;
51:2;54:3,4;69:18,19;
86:2,16;87:6,7;88:20;
90:25;91:23;92:14,16,
17;93:15,17;94:3;110:6;
137:19,24;138:24;
143:17,19
**learned (2)**
75:1;171:18
**learning (1)**
30:9

**least (2)**
9:16;134:24
**leave (3)**
19:21;72:25;174:6
**led (2)**
83:18;142:16
**LEED (4)**
100:18,19,20,25
**L-E-E-D (2)**
100:22,23
**left (12)**
40:19;56:20;90:14,15;
118:9;126:7,7,8;159:5;
171:17,24;172:2
**legal (4)**
165:23;166:2;168:13;
173:6
**legally (1)**
165:22
**legislation (2)**
27:18;28:20
**Legislature (1)**
12:16
**less (3)**
16:15;87:18;111:13
**letter (27)**
20:17,18,25;60:24;
61:3,22;62:20;63:9,12;
70:17,24;71:2,4,9;80:24;
97:1,3,9;104:11;121:22;
161:8;166:19;167:18;
171:12,20;172:8;173:11
**letters (1)**
28:22
**level (19)**
26:7;29:19,19;32:5;
50:16;78:2;88:16,18,18,
24,25;89:9,11,14,15,18;
94:22;118:20;169:7
**Levy (1)**
120:25
**licenses (1)**
11:3
**lieu (1)**
128:24
**life (1)**
122:8
**light (1)**
111:14
**limited (1)**
89:16
**Lindsay (5)**
139:6;140:11,17;
141:15,16
**line (2)**
24:10;101:20
**lines (5)**
14:9;32:21;80:3;
137:2;178:14
**link (1)**
89:24
**LIPA (6)**
120:18,20,22,24;

**121:2,16**
**list (23)**
41:1,15;50:24;69:1,2;
87:1;90:2,7,12,16,18;
98:5,6,6,10,15,17;
107:14;111:22;126:19;
139:8;151:14,15
**listed (9)**
97:17;100:6;104:10;
106:2;121:21;125:8;
126:25;142:12;158:2
**literature (1)**
53:25
**Litho (5)**
112:8,23;128:3,5;
135:4
**little (4)**
12:6;24:7;25:23;135:9
**lived (1)**
110:11
**LLC (1)**
100:14
**LLP (1)**
2:3
**load (1)**
91:22
**lobbying (1)**
11:13
**located (2)**
38:17;60:2
**location (2)**
106:24;135:24
**logged (1)**
88:13
**long (13)**
9:15;23:7;73:15;
111:5,8,9;119:22;121:3,
12;122:9;141:21;
155:12,13
**longer (3)**
64:11,12;81:3
**longest (1)**
96:12
**long-standing (1)**
103:7
**Lonnie (2)**
107:19;109:12
**look (6)**
28:15;42:17;62:13;
71:17;102:3;178:18
**looked (1)**
76:22
**looking (2)**
118:16;158:11
**looks (3)**
100:1;101:9;138:2
**lose (4)**
146:21;174:7,8,9
**lost (1)**
148:1
**lot (14)**
29:9;38:21;42:10;
45:16;47:6;78:5,25;

**Bennett v.**
**Sterling Planet**

Kelly Bennett
September 30, 2010

81:13,14;110:22;
134:25;136:9;165:4;
166:12
**loud (1)**
63:9
**love (2)**
18:16,16
**loved (3)**
17:25;18:15;105:20
**low (2)**
88:17,18
**lowest (1)**
88:23
**lucky (4)**
110:19;130:9,9,10
**lunch (1)**
137:6
**Luncheon (1)**
137:8

## M

**mad (1)**
7:4
**Maddox (4)**
30:8;84:10;108:25;
119:9
**mail (1)**
61:5
**maintain (3)**
21:22;176:16,21
**maintained (1)**
177:4
**maintenance (2)**
96:11,11
**major (1)**
10:17
**majority (1)**
42:3
**making (8)**
16:4;28:23;29:5;57:8,
24;59:25;85:11;133:17
**manage (3)**
50:5;110:14;117:23
**managed (7)**
49:9;52:9;53:1;69:14,
17;119:11;152:9
**Management (12)**
10:21;32:9;34:1;
45:15;46:21;71:19;
72:20;83:10;99:13;
115:1;142:15;154:8
**manager (6)**
45:9;76:9,11;113:19;
118:9;154:22
**manages (1)**
162:11
**managing (2)**
52:12;163:25
**mandate (1)**
31:10
**mandatory (3)**
31:6,14;49:17

**Many (7)**
31:2;84:4;86:12;
126:24;159:16,22;162:6
**March (11)**
21:3;58:21;62:18,23;
63:6;116:24;156:22;
159:1;160:11,16,18
**Marcus (25)**
30:7;32:18,24;34:4,6,
25;36:2,12,13,13,15,21;
37:13,18;39:4,6;48:21,
24;52:7;74:20;76:12,14;
84:9;115:17;177:1
**Marcus's (1)**
34:17
**Margin (4)**
98:22;99:7,10;154:9
**marked (7)**
60:19;91:16;96:16;
137:12;139:4;150:14;
178:3
**market (33)**
16:10;23:25;26:8,19;
27:10,15;30:2,11,23;
32:6;33:2,3,4,24;35:8,
23;41:7,9;42:14;46:20;
49:17;52:13;111:1,15;
114:17;115:4,19;
116:18;127:18;136:21;
157:9,21,24
**Marketer's (1)**
29:8
**marketing (10)**
14:11;25:7;27:24;
47:2;113:9,11;114:9,16;
129:14;135:5
**market-making (1)**
116:17
**marketplace (3)**
42:11;52:16;53:19
**Markets (11)**
22:18,19,21,22;23:1;
31:21,23;33:8,13;36:9,
10
**Martha (1)**
172:5
**Marty (16)**
114:1,2,4,5,13,17,21;
115:2,9,12;117:20;
179:21,23,25;180:3,4
**master (2)**
41:2;86:11
**Master's (1)**
10:19
**match (1)**
150:6
**matched (1)**
161:25
**Matt (1)**
105:20
**matter (1)**
33:3
**maximize (1)**

115:10
**maximizing (1)**
85:23
**may (51)**
4:12;23:9;29:3,11;
34:8;35:19,21;42:24;
47:23;49:17,17;51:21;
55:13;57:3;63:1,1;72:2;
75:22;89:14;102:4,4,5,5,
6,6,20,22,23,24;103:11;
106:21;111:5,9;122:8,9;
126:6,7;128:5,6;129:12;
130:15,21;132:12;
134:3;142:13;145:1;
150:4;151:6,15;171:1;
177:2
**maybe (8)**
19:8;23:9;24:7;30:14;
36:7;74:12;118:18;
143:19
**mayor's (1)**
41:14
**Mc (7)**
49:11;54:24;85:7;
148:13;149:9,10;151:25
**mean (15)**
25:22;34:12;57:25;
64:14;73:4;75:6;98:19;
111:8;127:6;128:10;
138:7;143:6;147:9,22;
157:14
**meaning (1)**
59:20
**means (4)**
38:6;44:12;123:5;
147:23
**meant (6)**
30:14;32:3,4,17,21;
91:12
**medication (1)**
7:20
**meet (16)**
33:18;73:15;75:4;
106:11;107:24,25;108:1,
5;109:10,18;113:2,2;
118:5;119:20;120:11;
132:11
**meeting (15)**
105:22;107:3;113:5;
115:2,13,20,21;116:8;
134:15,17;140:14;
141:23;25;142:3;143:22
**meetings (3)**
78:19;142:20;143:2
**megawatt (2)**
15:9;25:1
**Mel (116)**
17:7,10;18:8,15;
19:14,19;20:11,17;
26:25;27:6;30:7;32:23;
36:11,18;37:7,20;39:2,
11;40:17;42:21;43:11,
14,18;44:6,13;45:1,4,8;

46:1;48:15;49:6;51:6,
10,11;54:25;56:23;57:5,
15,16;59:14;60:25;61:5;
64:5,19;67:17;69:1,9;
70:11,13;71:7;77:14,17,
20;78:14;79:6,9,12;
81:7;82:13;85:22;86:11,
12,22;92:15,16;95:21;
99:6;103:10,12,17,20,
25;104:13;109:5,8;
110:1;113:22;114:5,18,
24;116:19;117:17;
118:1,17;119:6;130:17;
135:23;136:2;137:19;
142:15;144:1,3,9,11;
145:5,8,9,11,17;149:3,7,
15;151:9;152:1;155:24;
164:9,24;171:2;179:7,
20,23;180:1,18,19,20,24
**Mel's (9)**
78:8,9;86:3,7,16;
148:22;163:10,13;
179:19
**member (9)**
11:16;13:17;15:25;
17:23;103:8,13,17;
119:23;134:4
**members (10)**
12:2;13:17,20;16:3,
17;17:10,16;41:11,13;
134:23
**membership (6)**
14:8;16:5,6;17:12;
28:6;44:23
**memorandum (1)**
141:10
**mention (1)**
92:19
**mentioned (16)**
15:7;29:13;34:4;52:7;
56:24;57:13;58:13;75:6;
76:1;79:8;83:1;87:4;
141:23;157:5;171:21;
172:4
**mentor (1)**
45:2
**menu (1)**
47:12
**merged (1)**
72:5
**message (1)**
171:25
**met (31)**
17:11;59:22;64:16;
105:19;106:4,5,20,22;
107:14,18,19,20,21,21,
22;108:3;109:12;113:4,
6,7;114:5;118:17;
120:23;126:20,24;
127:6;135:18;141:20;
152:21;169:18;170:2
**Meyers (1)**
119:22

**MICHAEL (1)**
2:8
**Michelle (2)**
108:4,21
**micro (1)**
45:9
**middleman (1)**
55:20
**middlemen (2)**
34:23;35:9
**might (9)**
28:19;52:16;55:2,2;
131:19;144:24;150:5;
153:9;155:22
**Mike (2)**
48:5;132:9
**miles (1)**
165:15
**million (2)**
147:25,25
**Millner (8)**
105:19;108:3,21;
127:13,22;128:2;
129:17;135:7
**mind (1)**
75:11
**mine (4)**
12:12;111:3;118:7;
173:21
**Minimally (1)**
44:11
**minor (1)**
10:18
**minus (3)**
24:14,14,16
**minutes (1)**
58:15
**missing (1)**
46:18;47:1
**mistaken (1)**
128:12
**Mitchell (11)**
48:2,8;57:7;84:10;
94:2;117:18;155:10,16;
177:2;179:20;180:1
**mixture (1)**
42:12
**modeled (1)**
149:14
**modest (3)**
58:11;67:23;134:25
**modify (1)**
88:22;89:3,6
**Mohawk (24)**
26:5;49:21;81:8;
104:13,21;105:19;
107:18,24;108:1,18,24;
109:1,6,7;111:19;
112:12;126:16;127:12,
14,24;128:8,9;129:17;
147:8
**moment (2)**
94:24;139:10

Martin Deposition Services, Inc.
(518) 587-6832

Bennett v.
Sterling Planet

**monetary (1)**
78:1
**money (5)**
51:14;64:8,9;80:8;
146:21
**month (4)**
65:4;81:6;110:17;
160:14
**monthly (1)**
122:10
**months (12)**
19:10;21:21;23:9;
144:23,23;159:12,13,16;
160:12,19,20;161:2
**more (11)**
16:12;33:23;78:23;
79:9;80:2;99:8;110:16;
111:20;127:8;129:12;
180:21
**most (12)**
32:19;41:17;91:1,6;
96:13;106:5;115:5;
116:18;120:19;169:7,11,
24
**mother (1)**
13:1
**motivation (1)**
19:25
**mouth (1)**
40:22
**move (4)**
16:24;19:21;163:19;
165:15
**moved (3)**
25:16;101:22;118:13
**moving (5)**
20:11;78:21,21,21;
164:5
**much (8)**
16:14;26:18;27:4;
29:4;32:6;89:18;111:20;
130:11
**multiple (8)**
102:16,17;144:6;
145:7;152:1;163:16;
164:8;169:6
**Murphy (9)**
43:23;77:14;96:22,25;
117:2;163:21;164:4;
165:11;170:20
**Murphy's (1)**
173:11
**must (1)**
81:4
**myself (4)**
9:2;19:23;32:18;40:24

**N**

**name (15)**
6:1,5;9:10,11,12;57:4;
76:9,11;97:18;108:4;
119:1;120:17;134:1;

**151:5;177:20**
**named (1)**
15:18
**names (6)**
87:2,19;90:2;97:16;
106:2;176:4
**NATHAN (1)**
2:9
**National (5)**
22:5;26:7,21;27:5;
29:19
**nature (8)**
13:7;46:1;53:10;
85:17;93:16;100:14;
142:25;143:3
**Navalis (5)**
112:14;131:18,24;
151:11;152:21
**near (2)**
139:6;165:2
**necessarily (3)**
32:16;52:1;159:11
**necessary (3)**
38:16;82:4;164:2
**necessity (1)**
82:13
**need (14)**
19:3;31:9;49:16;
51:13,15;55:24;67:18;
80:5;100:24;105:8;
110:16;159:1;160:17;
167:4
**needed (18)**
19:21,25;20:1;24:15;
30:11;47:1;49:4;51:9,
10;54:15;114:16;
119:12,16;152:14;
153:16;154:24;155:5;
173:5
**needs (2)**
110:25;111:21
**negative (2)**
143:16;146:18
**negotiate (1)**
71:13
**negotiated (4)**
59:13,15;64:22;71:3
**negotiation (2)**
64:23,25
**net (5)**
66:18;144:20;146:17;
149:4;153:9
**network (1)**
28:8
**nevertheless (1)**
124:11
**New (61)**
2:6;6:4;9:14;11:9,23;
15:17;21:11,12,12;
40:25;44:19;53:8;60:6,
8;78:16,20;85:5,7;90:3;
102:4,6;106:10,22;
107:1;108:8;111:15,24;

**112:5,6,6,7,7,8,9,12,13,
15,19,21,21,22,22,23,23,
24,24,25;130:4,4;
131:16;132:3,18,20;
133:2,25;135:21;136:3,
4,16,24;147:13**
**newspaper (1)**
13:2
**next (19)**
19:15;20:15;21:3,17;
22:11;51:6;63:17;77:21;
88:25;98:25;102:22;
103:4;127:13;134:16;
135:18;137:1;138:6;
159:14;160:14
**night (1)**
26:25
**Nike (10)**
107:19;109:10,12,22,
25;110:9,10,11;112:15;
126:16
**ninety (1)**
10:14
**nod (1)**
6:22
**none (4)**
82:25;164:9,10;168:7
**non-governmental (1)**
157:13
**nonprofit (6)**
59:17,25;63:5;64:20;
157:11,12
**non-utility (8)**
48:25;49:5,13,20;
50:11,25;51:17,20
**nor (2)**
153:24;157:2
**normal (1)**
48:6
**Northeast (10)**
21:18,23;22:4,11;
23:10,13;24:3;25:6;
130:5;136:24
**note (2)**
140:8,21
**notes (7)**
8:24,25;9:1;99:20,21,
24;100:2
**notice (2)**
5:6;127:23
**number (36)**
4:4;9:21,22;11:18;
28:5,6;37:20;63:10,11,
13;65:1,14;68:16;71:21;
87:5;89:17;91:17;93:23;
96:17;103:19;122:8,9;
127:23;137:13;139:5;
141:5;143:17,19;
146:18;150:18;154:10,
11,24;155:14;162:7;
176:25
**numbered (3)**
63:13;64:17;65:8

**numbers (2)**
72:1;162:5
**numerous (2)**
30:3;163:7
**N-Y-S (1)**
132:1
**NYSERDA-like (1)**
28:20

**O**

**Object (68)**
17:5;41:22;53:13;
57:21;62:1,9;65:17;
66:2;70:5;73:5;74:1;
75:18;76:6;79:21;80:25;
82:1,9;86:8;87:10;
90:10;91:4;92:8;93:12;
94:12;95:5,12,16;96:2;
99:3;101:13;106:3,13;
107:16;108:15,22;
109:23;112:3;116:21;
117:11;120:6;123:12;
125:16;126:11;133:14;
138:9;140:20;142:9,21;
146:9;153:5;155:19;
163:20;164:6,21;
166:21;167:20;168:23;
169:22;170:6,13;
172:15;174:5;175:20;
176:3,11,19,23;177:7
**Objection (32)**
43:7;47:19;48:18;
77:2;82:23;83:3;89:7;
97:24;98:9;99:23;100:8;
102:14;104:12;105:16;
109:3;116:10;119:7;
120:1;124:2,12,18;
126:22;135:25;142:1;
151:21;156:17;158:4;
159:24;160:23;162:16;
165:25;173:14
**objections (3)**
5:10,13,18
**objective (1)**
13:21
**obtain (7)**
6:13;99:16;121:25;
125:13,22;155:5;161:14
**obtained (6)**
64:1;75:15;125:10,24;
136:18;162:8
**obviously (1)**
20:1
**OCC (1)**
112:18
**occasion (5)**
17:18;30:20;38:22;
39:2;109:15
**occasional (1)**
165:5
**occurred (3)**
57:19;164:20;170:20

**October (5)**
36:6,16;83:20;113:7;
180:2
**off (2)**
102:2;120:21
**offer (23)**
20:17,18,22,25;46:3,9;
60:24;61:21;63:9,15;
68:10;70:16,23;71:2,4;
72:19;80:23;138:11,12;
166:19;167:17;173:25;
174:4
**offered (7)**
43:3;64:23,24;74:7,
16;76:3;152:17
**offering (1)**
24:19
**office (14)**
16:15,22;17:14;51:6,
7;60:4,5;80:17;132:3;
135:21;163:9,15;172:7;
179:19
**offices (3)**
38:22;79:11
**official (4)**
22:15,24;36:21;49:9
**officially (9)**
10:13;11:11;48:24;
49:7;50:12;52:8;76:14;
83:16;162:19
**offset (2)**
14:19;24:18
**offsets (8)**
24:12,13,22;26:9;
33:5,9,13;46:4
**often (6)**
6:21;44:5,15;56:5
**oftentimes (7)**
16:17;26:24,25;44:20;
68:10;160:14;161:21
**oldest (1)**
110:1
**once (9)**
56:6;86:17,17,24;
101:25;114:21;118:25;
130:9;141:20
**one (58)**
7:2,9,11;15:9;16:12;
24:25;26:18,23;32:17;
39:2;46:6;57:1;59:15;
61:5;62:13;63:8,10,11,
13;75:4;77:17;91:9;
93:6;98:24,24,25,25,25;
101:11,25;103:1;
106:22;110:1;115:20;
116:17;119:9;122:2;
127:7;130:7,8;133:8,10;
134:4;135:23;138:4,21;
139:1;143:22;144:16,
17;146:20;147:18;
149:15;151:3,14;167:3;
170:25;175:2
**ongoing (2)**

**Min-U-Script®**

Martin Deposition Services, Inc.
(518) 587-6832

(13) monetary - ongoing

114:25;122:9
**online (2)**
35:20;84:19
**Only (16)**
9:1;38:12;49:4;57:18;
61:22;66:5;79:23,23;
88:19,21;131:19;
147:18;155:3,4;165:15;
176:13
**Onondaga (3)**
132:15,17,23
**onto (1)**
101:22
**open (1)**
157:19
**opening (1)**
136:16
**operated (1)**
121:12
**opportunities (1)**
27:22
**opportunity (16)**
17:3;18:18,24;27:2;
28:1;30:14;47:2;51:24;
100:7,13;104:10;106:2;
111:23;127:11;174:9;
178:17
**opposed (6)**
42:6;55:17;73:25;
76:25;87:19;112:1
**O-P-R-H-P (1)**
132:1
**option (10)**
17:17;72:7,8,11,12,12;
75:5;77:25;89:25;
127:20
**Options (20)**
71:18,20;72:15,17,21;
73:1,2,8,10,11,13,19,25;
76:25;77:15;79:19;
119:11,15;168:4;171:11
**oral (2)**
146:7;170:10
**orally (1)**
163:18
**order (11)**
66:13;102:2;106:11;
110:14;119:16;125:23;
132:7,11;154:17;
157:17;176:14
**orders (1)**
42:10
**Oregon (1)**
110:9
**organization (7)**
11:15;14:8;16:4;
29:10;44:24;157:11,13
**organizations (2)**
28:7,12
**original (13)**
79:7;83:25;84:13;
101:22;110:2;118:6,8;
119:21;136:5,7;137:25;

149:7;171:1
**originally (1)**
108:25
**originate (1)**
34:21
**originated (3)**
35:13;41:15;128:9
**originator (2)**
34:25,25
**originators (1)**
35:5
**others (7)**
29:11;53:20;89:15;
106:6;143:18;144:10;
180:1
**other's (1)**
85:20
**otherwise (4)**
11:2;49:9;93:9;158:14
**ours (2)**
105:4,5
**out (35)**
18:25;22:8;24:20;
30:12;36:20;46:18;
51:12,16;55:12;57:2;
62:25;63:9;65:5;79:1,2;
82:24;86:17;90:18;
91:20,24;113:8;115:8;
119:1;134:2;143:24;
149:24;152:12;156:1;
164:17;166:4,7,10;
169:24;170:2;172:6
**outlines (1)**
72:3
**outreach (1)**
131:2
**Outside (3)**
10:22;106:10;160:20
**over (13)**
12:4;48:12;50:25;
60:20;65:7;71:15,16;
84:16,22;90:13;106:6;
113:23;114:25
**overall (4)**
45:8;96:11;99:10;
154:8
**overview (2)**
53:11;55:7
**Overwhelmingly (4)**
45:21,23;91:13;171:9
**owe (1)**
166:10
**owed (7)**
65:15;76:25;98:8;
144:8;151:20;153:3;
170:12
**owes (1)**
166:11
**own (8)**
9:19;81:18,19;97:11,
15;109:9;135:9;158:9
**owned (3)**
60:14;73:14;75:17

**owners (1)**
35:11
**ownership (1)**
80:3
**owning (1)**
75:21

## P

**Page (8)**
4:2.5;70:16;139:5;
141:11;151:2,4,11;
154:25
**pages (1)**
174:24
**paid (40)**
19:22;58:10,12;61:25;
65:5;74:23;94:20;
122:14;123:1,2,17,17,
18;126:3;129:1;144:5,8,
15,25;145:6,11,14,14,18,
19,23;146:7;148:8,10,
12,15,17;149:18,20;
151:20;156:4;170:4,11;
172:11;173:3
**Paper (23)**
26:5;49:21;81:8;
104:13,21;105:19;
107:18,24;108:2,18,24;
109:2;111:19;127:12,15,
24,24;128:6;129:17;
133:9;143:8;147:8;
158:17
**paperwork (4)**
47:8;120:21;122:5;
129:13
**paragraph (24)**
62:13;63:8,13;64:17,
18;65:1,8,14;66:9;71:15,
17;72:14,16,23;73:12,
16,17,18,23;76:20;
92:12;167:3;168:2,3
**Parker (3)**
16:5,13;18:12
**Parks (2)**
112:17;132:3
**part (18)**
17:12;18:9;31:25;
34:2;72:19;73:14;
113:15;115:19;117:17;
121:13;122:10;133:17;
134:7;135:4;141:12;
166:6,13;171:15
**partially (2)**
129:5,6
**participant (1)**
157:20
**participate (2)**
28:22;142:13
**participated (3)**
84:11;117:5;142:8
**participating (1)**
41:7

**participation (1)**
142:13
**particular (10)**
13:24;35:17;39:18;
117:22;143:20;144:11;
150:8;153:23;156:24;
158:21
**parties (2)**
4:11;30:6
**partner (3)**
44:23;105:4;134:16
**partners (4)**
11:17;55:3,6;135:8
**partnerships (1)**
52:15
**party (6)**
8:19;28:19;37:1;93:3;
109:6,8
**passed (1)**
134:1
**past (4)**
7:24;56:17;57:24;
179:6
**path (1)**
80:7
**Paul (9)**
113:6;136:13,18,20;
179:25;180:7,8,10,13
**pay (5)**
94:6;122:24;123:9;
129:10;167:14
**payable (3)**
141:19;149:1,17
**paying (2)**
54:21;166:18
**payment (18)**
65:2,2,3;78:1;122:22;
123:6,25;124:7,9;126:5;
129:2;145:2;146:1,2,25;
149:2,23;152:25
**payments (6)**
56:14,15,17;57:8,24;
123:19
**people (17)**
6:21;16:10,14;28:8;
34:14,15,17;41:20;68:3;
79:13;80:13;88:3,6;
103:19;113:9;137:3;
163:25
**Pepsi (9)**
107:20;111:19;
112:19;113:1,3,15;
126:17;132:25;180:11
**PepsiCo (1)**
180:9
**Per (3)**
66:15;67:4;138:13
**percent (6)**
59:3,8;77:19;98:24,
25;99:1
**percentage (6)**
39:17,22;42:8;121:17;
138:7,13

**percentages (1)**
153:23
**perhaps (6)**
19:19;40:11;67:23;
100:1;155:24
**period (6)**
36:5;39:10;50:23;
100:1;138:23;159:2
**periods (1)**
96:7
**Permissible (3)**
61:14,18;159:9
**permission (3)**
45:13;88:16,18
**person (24)**
16:20,21;32:13;33:17;
44:17;48:12;49:10;
106:4,5;107:14,18,19,
20,21,22;120:23;126:15,
20,21;130:13;131:8;
136:14;161:23;162:1
**personal (1)**
169:9
**personnel (4)**
52:10;85:1;110:5;
142:15
**perspective (13)**
26:11;27:23,24;31:8,
14,15;34:3;51:4,5;
52:10;102:10;117:4;
153:11
**Pfizer (1)**
25:10
**Pham (1)**
57:4
**Philadelphia (2)**
106:21;107:6
**Phoenix (1)**
114:5
**phone (12)**
18:19,20,20;38:21;
44:14;48:12;84:16;
106:7;113:12;114:18;
171:1;179:21
**phoned (1)**
155:21
**phrase (1)**
65:24
**physically (2)**
44:15;60:2
**picky (1)**
98:19
**piece (1)**
27:18
**pieces (1)**
144:16
**pinch (1)**
27:2
**Pine (2)**
130:18;131:3
**pipeline (2)**
111:6,8
**pitch (2)**

40:9;105:25
**pitched (1)**
105:20
**place (14)**
4:13;12:4;29:11;
32:17;35:14;64:9;70:1;
79:10;88:7;99:8;115:19;
150:10;165:21;170:25
**places (2)**
122:2;127:12
**Plaintiff (3)**
2:14;5:21;10:2
**Plaintiff/Counterclaim (1)**
2:4
**Plaintiff's (9)**
60:19;70:22;77:11;
91:16;96:16;137:12;
139:4;150:14;167:25
**Plan (10)**
65:8,14,15,19,25;66:4,
5,9,12;71:1
**Planet (127)**
6:7,18;8:4,6;11:6;
12:24;14:2,10;16:25;
17:3;18:14;19:12,16;
20:12;21:5,15;24:4;
26:15,22;30:16,25;32:6;
35:3;37:3,5;39:23;40:5;
42:19;43:5,9;44:1;
48:22;50:1;52:7,20,23;
53:7;55:18;58:20;60:3;
61:7,23;62:5;63:2,16,20;
64:4;65:4,10;67:2,3;
68:1;73:3;74:7,9,16,17;
75:16,17;79:20;83:12,
22;89:13;90:17;93:3;
97:6,23;102:7,11,17;
105:10,14;108:20;109:2,
20;111:25;115:23;
116:4;121:18;122:14,
17;123:8;124:6,9;
125:25;126:3;128:16;
129:19;131:9;133:6,13;
134:10;137:23;138:11;
144:3;145:5,17,24;
146:8;148:7;152:7;
159:6;161:7;162:15,19;
163:4,7,18;166:16,17;
167:12,17,24;168:5,10,
18;170:4,11,18;172:13,
22;173:25;176:5,8,17,
21;177:6
**Planet's (5)**
42:13;43:4;84:4;91:2;
173:21
**Planning (1)**
10:19
**play (1)**
15:18
**pleadings (1)**
8:16
**please (4)**
44:25;97:8;173:7;

178:5
**plenty (1)**
145:20
**plus (2)**
11:14;130:5
**pm (1)**
137:9
**point (23)**
24:11;57:1;75:4;
89:16;91:22;111:11;
116:17;118:23;119:3,9,
18;120:16;151:14;
155:8,9;156:25;157:2;
173:17,18,19;177:15;
180:5,15
**poised (1)**
46:21
**policies (1)**
45:17
**Policy (14)**
10:21;11:12,13,25;
12:7;22:5;28:10;31:4,5,
6;59:6;80:22;123:21,22
**Political (1)**
10:18
**pool (5)**
71:20;72:21;73:8,19;
78:13
**populate (5)**
81:11,12,19;92:18;
161:15
**populating (1)**
81:16
**portfolio (1)**
17:19
**position (10)**
46:20;48:6;78:4;
101:23;163:10,13;
171:14;172:10;173:12,
21
**positioned (1)**
42:21
**possessed (1)**
93:2
**possession (6)**
73:21;80:20;81:21;
93:2;100:3;154:15
**possible (3)**
79:13;102:15;103:1
**possibly (2)**
70:11;164:25
**post (1)**
171:3
**post-college (1)**
10:25
**potential (5)**
16:3;18:10;35:2;
44:22;46:15
**potentially (4)**
27:22,22;34:20;102:2
**power (7)**
17:17;33:25;41:9;
121:3,11,12;157:9

**Powerpoint (1)**
84:22
**practical (1)**
51:5
**practically (1)**
122:25
**practice (3)**
18:4;50:14,15
**preceded (1)**
76:13
**preceding (1)**
159:18
**preexisting (6)**
53:6,8;130:2;132:12;
133:5;134:9
**preference (1)**
36:1
**prep (1)**
92:2
**preparation (5)**
8:1,14,21,25;9:7
**prepared (2)**
128:18,19
**presence (2)**
27:5;163:14
**present (2)**
7:23;79:4
**presentation (1)**
84:19
**presented (6)**
71:4,6,12,14;84:1;
128:23
**presenter (1)**
109:14
**presenting (1)**
27:4
**Preservation (1)**
132:4
**preserve (1)**
157:22
**President (14)**
21:25;22:1,2,13,25;
25:16;26:12,13;31:18;
41:18;49:2;96:9;133:23;
152:6
**press (5)**
42:17;115:9,11;
121:18,19
**presume (1)**
97:2
**pretty (3)**
53:18;89:18;111:6
**previous (3)**
94:17;113:18;159:13
**previously (6)**
60:19;91:16;96:16;
137:12;139:4;150:13
**price (5)**
32:15;68:13;147:11,
13;153:25
**prices (2)**
148:3,4
**pricing (9)**

68:6,8;102:5;103:12;
117:3;146:19,23;
154:17;158:18
**primarily (10)**
11:19;12:19;17:23;
24:5;27:9;33:22;40:24;
57:5;91:12;119:4
**primary (5)**
28:9;44:12;96:5,8;
146:14
**print (2)**
69:5;81:20
**printed (8)**
61:4;90:18;149:13
**Printing (2)**
133:1;135:3
**Prior (20)**
11:5,6,7;12:23;57:8;
64:5,6;69:3,14;86:1;
91:24;108:20;114:7;
116:8;119:14;131:11;
132:23;155:9;170:23;
173:24
**privileged (1)**
125:2
**privileges (2)**
88:9;89:19
**proactive (1)**
54:14
**probably (9)**
7:12;18:23;56:24,24;
57:6;78:16;97:4;132:14;
174:25
**problem (3)**
7:2;101:1;150:1
**procedural (1)**
78:22
**Procedure (1)**
4:14;5:9;45:23;156:7
**procedures (1)**
45:18
**proceed (1)**
173:5
**proceeding (3)**
17:20;29:22;166:14
**proceedings (3)**
17:18;165:23;178:4
**process (29)**
8:5;19:12;20:16;
45:22;64:10;70:1;72:4;
75:2;78:24;86:18;93:21;
119:3;133:17;141:19;
142:5;143:21;144:13,
21;146:15;149:21;
151:2;157:1,22;169:16,
16;170:1,18;172:24;
173:17
**produce (4)**
14:23,24,25,25
**produced (13)**
8:7,1,11,13;36:25;
93:3;139:22;140:1,15,
22;141:2,6;174:21

**producing (2)**
15:4;109:14
**product (21)**
14:3,4,11,14,19;24:10,
15;32:16;33:7;49:16,23;
55:15;100:1;101:20;
127:19;138:6,10,10,13,
17;150:7
**products (6)**
24:3;26:15;31:3;
33:11;115:19;152:16
**professional (9)**
11:2,3;19:18;28:6,8;
43:23;45:2;46:1;132:8
**profile (2)**
26:4;37:20
**Profit (7)**
98:21;99:7,10;146:17;
149:5;153:9;154:8
**profits (1)**
66:19
**program (24)**
16:20;18:13;31:20;
41:10;50:5;52:14,17,18;
53:11;68:7,9;109:14;
119:11,12;120:14,19,
22;121:4,11,16;134:22;
135:9;152:9
**programming (1)**
11:14
**programs (7)**
11:14;16:8;32:20;
34:7;41:8;68:8;158:8
**prohibit (1)**
7:17
**prohibited (1)**
165:13
**project (5)**
32:11;35:17,20;91:8,
10;150:7
**prominence (1)**
42:14
**promise (1)**
73:24
**promises (1)**
76:4
**promotion (3)**
25:24;26:2,3
**pronounce (1)**
132:15
**properly (2)**
65:24;85:15
**Property (3)**
100:14,24;104:5
**proposal (8)**
101:1;102:5,24;119:2;
120:8;128:19;130:22;
133:16
**proposals (2)**
102:23;129:21
**propose (1)**
158:17
**prospect (4)**

Bennett v.
Sterling Planet

Kelly Bennett
September 30, 2010

40:15;130:23;138:14,
16
**prospective (1)**
43:3
**prospects (5)**
40:16,20;41:1,19;42:4
**protect (1)**
173:5
**Protection (1)**
41:9
**provide (13)**
46:14;70:4,7;73:24;
92:6;96:22;119:17;
121:8;141:7;149:3;
150:20;167:24;175:13
**provided (28)**
8:4;16:18;17:12;28:7;
37:3;41:20;53:24;57:14,
15;68:22;70:11;90:17;
92:14,16;93:21;98:10;
129:9;140:23;144:1;
150:16;151:6;155:2,18,
18,25;161:7;176:4;
177:20
**providing (6)**
46:19;55:22;69:12,23;
109:7;151:16
**public (5)**
16:2;29:15,16;78:6;
80:8
**publish (3)**
28:25;29:1;157:15
**published (2)**
37:8,11
**publisher (1)**
13:2
**purchase (17)**
34:18;35:4;49:25;
67:23,25;68:15;101:18,
19;102:2;111:10;121:5,
20;122:10,10;155:13;
159:9;180:6
**purchased (14)**
101:3;105:21;129:18;
134:24;135:11;136:16;
150:5;156:21,24;157:2;
158:22,25;160:13,17
**purchases (7)**
67:21,24;112:14,17;
157:9;160:14,16
**purchasing (7)**
31:13;111:1;121:8,10;
134:6;135:9;146:16
**pure (1)**
33:24
**purpose (10)**
6:12,13;50:4;107:3,5,
7,9,11;108:13;113:5
**purposes (3)**
5:7;49:22;85:25
**Purser (9)**
48:1,8;56:23;57:8;
75:6;99:6;144:10;147:4,

9
**pursuant (5)**
4:13;5:6;62:20;66:12;
71:24
**pursue (1)**
87:21
**push (1)**
13:24
**pushing (1)**
51:16
**put (8)**
90:2,2;119:1;125:13;
154:11;162:1,11;175:1
**putting (1)**
18:3

## Q

**Quaker (1)**
113:13
**Quartier (4)**
112:20;133:1,2,13
**Queenin (1)**
118:6
**quick (2)**
55:7;174:15
**Quickbase (73)**
51:2;54:7,8;69:20;
70:1,2;81:4,10,11,24;
82:5,8,13,21,25;83:8,9,
13,15,17,22,24;84:5,25;
86:2,14;87:8,16,22,24,
25;88:12;90:5,9;91:3,
23;92:25;93:10,16,25;
95:1,3,11,15,19;96:1,6,
12;97:14;99:17,18;
122:8;125:18,20,23;
136:3;148:21;149:11,12,
22;152:17,18;153:15,18;
161:16,18,21,24;162:2,
9,10,12;179:9
**quickly (3)**
21:19,20;54:9
**quit (1)**
63:4
**quite (2)**
103:1;135:19

## R

**raise (3)**
59:3;77:19,24
**raising (5)**
16:16;27:21;51:14;
64:8;80:8
**range (2)**
12:8;25:3
**ranging (1)**
12:2
**rather (1)**
169:6
**RBS (12)**
107:21;112:20;118:5,

5,10,11,13;119:3,5,10,
14;126:17
**reached (1)**
134:2
**read (5)**
30:3;63:9;73:17,18;
98:20
**reading (3)**
77:8,9;160:5
**ready (3)**
18:2;19:21;118:15
**real (3)**
154:10,11;174:15
**really (9)**
18:3,3;19:21;20:2;
25:4;55:7;77:24;127:12;
165:8
**reason (6)**
140:18;146:6,11,14;
162:23,25
**reasonable (1)**
169:2
**reasons (1)**
115:20
**reassigned (1)**
50:16
**REC (19)**
27:10;33:15,16,24;
50:6;52:16;53:19;55:12;
68:5,6;111:17;112:17;
113:5;127:20;147:15;
157:18;159:2;160:9;
161:1
**recall (38)**
18:12;19:7;25:9;29:1,
20;34:9;43:6;62:22;
78:15;79:15;82:22;
89:15;90:7,15,19;
102:15;103:9,11;
105:11;135:17;139:8,
16;141:9,12,13;142:25;
145:20;150:25;151:12;
166:7,8,12;170:19;
171:7;173:16;177:17;
178:13;179:10
**receipt (1)**
122:17
**receive (13)**
20:18;28:11;70:12;
72:19;98:4;103:20;
104:1,7,8;118:2;124:7,9;
140:19
**received (20)**
56:14,16;58:8;59:3,5;
61:13,14;71:9;77:19;
100:16;101:2,16;
102:12;122:21;123:19;
126:6,6,7;145:1;149:2
**receiving (4)**
20:6;139:8,16;140:10
**recently (1)**
7:21
**recess (3)**

58:16;137:8;174:17
**recipient (1)**
139:7
**recognize (6)**
60:20;91:17;96:17;
137:13;150:23;151:4
**recollect (1)**
20:24
**recollection (11)**
19:17;25:12;36:17;
61:15;70:19;79:12;94:9;
126:18;127:5;138:19;
145:25
**recommendations (1)**
16:4
**recommended (1)**
134:18
**reconcile (1)**
56:13
**record (12)**
6:2;14:21;35:12;
125:4;127:6;140:21;
148:21;149:12;150:15;
161:23,24;175:16
**records (8)**
85:20,20;89:3,4,6,20;
149:13,23
**Recreation (1)**
132:4
**recruit (1)**
53:9
**recruited (1)**
13:16
**recruiting (1)**
13:20
**recruitment (1)**
16:1
**REC's (46)**
24:6;33:18,21;34:1,
15,16,18;35:1;49:18,19;
52:19;55:5,8,19;66:22;
67:25;68:16;100:24;
101:18,19;105:5,8,20;
107:12,15;121:6,8;
127:21;128:24;129:9,
18;131:6,8;132:10;
134:20;136:15;147:24,
25,25;155:1;158:6;
159:9,17,21,22;161:1
**redistributed (1)**
40:19
**reduction (3)**
33:19,20,25
**refer (4)**
33:5;82:20;178:20;
179:5
**reference (3)**
92:10,12;134:1
**referenced (1)**
83:5
**Referral (44)**
66:15;68:23,24;69:3,
4,12,13,16,19;70:8,13;

58:16;137:8;174:17

80:22;81:3,6,7,8,12,16,
25;92:7,11,18;95:23;
100:4,10,12;105:18;
128:11;133:8;137:2,20,
22;140:12;142:6,19;
143:1,4;148:23,24;
178:15,21;179:4,6,8
**referrals (1)**
40:22
**referred (8)**
41:20;42:5;80:23;
136:20;153:19;166:19;
167:1;178:14
**referring (9)**
14:15;21:11;36:24;
147:3;166:24;167:25;
170:8;171:12;173:10
**refers (1)**
73:9
**reflected (2)**
103:3;148:5
**reflection (3)**
22:22;23:23;33:23
**reflects (1)**
151:1
**refusal (1)**
162:25
**regarding (9)**
62:11;76:4;142:19;
145:21;152:2;158:21;
171:10;172:13,17
**regardless (1)**
75:14
**Region (16)**
21:7,9,18,23;22:4,9;
23:4,8,11,13,20,24;
51:24;110:8;133:3;
134:8
**Regional (3)**
10:19;76:8,10
**register (1)**
85:10
**registered (4)**
88:2,4,4;116:5
**registration (1)**
87:1
**registry (1)**
41:12
**regular (4)**
28:11;54:12,13;
122:11
**regulated (1)**
61:8
**regulatory (19)**
11:12,22;17:18;23:18;
26:6,16;27:14,25;28:3,
18;29:5,24;30:18,18,22;
31:1,4;33:2;35:18
**relate (1)**
6:15
**related (2)**
61:19;165:24
**relating (1)**

14:6
**relation (1)**
113:10
**relationship (24)**
43:23;45:1,6,20;
48:16;83:10;103:7;
108:19;109:9,22;112:2;
114:25;116:15;117:23,
24;127:1,22;131:18;
132:9;133:19;134:4;
179:12,15;180:12
**relationships (5)**
52:12;53:6;97:13;
177:4,5
**release (2)**
42:18;121:19
**relevance (1)**
6:19
**relevant (1)**
169:25
**relied (1)**
149:3
**relocate (4)**
163:1,3,7;164:11
**relocating (2)**
164:25;165:14
**relocation (1)**
164:9
**rely (1)**
30:16
**REMA (1)**
29:7
**R-E-M-A (1)**
29:7
**remain (1)**
73:3
**remember (16)**
7:24;19:5;20:20;57:4;
120:16;129:2,3;136:9;
138:1,2;140:10,11;
142:4;147:5;151:15;
172:2
**remembered (1)**
140:16
**removals (1)**
48:10
**removing (1)**
48:2
**renegotiated (1)**
147:14
**renew (1)**
110:18
**Renewable (31)**
14:15,22,23;15:1,5,12;
17:19;24:5,21,25;27:9,
14;29:7;30:2,22;31:9,
11;34:22;35:4,10,11,13,
16,18;42:16,20;49:25;
103:5;107:7;157:16,25
**Renewal (1)**
108:13
**rent (2)**
9:19,20

**Rented (2)**
60:15,16
**rep (13)**
40:14;87:3;109:6;
110:2,4;123:2;130:9;
138:15;144:15;162:11;
170:17;179:23;180:15
**repeat (8)**
7:6,11;33:10;41:24;
65:20;74:10;95:7;
139:15
**rephrase (6)**
7:6,15;66:10;121:7;
142:23;172:21
**replace (1)**
81:24
**replacing (1)**
179:8
**report (9)**
36:3,21;43:18,20;
50:10;54:11;56:21;
152:7;158:23
**reported (1)**
52:8
**reporter (2)**
6:23;7:3
**reporting (12)**
36:13,15;116:13;
156:19;158:24;159:3,8;
160:7,15,21,25;161:3
**represent (4)**
6:7;99:22;161:11;
162:5
**representative (6)**
91:9;101:17;105:23;
114:7;126:20;180:11
**representatives (4)**
102:13;106:1;113:13,
13
**represents (2)**
15:3;162:6
**reps (6)**
40:19;87:14,16;88:20;
110:7;126:25
**rep's (1)**
89:3
**REQUEST (18)**
4:1;5:2,18;96:22;
101:1;119:21,24;134:6;
144:3;145:4,10,16;
146:7;149:17;154:16;
170:4,11;174:22
**requested (4)**
155:15;163:3,6,18
**requesting (2)**
145:23;146:2
**requests (2)**
59:14;101:21;173:8
**require (3)**
102:4,5,6
**required (11)**
30:20;66:13;81:4;
92:2;93:24;94:4;123:18;

149:21;163:14;164:9;
179:4
**requirement (2)**
82:5;158:9
**requirements (2)**
67:4;158:10
**resellers (2)**
34:23;35:6
**reserve (1)**
5:12
**resided (1)**
9:15
**residential (1)**
68:11
**resign (1)**
162:21
**resolved (2)**
56:18,19
**resource (5)**
30:9;91:13;96:14;
136:22;157:7
**resources (2)**
47:14;53:24
**respect (1)**
175:21
**respective (1)**
4:11
**respond (1)**
47:3
**response (11)**
78:8,9;96:21,24;
147:16;165:11,12;
171:16,23;173:7,11
**responses (2)**
7:1;8:18
**responsibilities (8)**
11:20;13:11;22:6;
32:1,2;53:15;103:2;
118:11
**responsibility (19)**
13:3,7;16:16;28:10;
40:13;45:12;48:25;
50:25;52:11;69:15;
81:16;82:18;84:2;85:8,
10;87:15;96:8,10;
179:15
**responsible (7)**
11:12;40:7;54:21;
69:11,22;103:15;179:11
**responsive (1)**
103:14
**rest (1)**
160:21
**Restaurant (2)**
78:17;180:17
**restrictive (1)**
174:12
**retail (1)**
55:13
**retailer (2)**
42:20;121:15
**retaining (1)**
53:4

**return (3)**
69:6,7;143:13
**revealed (1)**
124:8
**revenue (1)**
46:19
**review (9)**
4:16;5:3,19;8:2;32:14,
15;139:11,13;169:14
**reviewed (5)**
8:3,14,16,24;9:4
**reviewing (2)**
121:23;141:9
**RFP (3)**
118:25;119:2,24
**rich (5)**
79:3;104:15,15,18;
144:12
**Richie (1)**
120:24
**rid (1)**
78:11
**Rider (2)**
112:21;133:20,21,22
**right (13)**
4:16;5:2;13:25;54:7;
65:7;68:19;80:7;108:4;
120:21;125:3;136:11;
146:24;150:12
**rights (1)**
173:5
**rigorous (2)**
111:20;157:22
**risk (2)**
27:25;115:18
**Roach (2)**
139:7;141:15
**road (2)**
47:5,10
**Rob (15)**
113:7;150:8;155:2,6,
8,16,23;160:8;170:16;
171:3,6,17,25;172:2,6
**Robert (7)**
47:25;56:23;57:8;
75:6;99:5;144:10;147:4
**role (10)**
15:17;22:22;23:7,8;
25:17;45:7;81:15;
117:25;118:12;152:11
**roles (2)**
24:2;102:19
**Ron (13)**
48:2;57:6,7;82:12;
84:10;94:1;117:18;
155:10,16,23;177:2;
179:20;180:1
**room (1)**
79:14
**round (2)**
63:17,21
**routinely (1)**
142:12

**row (2)**
98:21,23
**rows (1)**
129:23
**RPI (2)**
10:20;118:7
**Rubenstein (1)**
15:19
**Rubinstein (1)**
15:18
**rule (4)**
5:19;28:23;29:5;35:15
**rulemaking (1)**
29:18
**Rules (12)**
4:14;5:9,17;35:24;
156:21,23;157:15,18,19;
158:21;159:4;160:6
**Rutherford (5)**
107:22;112:21;
119:20;120:5;126:17
**Ruth's (1)**
78:17

---

**S**

**SABOURIN (1)**
2:9
**salaried (2)**
38:9;52:21
**salary (8)**
58:24;59:1,12,16;
64:18,20,21;169:5
**sale (53)**
39:18;51:24;55:5;
66:21,24;83:6;94:21;
107:23;109:13;110:3,
21;114:8,9,10;115:4,4;
116:7,9,12,17,23;
117:10,15,16,19;119:6;
120:10;121:17;125:15;
127:3,4;128:17;129:5,5;
130:17;131:17;133:13,
18;134:5;135:15;
144:23,24;146:16;
147:23;150:8;151:24;
152:24;153:23;156:19,
20,23;158:15,22
**sales (118)**
11:23;12:22,23;13:2,
9;14:5;15:24;23:6;25:7;
26:5;31:16;32:12,25;
34:13;37:13,16;38:5,13,
15;40:5,6,8,14,18,18,24,
25;41:17,17,20,25;42:3,
5,8,9;49:4,5,10;51:20,
21;56:13,15;58:11;
65:11,13;66:16,20,21,
25;67:1;80:6;82:18;
83:5;86:12;87:3,14,16;
88:20;89:3;90:4;91:6,
21;92:3;93:17,18,25;
94:6,8,17,18,19;95:20,21;

98:12,12;99:11,14;
100:5,11;102:18,19;
105:25;110:2,4,7;111:5,
6,8;122:7;123:2;124:6;
127:11;130:8,9;138:15;
142:11;143:5;144:9,14,
17;145:15;147:10,13;
148:8,21,25;149:3,10;
150:3;152:20;153:16;
156:14;158:11,13,14;
161:20;162:11;176:5;
180:11

**same (22)**
21:13;24:22;25:14;
57:15;76:2,15,20;77:7,8;
81:10;89:18,19,19;
92:25;95:4,11;98:23;
135:11;149:5;175:10;
179:3;180:14

**Sandi (7)**
52:7;85:4;101:1,5;
102:22;128:18;129:21

**Sandra (1)**
119:2

**Sandy (5)**
49:10;50:7;51:18,22;
52:2

**Sarah (5)**
49:11;50:7;51:19,23;
52:3

**Saratoga (3)**
109:19;112:22;134:14

**sat (3)**
17:21;38:12;87:13

**satisfactory (1)**
78:2

**saw (5)**
44:17;53:19;89:2,2;
114:22

**saying (5)**
27:1;100:23;103:12;
131:5;163:13

**Schassel (1)**
113:8

**scheduled (2)**
63:17,21

**school (2)**
10:9,10

**Schools (1)**
18:13

**Science (1)**
10:18

**scope (1)**
23:24

**second (4)**
63:8;92:12,13;139:5

**section (1)**
178:25

**Sedler (3)**
114:1;179:21;180:4

**seeing (6)**
90:15;129:3;141:9,12,
13;151:12

**seek (3)**
17:3;124:14,23

**seeking (1)**
124:22

**seems (3)**
123:20;127:4;138:22

**Segerman (7)**
55:1;56:9;148:11,20,
25;152:2,4

**select (2)**
83:23,25

**selected (1)**
89:25

**sell (18)**
14:3,17;33:15;35:23;
40:14;46:24;50:1;52:16;
55:8,12,13;105:3;107:4;
115:23;127:21;147:24;
157:25;158:6

**selling (18)**
13:4,8,11,23;14:4,6,6,
7;16:7;24:4;49:18;
52:19;107:7,11,14;
108:13;113:5;127:20

**send (1)**
140:7

**sending (2)**
102:25;115:17

**senior (9)**
44:2;49:2;51:7;91:7;
96:9;99:12;142:14;
154:7;169:7

**sense (1)**
35:16

**sent (23)**
20:17;36:19,20;61:4;
84:9;88:3,8,9;90:16,20;
91:20,24;96:24;97:5;
101:2;102:13,23;
125:25;146:4;152:12;
155:23;171:20;172:1

**sentence (7)**
7:10;63:8;72:18,23;
73:4,9;92:14

**separate (2)**
49:5;105:6

**separated (3)**
165:14,18,22

**separation (5)**
165:24;166:2,6,8;
170:18

**September (2)**
83:19;113:7

**seriously (3)**
80:6;163:22;165:9

**service (2)**
55:13;127:19

**Services (12)**
13:17;16:5,7;31:3;
46:3,8,14,19;47:12;53:5;
61:25;152:16

**set (8)**
39:19;45:8;53:25;

70:10;71:22;85:8;86:25;
137:21

**several (3)**
19:10;159:12,13

**shade (1)**
111:14

**shake (2)**
6:22;120:22

**shaking (1)**
16:9

**shall (1)**
73:3

**share (4)**
71:24;72:9,12;75:12

**shares (13)**
71:21;72:20;73:7,11,
24;74:8;76:25;77:15,18;
78:1,6;80:11;167:25

**Shaw's (2)**
54:5,6

**Sheer (4)**
112:22;135:3,4,10

**sheet (2)**
86:11;126:25

**Shop (2)**
112:24;136:12

**short (1)**
36:4

**shortly (1)**
148:2

**show (1)**
150:13

**showed (1)**
75:4

**showing (4)**
167:9

**sick (2)**
171:10,20

**side (14)**
32:24,25;34:10,12,14,
14,18;37:19;38:2;39:24;
40:7;102:20;146:22;
160:2

**sign (3)**
69:5,7;120:21

**signal (1)**
32:4

**signature (3)**
70:20;138:18,25

**signed (7)**
41:14;61:4;70:17,24;
81:7;138:20;167:18

**significant (1)**
43:1

**similar (7)**
74:21;76:4;101:15;
118:10;132:17;134:3;
151:23

**Simple (5)**
46:10,11;100:23;
110:16,19

**single (5)**
103:1;110:3;151:24;

154:20;158:11

**sit (1)**
36:12

**sitting (1)**
37:18

**situation (3)**
56:18;123:15;165:13

**situations (1)**
48:8

**six (6)**
59:3,8;77:19;160:11,
19;161:2

**skip (1)**
65:7

**skipped (1)**
71:15

**Skulnik (8)**
54:24;105:7,9,12;
148:13;149:8;152:2,4

**slide (1)**
60:20

**small (11)**
13:13;30:11;49:18,19;
66:21;67:21,21;101:19;
131:17;135:15;143:17

**smallish (1)**
115:7

**smart (1)**
16:21

**sold (13)**
13:5,18;14:19;26:16;
33:8,12;34:15;42:15;
55:4;72:4;108:25;
128:24;138:17

**solitary (1)**
110:3

**Solutions (1)**
157:8

**somebody (5)**
16:6;24:19;90:3;
133:18;155:13

**someone (2)**
15:18;89:24

**sometime (1)**
139:12

**Sometimes (5)**
7:3,7;16:15;28:18;
150:1

**somewhere (2)**
38:18;168:7

**Sonny (31)**
43:23;48:11;49:6;
56:24;75:4;77:14;79:24,
25;96:21;97:3;99:6;
117:2,5;141:18;144:10;
163:21;164:3,24;165:6,
7;170:15,20;171:5,13,
20,22,23,24;172:1,1;
173:10

**soon (1)**
103:13

**sophisticated (1)**
111:18

**Sorry (11)**
33:10;56:16;66:10;
93:4;98:19;113:15;
121:7;149:9;158:6;
161:9;172:20

**sort (3)**
14:16;91:2;97:13

**sorts (1)**
14:9

**sounds (1)**
5:20

**sources (1)**
35:2

**speak (2)**
27:7;39:3

**speaker (1)**
12:18

**speaking (4)**
26:7,20,22;113:10

**specific (15)**
24:18;64:21;65:12;
80:1;90:7;119:15;
139:14;141:3;145:4,10,
16;147:5;152:16;156:7;
173:20

**specifically (5)**
29:2;58:13;62:22;
79:15;125:11

**specifics (2)**
154:2;156:3

**specified (3)**
66:5;126:10;168:6

**specifies (2)**
93:22;158:19

**specify (3)**
36:10;122:16;164:23

**spell (2)**
60:9;108:10

**spent (1)**
12:13

**spirit (2)**
122:25;123:16

**spoke (6)**
39:12;113:11,14;
114:17,17;135:5

**sponsorship (3)**
16:16;128:25;129:6

**sponsorships (2)**
16:7;128:25

**sporadic (1)**
20:7

**spreadsheet (26)**
41:2,5;51:1;68:25;
69:3;75:5;81:11;86:7,
14,16;87:13,15,23;
92:22;97:10,15;122:4;
137:25;148:5,22;149:7,
14;151:9;155:1;156:2;
161:6

**spreadsheets (3)**
86:3,22;144:1

**Spring (5)**
6:3;9:14;49:1;83:15;

118:18

**staff (8)**
12:18;91:11;92:3;
106:4,5;110:6;120:9;
142:14

**staffers (2)**
120:15,23

**stakeholders (1)**
23:21

**Stamp (5)**
4:4;140:3,5;141:5;
150:18

**stamped (2)**
174:24;175:7,12

**stand (2)**
29:14;132:2

**standard (3)**
17:19;67:5,6

**Stangas (1)**
114:6

**Staples (1)**
49:21

**Star (3)**
112:22;135:4,10

**start (7)**
21:2;62:15,16,19;
63:10,14;83:12

**started (13)**
19:11;21:4;22:8;
36:15;43:10,15;46:23;
58:19,23;83:14,16;
118:19;122:8

**starting (3)**
59:12;78:12;111:11

**start-up (1)**
13:13

**State (12)**
6:1;7:16;11:9;12:15;
20:8;23:20;29:19;
131:16;132:3,19,21;
133:2

**stated (9)**
9:10,23;47:2;60:14;
92:23;144:11;162:23,
25;163:16

**statements (1)**
9:4

**states (4)**
62:14;72:18,24;
144:18

**statesman (1)**
44:2

**stating (3)**
64:18;173:8,12

**steep (1)**
30:9

**step (2)**
83:7;164:2

**Stephen (1)**
83:25

**steps (1)**
29:25

**Sterling (132)**

6:7,18;8:4,6;11:5;
12:24;14:2,10;16:25;
17:2;18:14;19:12,16;
20:12;21:4,14;24:3;
26:15,22;30:16,25;32:5;
35:3;37:3,5;39:23;40:5;
42:13,19;43:4,5,8,25;
48:21;50:1;52:6,19,23;
53:6;55:18;58:20;60:3;
61:7,23;62:4;63:2,16,20;
64:4;65:4,9;67:1,3;68:1;
73:3;74:7,8,16,17;75:16,
17;79:20;83:12,22;84:4;
89:12;90:17;91:1;93:2;
97:6,23;102:7,11,17;
105:9,14;108:20;109:2,
20;111:25;115:23;
116:4;121:18;122:14,
17;123:8;124:6,8;
125:25;126:3;128:16;
129:19;131:9;133:6,12;
134:10;137:22;138:11;
144:2;145:5,17,24;
146:8;148:7;152:7;
159:6;161:7;162:15,19;
163:4,7,18;166:15,17;
167:12,17,24;168:5,10,
18;170:4,11,17;172:13,
22;173:21,24;176:5,8,
17,21;177:5

**Steve (4)**
86:15,17;119:21;
120:25

**still (7)**
33:21;42:25;43:24;
122:15;123:10;165:17,
19

**stipulate (1)**
5:10

**STIPULATED (2)**
4:10,15

**S-T-I-P-U-L-A-T-I-O-N-S (1)**
4:8.5

**Stock (48)**
71:18,19;72:7,8,14,16,
20;73:8,13,14,19,20,20,
25;74:4,9,10,17,21,22,
25;75:3,5,17,24;76:4,25;
77:9,15,16;78:15,23;
79:9,19,19;167:25;
168:1,4,8;169:8;170:22;
171:10,19;173:1,3,4,9;
176:2

**stocks (1)**
168:2

**stop (3)**
7:10;112:24;136:11

**store (2)**
136:12,16

**straightforward (2)**
111:7;135:20

**strange (1)**
129:7

**strategic (13)**
11:17;26:10;40:10;
44:22,23;52:14;55:3,4,6;
105:4;110:12;117:3;
130:5

**strategically (2)**
23:25;51:3

**strategy (3)**
40:12;44:3;45:8

**stream (1)**
91:25

**Street (3)**
2:15;115:8;119:1

**strictly (1)**
51:19

**structure (5)**
38:1;45:16,17;54:18;
78:12

**studied (1)**
10:17

**study (1)**
10:16

**stuff (1)**
81:14

**submit (1)**
143:25

**submitted (2)**
29:21;149:16

**subsequent (4)**
97:3;98:23;101:21,21

**subsequently (1)**
75:1

**substance (1)**
164:12

**substantial (1)**
5:13

**substantive (1)**
29:9

**successful (2)**
78:18,19

**Suffolk (8)**
107:23;112:23;
120:11,13;121:8,10,24;
126:17

**Suite (1)**
2:16

**summer (4)**
19:9;83:16;114:18;
179:22

**summers (1)**
13:3

**SUNY (3)**
10:14,15,19

**Supermarket (1)**
54:5,6

**supervise (1)**
36:3;43:12;48:20

**supervised (3)**
39:1;48:24;154:19

**supervision (1)**
53:10

**supervisor (4)**
43:9,15;44:6;45:1

**supervisory (2)**
45:6,15

**supplied (1)**
160:22

**suppliers (2)**
34:20,21

**supplies (4)**
55:22;122:24;144:21,
22

**supply (59)**
32:11,14,24;34:10,12,
14,18;35:7,9;37:19;38:2,
14;39:15;40:2;48:3;
66:18;90:21;91:8;
102:19;117:17;119:13,
15,16;120:9;122:23;
127:25;144:18,20;
145:2;146:16,17,22;
147:10,16;149:4,25;
150:2,3;153:8,25;154:2,
7,14,15,16,20,21,23;
155:12,15;156:12,21,23;
157:2,4;158:21,24;
160:16,17

**support (8)**
16:13;51:9,10,10,11;
73:22;125:14;175:18

**supported (8)**
16:18,19,19,20,21;
38:14,15;51:21

**supports (1)**
81:23

**supposed (1)**
7:8

**sure (29)**
6:24;7:13;13:19;
14:23;48:23;62:12;
65:21;66:8;75:20;85:8,
11;87:21;95:8;103:14;
132:13;137:7;139:20;
149:11,12;152:13;
159:19,20;161:23;
167:4;168:13;170:22;
174:16;175:6,14

**sustainability (3)**
118:9;130:25;131:2

**swap (1)**
129:2

**switch (2)**
35:21,21

**sworn (2)**
5:22;6:13

**Syracuse (1)**
107:1

**system (38)**
70:2;81:24;82:17,25;
83:11;84:1;85:2,9,15,19,
23,24;86:1,6,20,25;87:2,
9;88:1,5,21;89:2,13,17,
22;90:9;91:3;92:4,25;
93:11,17;94:5,20;95:15;
96:6,13;170:1;179:9

**T**

**table (1)**
158:18

**tag (4)**
15:2,8,9;116:6

**tags (10)**
14:19;15:8;24:9;
25:14;33:5,9,14;113:14;
116:1;130:6

**talk (12)**
16:24;17:16;18:22;
39:11;48:17;65:12;
67:17;80:13;82:3;95:19;
101:24;137:4

**talked (13)**
20:10;51:2;57:3,6;
92:1;94:18,19,19,20;
113:9;132:25;134:21;
135:11

**Talking (5)**
14:14;28:16;48:15;
93:15;94:10

**talks (1)**
179:1

**tape-recordings (1)**
9:3

**target (1)**
130:22

**targeted (1)**
131:10

**team (37)**
32:22;35:7,9;38:15;
40:8,18,24;41:25;42:5;
45:10,10;48:3;49:10;
51:16;57:10;64:8;83:18;
84:3,13;86:23;90:4,21,
22;91:6,8,8,10,14,21;
94:8;119:13,16;130:8;
133:16,17;142:11;143:5

**Technologies (1)**
134:18

**Technologist (1)**
13:13

**telephone (3)**
9:21;91:25;114:20

**telling (1)**
147:1

**template (2)**
67:15,20

**tense (1)**
179:6

**tenure (1)**
32:19;52:6

**term (3)**
116:3,6;162:5

**termed (1)**
37:20

**terminate (2)**
73:1;162:19

**terminated (5)**
162:21,22;169:12;

172:24,25

**termination (4)**
162:24;169:17;171:4;
173:24

**terminations (1)**
72:24

**terms (17)**
39:23;58:9,10;59:22;
61:8,24;62:4,7;64:14;
67:14;71:11;73:15;
168:15;169:1,9,18;
173:23

**territory (3)**
23:15,16;133:3

**testified (1)**
5:23

**testimony (2)**
4:12;6:13

**Texas (1)**
113:8

**theoretically (1)**
155:12

**thereabouts (1)**
143:23

**therefore (1)**
93:18

**thinking (2)**
18:14;78:11

**third (3)**
28:19;109:6,8

**though (1)**
33:20

**thought (4)**
46:8;75:9;153:3,10

**thousand (1)**
147:24

**three (14)**
23:9;49:10;50:10;
51:5,18;52:2;58:12;
65:1,3;143:19;149:16;
154:25;160:20;161:2

**throughout (3)**
21:14,23;84:3

**time-consuming (2)**
111:4;143:21

**time-frame (1)**
64:12

**times (5)**
31:22;42:23;60:7;
143:19;163:17

**title (19)**
13:8;21:5,13,17,22;
22:2,15,25;23:10;32:19;
34:8,9;36:6,8;49:8;
72:16;100:7;104:10;
111:23

**today (4)**
7:18,23;8:14;169:25

**today's (6)**
8:21,25;9:8;141:4;
166:20;167:19

**together (6)**
38:23,24;50:19;51:6;

74:19;175:2

**told (6)**
78:5;104:13,18;
114:19;125:10;146:20

**tomorrow (1)**
175:12

**took (8)**
29:11;42:10;50:15;
79:10;113:22;118:10;
152:22;170:25

**tool (1)**
84:19

**top (1)**
151:4

**Total (3)**
99:15;121:23;125:8

**towards (2)**
24:7;164:20

**track (10)**
23:19;28:3;54:10;
86:2;93:17,19,25;94:3,6;
97:12

**tracking (3)**
28:10,20;82:6

**trade (2)**
28:9;103:8

**trademark (2)**
116:5,6

**trademarked (1)**
116:3

**traditional (1)**
14:4

**train (1)**
84:5

**trained (4)**
53:23;152:13,15,17

**training (10)**
10:24,25;53:16;83:17,
19;84:6,11,14;91:23;
152:14

**trainings (1)**
84:25

**transaction (23)**
100:15;101:5;103:6;
109:11;111:25;118:22;
120:17;123:24;127:10;
128:4;129:15,20;
131:15;132:5,8;134:13;
135:2,13,20;136:10,12,
25;147:6

**transactions (15)**
40:2;97:18;98:3,7,16;
101:12;105:1,6;111:5,7;
123:11;124:10;129:25;
154:3;157:23

**transcript (3)**
4:17;5:3,19

**transfer (1)**
110:7

**transferred (1)**
110:6

**transparent (1)**
157:19

**transportation (1)**
12:19

**travel (3)**
106:10,16;107:2,6;
108:12

**traveled (2)**
113:2,6

**trends (1)**
28:4

**trial (1)**
175:17

**tried (1)**
174:20

**troubleshooting (1)**
152:22

**true (2)**
70:23;122:23

**trusted (3)**
45:10,11;145:9

**truthfully (1)**
167:5

**try (1)**
175:11

**trying (6)**
13:21,23;40:9;57:2;
98:14;153:20

**Tuan (1)**
57:3

**turn (1)**
139:5

**twice (1)**
59:24

**two (20)**
7:9;14:24;23:8;26:23;
59:14;61:4;64:17;69:5;
81:5;94:15;104:24;
105:6;122:2;127:12;
129:23;138:8;143:18;
146:14;147:15;151:3

**type (20)**
6:25;9:3;10:24;12:22,
22,23;23:4;24:3;29:25;
86:6;112:1;115:3;138:6,
10,13,17;141:23;142:18;
153:21;166:4

**types (1)**
110:13

**typically (3)**
44:18;67:6,8

**UBS (5)**
111:18;118:8,9,9,12

**ultimately (2)**
148:15;152:23

**Um (6)**
28:13;51:4;74:18;
79:23;103:11;150:7

**um-hum (1)**
7:4

**unassigned (1)**
90:25

**unaware (5)**
63:3;75:22;92:23;
93:20;124:4

**unclear (3)**
7:13;84:12;174:24

**under (24)**
4:17;5:2,8,19;31:10;
33:15;37:25;65:15,25;
92:12;97:17;99:14;
100:6;106:2;111:22;
121:23;125:8;147:1,7,9;
176:14;177:19;178:24,
25

**undergraduate (1)**
12:13

**Understood (5)**
64:17;65:20;91:15;
127:8;159:4

**unique (1)**
103:2

**unit (1)**
155:1

**United (2)**
112:24;136:23

**universities (4)**
41:12;87:20,22;
133:25

**University (2)**
10:13;133:20

**Unless (1)**
168:6

**unnecessary (1)**
163:11

**unofficially (4)**
11:11;48:23,24;52:8

**unvested (1)**
73:2

**up (20)**
17:21;18:11;39:8,19;
53:25;68:13;83:7;85:9;
86:25;91:22;104:14;
118:15,22;121:14;
144:12;147:17,21;
148:2;150:6;161:10

**up-charge (1)**
68:12

**updates (2)**
28:7,11

**upon (2)**
63:16;172:23

**upset (1)**
143:20

**up-to-date (1)**
85:23

**usage (3)**
68:13;70:9;121:14

**use (15)**
6:14;30:24;61:14,18;
81:4;82:5;85:24;86:1;
93:24,24;94:4,5;96:11;
142:19;175:12

**useage (2)**
122:11;135:1

**used (20)**
15:10;27:11;33:16;
67:7;70:2;81:10,24;
82:15,16,17;85:11;86:5;
91:7;92:17;93:19;97:11;
98:5;141:3;151:10;
156:8

**user (4)**
85:9;88:2,17;90:1

**users (2)**
89:17;90:19

**using (9)**
15:14,15;40:1;80:22;
82:13;83:12,16;85:15;
150:11

**Utilities (4)**
29:15;49:14,14;51:15

**Utility (17)**
29:16;31:8;49:4,13,
19,24;50:2;51:21,24;
68:6,8,9,15;120:13;
121:4,9;158:8

**utilized (1)**
148:22

**vacation (1)**
171:19

**Val (5)**
102:25,25;128:19;
129:22;151:1

**Valerie (4)**
85:4;101:7;102:9;
161:21

**valuable (1)**
163:8

**value (9)**
30:24;75:11;80:2;
99:16;121:23;129:8;
150:10;165:4;169:9

**valued (1)**
129:1

**vary (1)**
55:1

**venders (1)**
135:8

**vendor (1)**
122:22

**vendors (1)**
56:15

**verbal (4)**
6:25;104:22;156:2;
170:24

**verbally (2)**
155:25;163:16

**Verified (1)**
167:11

**versus (4)**
42:9;49:20;56:15;
146:16

**verticals (2)**
50:17,18

**Bennett v.**
**Sterling Planet**

**Kelly Bennett**
**September 30, 2010**

**vest (1)**
71:24
**vested (1)**
73:1
**vestment (1)**
72:4
**via (6)**
69:1;106:7;114:14;
129:17;131:17;156:5
**Vice (13)**
21:25;22:1,2,13,25;
25:16;26:12,13;31:18;
41:18;49:2;96:9;152:6
**view (3)**
23:17;153:16;164:1
**Vinnie (2)**
69:20;84:8
**visit (1)**
44:20
**visited (3)**
126:15,19;127:3
**visiting (2)**
44:18,18
**vocational (1)**
10:25
**voicemail (4)**
171:17,21;172:2,4
**volume (4)**
49:18,19;147:18,21
**voluntarily (1)**
31:12
**voluntary (8)**
27:12;31:5,14;33:2;
35:18;68:9;157:9,23
**voraciously (1)**
30:3
**VP (6)**
22:16,17;31:20;36:10;
51:8;180:4

**W**

**wait (1)**
19:3
**Wall (1)**
115:7
**WALLENDER (118)**
2:8;5:1,15,16;17:5;
41:22;43:7;47:19,21;
48:18;53:13;57:21;62:1,
9;65:17;66:2;70:5;73:5;
74:1;75:18;76:6;77:2;
79:21;80:25;82:1,9,23;
83:3;86:8;87:10;89:7;
90:10;91:4;92:8;93:12;
94:12;95:5,12,16;96:2;
97:24;98:9;99:3,23;
100:8;101:13;102:14;
104:12;105:16;106:3,
13;107:16;108:15,22;
109:3,23;112:3;116:10,
21;117:11;119:7;120:1,
6;123:12;124:2,12,18,

25;125:16;126:11,22;
133:14;135:25;137:7;
138:9;139:10,18,21;
140:4,20;142:1,9,21;
146:9;151:21;153:5;
155:19;156:17;158:4;
159:24;160:23;162:16;
163:20;164:6,21;
165:25;166:21;167:9,
20;168:23;169:22;
170:6,13;172:15;
173:14;174:5,16,19;
175:9,20;176:3,11,19,
23;177:7;178:1,10;
180:25
**Washington (5)**
100:14;104:4;106:18;
107:2;112:5
**watch (2)**
157:8,14
**water (7)**
12:3;80:14,15,17;
147:2,7,9
**way (13)**
7:16;16:1;18:25;
19:20;31:24;39:12;
61:24;62:25;73:17,18;
140:24;144:21;169:13
**ways (2)**
26:23;28:5
**wealth (5)**
75:11;78:3;80:4;
169:9,10
**web (1)**
91:25
**WebEx (2)**
84:17,18
**website (3)**
28:19;42:18;68:5
**weekly (3)**
44:10,11;142:6
**weeks (2)**
81:5;97:4
**welcome (1)**
164:15
**weren't (10)**
20:6;35:22;45:17,18,
18;47:6;51:25;58:6;
79:25;130:23
**West (3)**
100:13;104:4;112:5
**Western (2)**
76:8;110:8
**what's (7)**
33:1;42:18;71:18;
80:2;98:17;158:19,20
**whenever (3)**
88:13;117:13;155:5
**WHITE (14)**
2:3;14:18;15:7,8,9;
24:9;25:14;33:5,9,14;
113:14;116:1,6;130:6
**whole (2)**

12:20;90:2
**wholesaler (1)**
157:16
**whomever (1)**
155:8
**who's (1)**
93:15
**whose (4)**
28:9;74:16;94:17;
108:4
**wide (1)**
25:3
**willing (1)**
155:13
**window (1)**
159:12
**Wise (1)**
132:9
**W-I-S-E (1)**
132:9
**Within (8)**
21:21;33:12;81:5,6;
97:4;115:16;165:3;
177:9
**without (6)**
64:23,24;66:20;
140:14,15;158:11
**WITNESS (1)**
47:20
**witnesses (2)**
175:18,22
**woman (1)**
17:14
**word (5)**
40:22;81:19;86:9;
137:19;153:21
**work (26)**
10:20;11:5;12:11,15;
13:14;20:12,23;19:29:9;
32:23;40:8;45:7;54:5;
55:23;56:2,25;59:18;
62:25;92:2;103:18;
104:2,9;110:22;115:5;
131:5;143:9;173:25
**worked (11)**
14:3;35:7,9;50:19;
51:25;54:2;55:7;59:16;
60:3;86:17;96:14
**working (16)**
12:16,17;13:15,19;
20:5;41:6;43:8;45:14;
58:20,23;75:11;78:24;
79:1;83:14;127:14;
146:8
**works (2)**
80:1;144:21
**world (1)**
18:7
**worried (1)**
47:5
**worry (2)**
78:9;79:2
**wow (1)**

53:21
**write (1)**
143:12
**writing (5)**
29:8;151:1;153:12;
156:1;170:21
**written (14)**
27:18;57:12;66:20,22;
80:21;81:2,13,22;146:7;
151:17;163:5;170:10;
172:12,18
**wrong (3)**
6:21;132:15;146:24
**wrote (4)**
36:18;39:8;171:13;
173:11

**Y**

**year (27)**
12:25;20:23;21:2,3;
64:21;72:1;99:11;
116:13;131:3;144:23;
147:25;156:19;158:24;
159:3,8,10,11,13,14,18,
22;160:7,12,15,21,25;
165:3
**yearly (2)**
99:7,10
**years (10)**
9:16;35:23;60:14,16;
86:12;162:6,7;177:10,
12,13
**York (26)**
2:6;6:4;9:14;11:9;
15:17;21:11,12;44:19;
60:6,8;78:16,20;106:11,
22;107:1;108:8;130:4;
131:16;132:3,18,20;
133:2;135:21;136:4,4,24

**Z**

**Zox (4)**
69:20;84:8;113:20;
148:10
**Z-O-X (1)**
113:22



**STERLING PLANET, INC.**
www.sterlingplanet.com

3295 River Exchange Drive
Suite 300
Norcross, GA  30092-4238
Phone: (404) 513-0259
Fax:    (678) 325-3174

December 30, 2005

Ms. Kelly Bennett
Sent by Email

Dear Kelly,

This letter is to confirm our offer of employment to you with Sterling Planet, Inc. as Director, Business Development North Central Region reporting to me.  For projects and programs managed by other executive within Sterling Planet, you agree to follow their direction to meet the company's goals.

The terms and conditions of your employment are outlined below:

1.  **Start Date**

    Your employment start date will be February 13, 2006 or earlier or later if mutually agreed.  This employment offer is contingent upon Sterling Planet closing $5,000,000 in its next round of funding scheduled for January 27, 2006.

2.  **Salary**

    Your starting salary will be $4,166.67 per pay period ($100,000 per year if expressed in annual terms) paid on the 15th and at the end of the month.

3.  **Hiring Bonus Payment**

    As an incentive to induce your acceptance of this employment offer, Sterling Planet will provide you a payment of $5,000.00 on your first paycheck once your begin work and an additional payment of $5,000.00 on your three month anniversary with Sterling Planet. As with all compensation, federal and other taxes will be withheld.

4.  **Stock Options**

Kelly, part of this offer you will receive 25,000 shares from the management stock options pool based on the following vesting schedule:

- 8,333 shares at the end of 12 months from Start Date.
- 8,333 shares at the end of 24 months from Start Date.
- 8,334 shares at the end of 36 months from Start Date.



PLAINTIFF'S DEPOSITION
EXHIBIT

PENGAD 800-631-6989

9-30-10

Ms. Kelly Bennett
December 30, 2005
Page 2 of 3

In the event, the company is sold or merged, all shares will immediately vest.  If you decide to leave the company or are terminated before all the options are vested above, then any unvested options under this agreement shall remain with Sterling Planet.

## 5.  Commission Plan

The following is the commission plan we have put in place for you during the employment as Director, Business Development North Central Region.  All payouts of commission earned by you will be at the commission percentages as defined below.  Each new prospect must have an End-User Referral Form completed.

| Product Type | Commission % of Profit |
|---|---|
| Renewable Energy Certificates | 10% |

Sterling Planet is in the business of purchasing Renewable Energy Certificates (RECs) or renewable energy bundled with electricity provided by a utility or an energy service company and reselling them to retail and wholesale customers, including sales brokered through others that provide exchange and brokering services for Green Certificates associated with electricity generation ("Brokers").

If you are involved in closing the sale of renewable energy certificates ("REC Product") as documented with a mutually agreed to and executed End-User Referral Form, then you will receive ten percent (10%) of the Gross Profit for that contract.  The definition of Gross Profit for these contracts will be Sterling Planet revenue received from customer minus any broker fees paid to Broker to supply the renewable energy minus supply costs.  No other costs will be associated with Gross Profit.

Any earned and recorded commissions, as evidenced by a signed contract with a client which has an executed End-User Referral Form with you, will be paid to you by Sterling Planet at the appropriate commission levels for the full term of each contract sold (including multiple contracts sold to the same customer while you are employed or under contract to Sterling Planet).  There are no caps on the commissions you earn by client on in total.

Should you leave the company, for any reason, then contracts signed by the client documented by an End-User Referral Form(s) by you before your departure, will still be earned and paid for the total length of the contract(s).  Contracts signed by these same clients with Sterling Planet after your departure, will not earn you or pay you a commission.

## 6.  Proprietary Information, Invention, and Confidentiality Agreements

As a condition of employment you will be required to sign proprietary information, invention, and confidentiality agreements outlining your responsibilities in regards to your exposure to and development of sensitive and important information, resources, and products of Sterling Planet.  This agreement does not restrict you as to whom or where you may work in the future, but it does restrict you in your ability to share knowledge of information or resources of the company with others.

Ms. Kelly Bennett
December 30, 2005
Page 3 of 3

### 7. Benefits and Time Off

**Benefits.**          As we get more established, we will enhance our benefits package.

**Medical Insurance:**     Sterling Planet pays 100% of the medical insurance payments for
employees and 50% of their spouse and dependents medical
insurance premiums.

**Dental Insurance:**     Sterling Planet pays 100% of the dental insurance payments for
employees and 50% of their spouse and dependents dental insurance
premiums.

**Time Off.**          We observe 10 paid holidays
We offer 10 days of Paid Time Off (Vacation)

We currently do not offer life insurance, long/short term disability but plan to in the not too
distant future. Our current thinking is that these benefits should be 100% funded by Sterling
Planet.

### 8. Termination of Employment Offer

This offer of employment is valid thirty (30) calendar days from the date written unless both
parties agree to extend it.

We would be pleased to have you as a member of our management team and look forward
to working with you. Should you have any questions, please call me at (404) 513-0259.

We wish you every success in your challenging new career. I look forward to working with
you in achieving the continued success of our business.

Sincerely,

Mel Jones
President and Chief Executive Officer

AGREED TO:

Kelly Bennett                    02 Jan 06
                                  Date

**Ron Mitchell**

| | |
|---|---|
| **From:** | Kelly Bennett |
| **Sent:** | Wednesday, August 30, 2006 6:14 PM |
| **To:** | Greg Chambers; Elizabeth Kasprowicz; Vincent Fugere; Alan Zox; Marcus Krembs; Dell Jones |
| **Cc:** | Mel Jones; Sonny Murphy; Ron Mitchell; Joe Barclay |
| **Subject:** | Lead management system |
| **Importance:** | High |

**Attachments:** lead.contact.template.for.Quickbase.xls

To all,

As you are all aware, a lead management tool has been in development for some time and we are now ready to import your lead contact information into the selected system, called Quickbase. I have attached a template for your use. Every effort has been made to design the template to allow you to cut and paste as much information as possible.

**Your completed templates are due by EOD September 6th.**

### General Information

You are completing the "Contacts" worksheet only; the "qb export" worksheet is protected and will be used to import the "Contacts" data into Quickbase.

All your leads are expected to be imported into Quickbase (not simply the "top ten" list we submitted to Sonny for the revenue forecast). This includes all leads provided by Mel as well as any other leads subsequently acquired on your own.

### Detailed Instructions for Each Lead Entry

**Sales Rep Email** – enter your Sterling Planet email address.

**Lead Name** – enter name of the company/organization (e.g., Wal-Mart, City of Chicago, Apollo Alliance).

**Customer Contact, Contact Title** – enter lead's point of contact and title.

**Contact Address1, Contact Address2, Contact City, Contact State, Contact City, Contact State, Contact Phone Number, Contact Fax Number, Contact Email** – enter full contact information for each lead. This is the same information that was required for the end-user referral forms.

**Sales Stage** - enter the sales stage of the lead. When you click in the cell, you'll see a double arrow to the right. Click on the arrows to see the entire list, or start by typing a number, then select the item.

**Region** - enter the geographic region for the lead (not your regional location). When you click in the cell, you'll see a double arrow to the right. Click on the arrows to see the entire list then select the region.

**Last Contact Date** – enter the date of the last contact with the lead (00/00/0000 format



PLAINTIFF'S DEPOSITION EXHIBIT
2
9-30-10
PENGAD 800-631-6989

**Next Steps**

Once all the data is imported, you will be sent Quickbase user account information.

A training session for Quickbase is scheduled for **September 11 at 4:00 pm EST**.  You should allow an hour for the training.

Once trained on Quickbase, you will need to complete one last step (enter the projected revenue information for each lead).

Please do not hesitate to call me with any questions.  I have been the guinea pig in the process so far, importing my sales leads into Quickbase and working with Steve on any glitches we've found along the way.   It's still a work in progress and I expect some refinements along the way.  Your input is going to be important as we move into the day-to-day use of the system.

Thanks,

Kelly

**Kelly Bennett**
Director, Northeast Region
Sterling Planet, Inc.
20 Spring Avenue
Latham, NY  12110
Phone: 518 269 1636
Fax: 678 325 3174
kbennett@sterlingplanet.com
www.sterlingplanet.com

7/19/2010

**KELLY J. BENNETT**

█████████████ ▪ Latham, NY 12110

(518) 782-1931 ▪ (518) 269-1636 cell

Kellyb0426@gmail.com

Therrell "Sonny" Murphy
Chairman
Sterling Planet, Inc.
3295 River Exchange Drive
Suite 300
Norcross, GA  30092

Dear Sonny:

I am in receipt of your letter dated August 1, 2009. At this point it would serve no useful purpose to belabor my disagreement with your contentions. Suffice it to say they are self-serving and inaccurate.

I do take this opportunity to reiterate my entitlement to my stock and my commissions under my commission plan. Demand is made for payment of all earned commission in the amount of $505,904.48 plus interest. Enclosed herewith are spreadsheets with respect to the closed sales for which I am entitled to commissions, together with my calculation of my commission of 10% of the gross profits. This information is provided under a reservation of rights including, but not limited to, entitlement with respect to the new PepsiCo contract.

As you should know, we initially memorialized commission entitlements under End User Referral Forms and then switched to utilizing the Quickbase computerized database to track entitlement of employees and agents to their commissions. I am the Sales Representative recognized in Quickbase for all of the closed sales set forth on the enclosed spreadsheet. I also enclose an example of the initially used End User Referral Form signed by Mel Jones and me in April of 2006. It is a proverbial "smoking gun," which belies the Company's "position on commission payments."

Please provide me with confirmation of my stock holdings and a statement of my commission earnings, all of which are due and owing, and any written terms of employment which you allege are applicable other than my accepted offer of employment dated December 31, 2005. All rights are reserved.

Very truly yours,

*Kelly Bennett*

Kelly Bennett

PENGAD 800-631-6989

PLAINTIFF'S DEPOSITION
EXHIBIT

3

9-30-10

## EXHIBIT A

## END-USER REFERRAL FORM

1.    **End-User Company Name and Address:**    **American Wind Energy Association**

2.    **End-User Contact Name:**

3.    **End-User Title:**

4.    **End-User Phone Number:**

5.    **End-User E-Mail Address:**

6.    **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| **REC Product** | **10% of Profit** | __X__ |
| **White Tags Product** | **10% of Profit** | __X__ |
| **White Tags Generation Product** | **10% of Retainer per Month** | __X__ |
| **Fixed-Price Development Fee** | **10% of Development Fee** | __X__ |
| **Software Development Fee** | **10% of Profit** | __X__ |
| **(Check box that applies)** | | |

7.    **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                 **KELLY BENNETT:**

_____              _____
Signed By                            Signed By

____Mel Jones____                  ____Kelly Bennett____
Print or Typed Name                 Print or Typed Name

__President and Chief Executive Officer____   ____Director, Business Development____
Title                                  Title

____April 9, 2006____                 ____April 8, 2006____
Date                                 Date

PLAINTIFF'S DEPOSITION EXHIBIT
PENGAD 800-631-6989
4
9-30-10

0C00459

**EXHIBIT A**

**END–USER REFERRAL FORM**

1.  **End-User Company Name and Address:**  **Apollo Alliance (National)**

_____

_____

_____

2.  **End-User Contact Name:** _____

3.  **End-User Title:** _____

4.  **End-User Phone Number:** _____

5.  **End-User E-Mail Address:** _____

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

_____

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____              _____
Signed By                                              Signed By

_____Mel Jones_____              _____Kelly Bennett_____
Print or Typed Name                             Print or Typed Name

_____President and Chief Executive Officer_____              _____Director, Business Development_____
Title                                                          Title

_____April 9, 2006_____              _____April 8, 2006_____
Date                                                          Date

0000460

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.  **End-User Company Name and Address:**   Arrow Electronics, Inc.

2.  **End-User Contact Name:**
3.  **End-User Title:**
4.  **End-User Phone Number:**
5.  **End-User E-Mail Address:**
6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
| --- | --- | --- |
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_Mel Jones_
Signed By

Mel Jones
Print or Typed Name

President and Chief Executive Officer
Title

April 9, 2006
Date

**KELLY BENNETT:**

_Kelly Bennett_
Signed By

Kelly Bennett
Print or Typed Name

Director, Business Development
Title

April 8, 2006
Date

0000461

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.    **End-User Company Name and Address:**    Avava Inc.

    _____

    _____

    _____

2.    **End-User Contact Name:**    _____

3.    **End-User Title:**    _____

4.    **End-User Phone Number:**    _____

5.    **End-User E-Mail Address:**    _____

6.    **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
| --- | --- | --- |
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.    **Additional Terms Unique to This Client:**

_____

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                    **KELLY BENNETT:**

_____        _____
Signed By                                              Signed By

_____Mel Jones_____                  _____Kelly Bennett_____
Print or Typed Name                          Print or Typed Name

__President and Chief Executive Officer__    ___Director, Business Development___
Title                                                      Title

_____April 9, 2006_____            _____April 8, 2006_____
Date                                                    Date

0000462

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   Avon Products, Inc.

       _____

       _____

       _____

2.   **End-User Contact Name:** _____

3.   **End-User Title:** _____

4.   **End-User Phone Number:** _____

5.   **End-User E-Mail Address:** _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.   **Additional Terms Unique to This Client:**

_____

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____             _____
      Signed By                                               Signed By

\_\_\_Mel Jones_____             \_\_\_Kelly Bennett_____
Print or Typed Name                                 Print or Typed Name

\_\_President and Chief Executive Officer\_\_\_\_             \_\_\_\_\_Director, Business Development_____
      Title                                                    Title

_____April 9, 2006_____             _____April 8, 2006_____
      Date                                                    Date

0300463

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **BASF**

2.   **End-User Contact Name:**

3.   **End-User Title:**

4.   **End-User Phone Number:**

5.   **End-User E-Mail Address:**

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.   **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                      **KELLY BENNETT:**

_____                    _____
Signed By                                                              Signed By

_____Mel Jones_____                    _____Kelly Bennett_____
Print or Typed Name                                          Print or Typed Name

____President and Chief Executive Officer____    ____Director, Business Development____
Title                                                                    Title

_____April 9, 2006_____                    _____April 8, 2006_____
Date                                                                    Date

0000464

## EXHIBIT A

### END-USER REFERRAL FORM

1.     **End-User Company Name and Address:**    **Bristol Myers Squibb**

        _____

        _____

        _____

2.     **End-User Contact Name:**    _____

3.     **End-User Title:**    _____

4.     **End-User Phone Number:**    _____

5.     **End-User E-Mail Address:**    _____

6.     **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.     **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

___Mel Jones_____
Print or Typed Name

__President and Chief Executive Officer____
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

_____Kelly Bennett_____
Print or Typed Name

_____Director, Business Development___
Title

_____April 8, 2006_____
Date

0000465

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.    **End-User Company Name and Address:**    **Canon**

                  _____

                  _____

                  _____

2.    **End-User Contact Name:**

3.    **End-User Title:**

4.    **End-User Phone Number:**

5.    **End-User E-Mail Address:**

6.    **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below.  The commissions will be paid as payments are received by the Prospect.  This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | \_\_**X**\_\_ |
| White Tags Product | 10% of Profit | \_\_**X**\_\_ |
| White Tags Generation Product | 10% of Retainer per Month | \_\_**X**\_\_ |
| Fixed-Price Development Fee | 10% of Development Fee | \_\_**X**\_\_ |
| Software Development Fee | 10% of Profit | \_\_**X**\_\_ |
| (Check box that applies) | | |

7.    **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

        *[signature]*                                    *[signature]*

        Signed By                                     Signed By

        Mel Jones                                   Kelly Bennett

        Print or Typed Name                          Print or Typed Name

\_\_\_\_President and Chief Executive Officer\_\_\_\_    _____Director, Business Development_____

                Title                                        Title

_____April 9, 2006_____         _____April 8, 2006_____

                Date                                          Date

0000466

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.     **End-User Company Name and Address:**   **City of Bayonne, NJ**

_____

_____

_____

2.     **End-User Contact Name:**    _____

3.     **End-User Title:**    _____

4.     **End-User Phone Number:**    _____

5.     **End-User E-Mail Address:**    _____

6.     **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.     **Additional Terms Unique to This Client:**

_____

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

___Mel Jones_____
Print or Typed Name

___President and Chief Executive Officer___
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

___Kelly Bennett_____
Print or Typed Name

_____Director, Business Development____
Title

_____April 8, 2006_____
Date

000467

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **City of Bloomfield, NJ**

_____

_____

2.   **End-User Contact Name:**   _____

3.   **End-User Title:**   _____

4.   **End-User Phone Number:**   _____

5.   **End-User E-Mail Address:**   _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.   **Additional Terms Unique to This Client:**

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

_____Mel Jones_____
Print or Typed Name

____President and Chief Executive Officer____
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

_____Kelly Bennett_____
Print or Typed Name

____Director, Business Development____
Title

_____April 8, 2006_____
Date

0000468

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **City of Elizabeth, NJ**

2.   **End-User Contact Name:** _____

3.   **End-User Title:** _____

4.   **End-User Phone Number:** _____

5.   **End-User E-Mail Address:** _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| **REC Product** | **10% of Profit** | __X__ |
| **White Tags Product** | **10% of Profit** | __X__ |
| **White Tags Generation Product** | **10% of Retainer per Month** | __X__ |
| **Fixed-Price Development Fee** | **10% of Development Fee** | __X__ |
| Software Development Fee | **10% of Profit** | __X__ |
| **(Check box that applies)** | | |

7.   **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                          **KELLY BENNETT:**

_____                 _____
Sign**ed** By                                          Signed By

____Mel Jones____                          ____Kelly Bennett____
**Print or Typed Name**                     **Print or Typed Name**

__President and Chief Executive Officer__   _____Director, Business Development_____
**Title**                                            **Title**

_____April 9, 2006_____                 _____April 8, 2006_____
**Date**                                            **Date**

0000469

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.     **End-User Company Name and Address:**    **City of Hamilton, NJ**

<br>

<br>

<br>

2.     **End-User Contact Name:**

3.     **End-User Title:**

4.     **End-User Phone Number:**

5.     **End-User E-Mail Address:**

6.     **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below.  The commissions will be paid as payments are received by the Prospect.  This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.     **Additional Terms Unique to This Client:**

<br>

<br>

<br>

**AGREED TO:**

**STERLING PLANET:**

        *[signature]*

Signed By

____Mel Jones_____
Print or Typed Name

____President and Chief Executive Officer____
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

        *[signature: Kelly Bennett]*

Signed By

____Kelly Bennett_____
Print or Typed Name

____Director, Business Development_____
Title

_____April 8, 2006_____
Date

0000470

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.    **End-User Company Name and Address:**    City of Hope, NJ

2.    **End-User Contact Name:**

3.    **End-User Title:**

4.    **End-User Phone Number:**

5.    **End-User E-Mail Address:**

6.    **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.    **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                  **KELLY BENNETT:**

          Signed By                                              Signed By

          Mel Jones                                       Kelly Bennett

     **Print or Typed Name**                                **Print or Typed Name**

_____President and Chief Executive Officer_____           _____Director, Business Development_____

            **Title**                                                  **Title**

_____April 9, 2006_____                  _____April 8, 2006_____

           **Date**                                                 **Date**

0000471

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.     **End-User Company Name and Address:**    City of Hopewell, NJ

2.     **End-User Contact Name:**

3.     **End-User Title:**

4.     **End-User Phone Number:**

5.     **End-User E-Mail Address:**

6.     **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.     **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

____Mel Jones____
Print or Typed Name

___President and Chief Executive Officer___
Title

____April 9, 2006____
Date

**KELLY BENNETT:**

_____
Signed By

____Kelly Bennett____
Print or Typed Name

____Director, Business Development____
Title

____April 8, 2006____
Date

0000472

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.  **End-User Company Name and Address:**    City of Kearny, NJ

_____

_____

_____

2.  **End-User Contact Name:** _____

3.  **End-User Title:** _____

4.  **End-User Phone Number:** _____

5.  **End-User E-Mail Address:** _____

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:** _____

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**                                           **KELLY BENNETT:**

_____                                           _____
Signed By                                                               Signed By

_____                                           _____
Mel Jones                                                               Kelly Bennett
Print or Typed Name                                               Print or Typed Name

__President and Chief Executive Officer____          ____Director, Business Development_____
Title                                                                       Title

____April 9, 2006_____                              _____April 8, 2006_____
Date                                                                      Date

0000473

## EXHIBIT A

### END-USER REFERRAL FORM

1. **End-User Company Name and Address:**   **City of Newark, NJ**

   _____

   _____

   _____

2. **End-User Contact Name:** _____

3. **End-User Title:** _____

4. **End-User Phone Number:** _____

5. **End-User E-Mail Address:** _____

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7. **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                          _____
Signed By                                                       Signed By

_____Mel Jones____                              _____Kelly Bennett____
Print or Typed Name                                     Print or Typed Name

__President and Chief Executive Officer__      __Director, Business Development__
Title                                                                 Title

____April 9, 2006____                            ____April 8, 2006____
Date                                                                Date

0000474

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**    City of Plainfield, NJ

   _____

   _____

   _____

2.   **End-User Contact Name:**    _____

3.   **End-User Title:**    _____

4.   **End-User Phone Number:**    _____

5.   **End-User E-Mail Address:**    _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

   **(Check box that applies)**

7.   **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                              **KELLY BENNETT:**

_____                    _____
Signed By                                                Signed By

___Mel Jones_____                      ____Kelly Bennett_____
Print or Typed Name                               Print or Typed Name

___President and Chief Executive Officer____    _____Director, Business Development_____
Title                                                      Title

____April 9, 2006_____                    _____April 8, 2006_____
Date                                                      Date

0000475

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.  **End-User Company Name and Address:**   City of Robbinsville, NJ

    _____

    _____

    _____

2.  **End-User Contact Name:** _____

3.  **End-User Title:** _____

4.  **End-User Phone Number:** _____

5.  **End-User E-Mail Address:** _____

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.  **Additional Terms Unique to This Client:**

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                                _____
Signed By                                              Signed By

____Mel Jones_____                              ____Kelly Bennett_____
Print or Typed Name                                    Print or Typed Name

____President and Chief Executive Officer____           ____Director, Business Development_____
Title                                                  Title

____April 9, 2006_____                            ____April 8, 2006_____
Date                                                   Date

0000476

## EXHIBIT A

## END-USER REFERRAL FORM

1. **End-User Company Name and Address:**   **City of Westfield, NJ**

_____

_____

_____

2. **End-User Contact Name:** _____

3. **End-User Title:** _____

4. **End-User Phone Number:** _____

5. **End-User E-Mail Address:** _____

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7. **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                    _____
Signed By                                                      Signed By

_____Mel Jones_____                    _____Kelly Bennett_____
Print or Typed Name                                  Print or Typed Name

__President and Chief Executive Officer____           __Director, Business Development_____
Title                                                              Title

_____April 9, 2006_____                    _____April 8, 2006_____
Date                                                              Date

0000477

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **City of Albany, NY**

2.   **End-User Contact Name:**

3.   **End-User Title:**

4.   **End-User Phone Number:**

5.   **End-User E-Mail Address:**

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
|---|---|---|
| **REC Product** | **10% of Profit** | __X__ |
| **White Tags Product** | **10% of Profit** | __X__ |
| **White Tags Generation Product** | **10% of Retainer per Month** | __X__ |
| **Fixed-Price Development Fee** | **10% of Development Fee** | __X__ |
| **Software Development Fee** | **10% of Profit** | __X__ |
| **(Check box that applies)** | | |

7.   **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                        **KELLY BENNETT:**

_____                                _____
Signed By                                                              Signed By

__Mel Jones_____                                __Kelly Bennett_____
Print or Typed Name                                            Print or Typed Name

__President and Chief Executive Officer____      __Director, Business Development____
Title                                                                      Title

_____April 9, 2006_____                        _____April 8, 2006_____
Date                                                                     Date

P000478

## EXHIBIT A

## END-USER REFERRAL FORM

1.   **End-User Company Name and Address:**   **City of Buffalo, NY**

_____

_____

_____

2.   **End-User Contact Name:**   _____

3.   **End-User Title:**   _____

4.   **End-User Phone Number:**   _____

5.   **End-User E-Mail Address:**   _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below.  The commissions will be paid as payments are received by the Prospect.  This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.   **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                               **KELLY BENNETT:**

_____                        _____
Signed By                                                      Signed By

_____Mel Jones_____                              _____Kelly Bennett_____
Print or Typed Name                                  Print or Typed Name

__President and Chief Executive Officer____    ____Director, Business Development_____
Title                                                             Title

_____April 9, 2006_____                     _____April 8, 2006_____
Date                                                           Date

0000479

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.  **End-User Company Name and Address:**   **City of Hempstead, NY**

2.  **End-User Contact Name:**
3.  **End-User Title:**
4.  **End-User Phone Number:**
5.  **End-User E-Mail Address:**
6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                        **KELLY BENNETT:**

_____                    _____
Signed By                                                          Signed By

__Mel Jones_____                    __Kelly Bennett_____
Print or Typed Name                                            Print or Typed Name

__President and Chief Executive Officer__          __Director, Business Development__
Title                                                                 Title

_____April 9, 2006_____                _____April 8, 2006_____
Date                                                                 Date

0000480

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **City of Ithica, NY**

2.   **End-User Contact Name:**   _____

3.   **End-User Title:**   _____

4.   **End-User Phone Number:**   _____

5.   **End-User E-Mail Address:**   _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.   **Additional Terms Unique to This Client:**

_____
_____
_____
_____.

**AGREED TO:**

**STERLING PLANET:**                                   **KELLY BENNETT:**

_____                        _____
Signed By                                                          Signed By

____Mel Jones____                                   ____Kelly Bennett____
Print or Typed Name                                        Print or Typed Name

___President and Chief Executive Officer____      ___Director, Business Development___
Title                                                                      Title

_____April 9, 2006_____                    _____April 8, 2006_____
Date                                                                      Date

0000481

# EXHIBIT A

## END-USER REFERRAL FORM

1.      **End-User Company Name and Address:**      **City of Mount Vernon, NY**

2.      **End-User Contact Name:**

3.      **End-User Title:**

4.      **End-User Phone Number:**

5.      **End-User E-Mail Address:**

6.      **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.      **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                             **KELLY BENNETT:**

_____                                    _____
Signed By                                                                 Signed By

_____Mel Jones_____                                             _____Kelly Bennett_____
Print or Typed Name                                              Print or Typed Name

__President and Chief Executive Officer__                __Director, Business Development__
Title                                                                        Title

_____April 9, 2006_____                                        _____April 8, 2006_____
Date                                                                       Date

0000482

**EXHIBIT A**

**END-USER REFERRAL FORM**

1. **End-User Company Name and Address:**   **City of Niagara Falls, NY**

_____

_____

_____

2. **End-User Contact Name:**   _____

3. **End-User Title:**   _____

4. **End-User Phone Number:**   _____

5. **End-User E-Mail Address:**   _____

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7. **Additional Terms Unique to This Client:**

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                    _____
**Signed By**                                                        **Signed By**

___Mel Jones_____                    ___Kelly Bennett_____
**Print or Typed Name**                                      **Print or Typed Name**

___President and Chief Executive Officer_____       ___Director, Business Development_____
**Title**                                                                    **Title**

___April 9, 2006_____                    ___April 8, 2006_____
**Date**                                                              **Date**

0000483

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.  **End-User Company Name and Address:**   City of Rochester, NY

_____

_____

_____

2.  **End-User Contact Name:**

3.  **End-User Title:**

4.  **End-User Phone Number:**

5.  **End-User E-Mail Address:**

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

_____

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                              _____
Signed By                                                      Signed By

_____Mel Jones_____                               _____Kelly Bennett_____
Print or Typed Name                                    Print or Typed Name

___President and Chief Executive Officer___       ___Director, Business Development___
Title                                                              Title

_____April 9, 2006_____                            _____April 8, 2006_____
Date                                                             Date

0000484

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.     **End-User Company Name and Address:**     **City of Rockville Centre, NY**

2.     **End-User Contact Name:**

3.     **End-User Title:**

4.     **End-User Phone Number:**

5.     **End-User E-Mail Address:**

6.     **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.     **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                        _____
Signed By                                                        Signed By

_____Mel Jones_____                        _____Kelly Bennett_____
Print or Typed Name                                        Print or Typed Name

___President and Chief Executive Officer____        ____Director, Business Development____
Title                                                                Title

_____April 9, 2006_____                        _____April 8, 2006_____
Date                                                                Date

0000485

**EXHIBIT A**

**END-USER REFERRAL FORM**

1. **End-User Company Name and Address:**   City of Schenectady, NY

2. **End-User Contact Name:**
3. **End-User Title:**
4. **End-User Phone Number:**
5. **End-User E-Mail Address:**
6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7. **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                      **KELLY BENNETT:**

_Signed By_                                                        _Signed By_

__Mel Jones__                                                    __Kelly Bennett__
**Print or Typed Name**                                     **Print or Typed Name**

__President and Chief Executive Officer__            __Director, Business Development__
**Title**                                                              **Title**

__April 9, 2006__                                               __April 8, 2006__
**Date**                                                             **Date**

0000486

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.    **End-User Company Name and Address:**    City of White Plains, NY

2.    **End-User Contact Name:**

3.    **End-User Title:**

4.    **End-User Phone Number:**

5.    **End-User E-Mail Address:**

6.    **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.    **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                    _____
Signed By                                                      Signed By

_____Mel Jones_____                    _____Kelly Bennett_____
Print or Typed Name                                      Print or Typed Name

__President and Chief Executive Officer__         __Director, Business Development__
Title                                                             Title

_____April 9, 2006_____                    _____April 8, 2006_____
Date                                                             Date

0000487

## EXHIBIT A

## END-USER REFERRAL FORM

1.  **End-User Company Name and Address:**   **City of Syracuse, NY**

2.  **End-User Contact Name:**
3.  **End-User Title:**
4.  **End-User Phone Number:**
5.  **End-User E-Mail Address:**
6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
| --- | --- | --- |
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                  **KELLY BENNETT:**

_____Mel Jones_____                              _____Kelly Bennett_____
Signed By                                             Signed By

____Mel Jones____                                    ____Kelly Bennett____
Print or Typed Name                                  Print or Typed Name

__President and Chief Executive Officer__             __Director, Business Development__
Title                                                Title

____April 9, 2006____                                ____April 8, 2006____
Date                                                 Date

0000488

## EXHIBIT A

## END-USER REFERRAL FORM

1. **End-User Company Name and Address:** Croton-on-Hudson, NY

2. **End-User Contact Name:**

3. **End-User Title:**

4. **End-User Phone Number:**

5. **End-User E-Mail Address:**

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7. **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                        **KELLY BENNETT:**

_____Mel Jones_____
**Print or Typed Name**                                     Kelly Bennett_____
                                                            **Print or Typed Name**

____President and Chief Executive Officer_____
**Title**                                                   ____Director, Business Development_____
                                                            **Title**

_____April 9, 2006_____
**Date**                                                    _____April 8, 2006_____
                                                            **Date**

0000489

## EXHIBIT A

### END-USER REFERRAL FORM

1. **End-User Company Name and Address:**   **Eastman Kodak**

2. **End-User Contact Name:**

3. **End-User Title:**

4. **End-User Phone Number:**

5. **End-User E-Mail Address:**

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7. **Additional Terms Unique to This Client:**

**AGREED TO:**

| STERLING PLANET: | KELLY BENNETT: |
|---|---|
| _Signed By_ | _Signed By_ |
| __Mel Jones__ | __Kelly Bennett__ |
| Print or Typed Name | Print or Typed Name |
| __President and Chief Executive Officer__ | __Director, Business Development__ |
| Title | Title |
| __April 9, 2006__ | __April 8, 2006__ |
| Date | Date |

0000490

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **Environmental Business Association of New York State Members**

_____

_____

_____

2.   **End-User Contact Name:**   _____

3.   **End-User Title:**   _____

4.   **End-User Phone Number:**   _____

5.   **End-User E-Mail Address:**   _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
|---|---|---|
| **REC Product** | **10% of Profit** | __X__ |
| **White Tags Product** | **10% of Profit** | __X__ |
| **White Tags Generation Product** | **10% of Retainer per Month** | __X__ |
| **Fixed-Price Development Fee** | **10% of Development Fee** | __X__ |
| **Software Development Fee** | **10% of Profit** | __X__ |

**(Check box that applies)**

7.   **Additional Terms Unique to This Client:**

_____

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

____Mel Jones____
**Print or Typed Name**

__President and Chief Executive Officer___
**Title**

____April 9, 2006_____
**Date**

**KELLY BENNETT:**

_____
Signed By

__Kelly Bennett__
**Print or Typed Name**

___Director, Business Development___
**Title**

___April 8, 2006_____
**Date**

0000491

# EXHIBIT A

## END-USER REFERRAL FORM

1. **End-User Company Name and Address:**   **First Environment**

_____

_____

_____

2. **End-User Contact Name:**   _____

3. **End-User Title:**   _____

4. **End-User Phone Number:**   _____

5. **End-User E-Mail Address:**   _____

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7. **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

___Mel Jones_____
Print or Typed Name

___President and Chief Executive Officer___
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

___Kelly Bennett_____
Print or Typed Name

___Director, Business Development___
Title

_____April 8, 2006_____
Date

0000492

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.      **End-User Company Name and Address:**      **Husky Injection Molding Systems / Buffalo Center**

2.      **End-User Contact Name:**

3.      **End-User Title:**

4.      **End-User Phone Number:**

5.      **End-User E-Mail Address:**

6.      **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.      **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

____Mel Jones_____
Print or Typed Name

____President and Chief Executive Officer____
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

____Kelly Bennett_____
Print or Typed Name

____Director, Business Development____
Title

_____April 8, 2006_____
Date

0000493

## EXHIBIT A

## END-USER REFERRAL FORM

1.　　**End-User Company Name and Address:**　　**LeMoyne College**

_____

_____

_____

2.　　**End-User Contact Name:**　　_____

3.　　**End-User Title:**　　_____

4.　　**End-User Phone Number:**　　_____

5.　　**End-User E-Mail Address:**　　_____

6.　　**Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
|---|---|---|
| **REC Product** | 10% of Profit | __X__ |
| **White Tags Product** | 10% of Profit | __X__ |
| **White Tags Generation Product** | 10% of Retainer per Month | __X__ |
| **Fixed-Price Development Fee** | 10% of Development Fee | __X__ |
| **Software Development Fee** | 10% of Profit | __X__ |
| **(Check box that applies)** | | |

7.　　**Additional Terms Unique to This Client:**

_____

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**

_____
**Signed By**

_____Mel Jones_____
**Print or Typed Name**

___President and Chief Executive Officer___
**Title**

_____April 9, 2006_____
**Date**

**KELLY BENNETT:**

_____
**Signed By**

_____Kelly Bennett_____
**Print or Typed Name**

___Director, Business Development___
**Title**

_____April 8, 2006_____
**Date**

0000494

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **Linens N' Things**

_____

_____

_____

2.   **End-User Contact Name:** _____

3.   **End-User Title:** _____

4.   **End-User Phone Number:** _____

5.   **End-User E-Mail Address:** _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.   **Additional Terms Unique to This Client:**

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**                                              **KELLY BENNETT:**

_____                  _____
          Signed By                                                          Signed By

_____Mel Jones_____                  _____Kelly Bennett_____
     Print or Typed Name                                        Print or Typed Name

___President and Chief Executive Officer____        ___Director, Business Development___
             Title                                                             Title

_____April 9, 2006_____            _____April 8, 2006_____
             Date                                                            Date

0000495

**EXHIBIT A**

**END-USER REFERRAL FORM**

1. **End-User Company Name and Address:**    **Moody's Corporation**

2. **End-User Contact Name:**

3. **End-User Title:**

4. **End-User Phone Number:**

5. **End-User E-Mail Address:**

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7. **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                           **KELLY BENNETT:**

_____                                _____
Signed By                                                               Signed By

____Mel Jones_____                          Kelly Bennett_____
Print or Typed Name                                          Print or Typed Name

___President and Chief Executive Officer____          Director, Business Development_____
Title                                                                      Title

_____April 9, 2006_____                     _____April 8, 2006_____
Date                                                                     Date

0000496

## EXHIBIT A

## END-USER REFERRAL FORM

1.    **End-User Company Name and Address:**    **Nature Tyme**

2.    **End-User Contact Name:**

3.    **End-User Title:**

4.    **End-User Phone Number:**

5.    **End-User E-Mail Address:**

6.    **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.    **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

___Mel Jones_____
Print or Typed Name

___President and Chief Executive Officer_____
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

_Kelly Bennett_
Signed By

___Kelly Bennett_____
Print or Typed Name

___Director, Business Development_____
Title

_____April 8, 2006_____
Date

0000497

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **New Jersey Consolidated Energy Savings Program**

2.   **End-User Contact Name:**

3.   **End-User Title:**

4.   **End-User Phone Number:**

5.   **End-User E-Mail Address:**

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below.  The commissions will be paid as payments are received by the Prospect.  This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.   **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                          **KELLY BENNETT:**

_____Signed By_____                                      _____Signed By_____

_____Mel Jones_____                                      _____Kelly Bennett_____
Print or Typed Name                                          Print or Typed Name

___President and Chief Executive Officer___                  ___Director, Business Development___
Title                                                        Title

_____April 9, 2006_____                                  _____April 8, 2006_____
Date                                                         Date

0000498

# EXHIBIT A

## END-USER REFERRAL FORM

1.  **End-User Company Name and Address:**   **New Jersey Meadowlands Commission**

2.  **End-User Contact Name:**
3.  **End-User Title:**
4.  **End-User Phone Number:**
5.  **End-User E-Mail Address:**
6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                     **KELLY BENNETT:**

_____                          _____
Signed By                                                     Signed By

____Mel Jones_____                              ____Kelly Bennett_____
Print or Typed Name                                   Print or Typed Name

__President and Chief Executive Officer____   __Director, Business Development__
Title                                                              Title

____April 9, 2006_____                         ____April 8, 2006_____
Date                                                             Date

0ᴊ00499

## EXHIBIT A

## END-USER REFERRAL FORM

1.  **End-User Company Name and Address:**   **New York State Municipal Wind Buyers Group**

2.  **End-User Contact Name:**

3.  **End-User Title:**

4.  **End-User Phone Number:**

5.  **End-User E-Mail Address:**

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

__Mel Jones_____
Print or Typed Name

__President and Chief Executive Officer__
Title

__April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

__Kelly Bennett_____
Print or Typed Name

__Director, Business Development__
Title

__April 8, 2006_____
Date

0000500

**EXHIBIT A**

**END-USER REFERRAL FORM**

1. **End-User Company Name and Address:**   New York Times Co.

2. **End-User Contact Name:**

3. **End-User Title:**

4. **End-User Phone Number:**

5. **End-User E-Mail Address:**

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
|---|---|---|
| **REC Product** | 10% of Profit | __X__ |
| **White Tags Product** | 10% of Profit | __X__ |
| **White Tags Generation Product** | 10% of Retainer per Month | __X__ |
| **Fixed-Price Development Fee** | 10% of Development Fee | __X__ |
| **Software Development Fee** | 10% of Profit | __X__ |
| **(Check box that applies)** | | |

7. **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

_____
Mel Jones
Print or Typed Name

____President and Chief Executive Officer____
Title

_____April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

_____
Kelly Bennett
Print or Typed Name

____Director, Business Development____
Title

_____April 8, 2006_____
Date

0000501

## EXHIBIT A

### END-USER REFERRAL FORM

1.   **End-User Company Name and Address:**   **Price Chopper**

2.   **End-User Contact Name:**

3.   **End-User Title:**

4.   **End-User Phone Number:**

5.   **End-User E-Mail Address:**

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | X |
| White Tags Product | 10% of Profit | X |
| White Tags Generation Product | 10% of Retainer per Month | X |
| Fixed-Price Development Fee | 10% of Development Fee | X |
| Software Development Fee | 10% of Profit | X |

(Check box that applies)

7.   **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                       **KELLY BENNETT:**

_____                  _____
Signed By                                                         Signed By

_____Mel Jones_____                           _____Kelly Bennett_____
Print or Typed Name                                          Print or Typed Name

__President and Chief Executive Officer____          ___Director, Business Development___
Title                                                                 Title

_____April 9, 2006_____                        _____April 8, 2006_____
Date                                                                 Date

# EXHIBIT A

## END-USER REFERRAL FORM

1.   **End-User Company Name and Address:**   **Prudential**

2.   **End-User Contact Name:**

3.   **End-User Title:**

4.   **End-User Phone Number:**

5.   **End-User E-Mail Address:**

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.   **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                              **KELLY BENNETT:**

_____                      _____
Signed By                                               Signed By

_____Mel Jones_____       _____Kelly Bennett_____
Print or Typed Name                                Print or Typed Name

___President and Chief Executive Officer____   _____Director, Business Development_____
Title                                                       Title

_____April 9, 2006_____      _____April 8, 2006_____
Date                                                      Date

0000503

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.  **End-User Company Name and Address:**  **Prudential Financial, Inc.**

2.  **End-User Contact Name:**

3.  **End-User Title:**

4.  **End-User Phone Number:**

5.  **End-User E-Mail Address:**

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| **Product Type** | **Commission %** | |
|---|---|---|
| **REC Product** | 10% of Profit | __X__ |
| **White Tags Product** | 10% of Profit | __X__ |
| **White Tags Generation Product** | 10% of Retainer per Month | __X__ |
| **Fixed-Price Development Fee** | 10% of Development Fee | __X__ |
| **Software Development Fee** | 10% of Profit | __X__ |
| **(Check box that applies)** | | |

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                        **KELLY BENNETT:**

_____Signed By_____                                  _____Signed By_____

_____Mel Jones_____                                  _____Kelly Bennett_____
Print or Typed Name                                        Print or Typed Name

___President and Chief Executive Officer___        ___Director, Business Development___
Title                                                             Title

_____April 9, 2006_____                              _____April 8, 2006_____
Date                                                             Date

0000504

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   Reconstructionist Synagogue of the North Shore

2.   **End-User Contact Name:**

3.   **End-User Title:**

4.   **End-User Phone Number:**

5.   **End-User E-Mail Address:**

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
| --- | --- | --- |
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.   **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                              **KELLY BENNETT:**

_____                         _____
Signed By                                                                Signed By

_____Mel Jones_____                                        _____Kelly Bennett_____
Print or Typed Name                                            Print or Typed Name

___President and Chief Executive Officer_____          ____Director, Business Development____
Title                                                                    Title

_____April 9, 2006_____                                   _____April 8, 2006_____
Date                                                                     Date

0000505

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.  **End-User Company Name and Address:**   Rochester City School District

2.  **End-User Contact Name:**

3.  **End-User Title:**

4.  **End-User Phone Number:**

5.  **End-User E-Mail Address:**

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**                                                        **KELLY BENNETT:**

_____                                      _____
Signed By                                                                          Signed By

____Mel Jones____                                                  ____Kelly Bennett____
Print or Typed Name                                                   Print or Typed Name

__President and Chief Executive Officer__              __Director, Business Development__
Title                                                                                 Title

____April 9, 2006____                                              ____April 8, 2006____
Date                                                                                 Date

0000506

## EXHIBIT A

## END-USER REFERRAL FORM

1.  **End-User Company Name and Address:**   Scholastic Corporation

2.  **End-User Contact Name:**
3.  **End-User Title:**
4.  **End-User Phone Number:**
5.  **End-User E-Mail Address:**
6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

____Mel Jones_____
Print or Typed Name

____President and Chief Executive Officer____
Title

____April 9, 2006_____
Date

**KELLY BENNETT:**

_____
Signed By

____Kelly Bennett_____
Print or Typed Name

____Director, Business Development____
Title

____April 8, 2006_____
Date

0000507

## EXHIBIT A

## END-USER REFERRAL FORM

1.   **End-User Company Name and Address:**   **Sirius Satellite Radio Inc.**

_____

_____

_____

2.   **End-User Contact Name:**   _____

3.   **End-User Title:**   _____

4.   **End-User Phone Number:**   _____

5.   **End-User E-Mail Address:**   _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.   **Additional Terms Unique to This Client:**

_____

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                       **KELLY BENNETT:**

_____                              _____
Signed By                                                       Signed By

_____Mel Jones_____                          _____Kelly Bennett_____
Print or Typed Name                                      Print or Typed Name

___President and Chief Executive Officer___    Director, Business Development
Title                                                               Title

_____April 9, 2006_____                     _____April 8, 2006_____
Date                                                              Date

**EXHIBIT A**

**END-USER REFERRAL FORM**

1. **End-User Company Name and Address:**   State of New Jersey

   _____

   _____

   _____

2. **End-User Contact Name:**   _____

3. **End-User Title:**   _____

4. **End-User Phone Number:**   _____

5. **End-User E-Mail Address:**   _____

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
| --- | --- | --- |
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7. **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**                                **KELLY BENNETT:**

_____                          _____
         Signed By                                         Signed By

____Mel Jones_____                            ____Kelly Bennett_____
   Print or Typed Name                                Print or Typed Name

___President and Chief Executive Officer___          ___Director, Business Development___
         Title                                             Title

_____April 9, 2006_____                         _____April 8, 2006_____
         Date                                              Date

0000509

## EXHIBIT A

### END-USER REFERRAL FORM

1.  **End-User Company Name and Address:**   **Syracuse University**

    _____

    _____

    _____

2.  **End-User Contact Name:**   _____

3.  **End-User Title:**   _____

4.  **End-User Phone Number:**   _____

5.  **End-User E-Mail Address:**   _____

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| <u>Product Type</u> | <u>Commission %</u> | |
|---|---|---|
| **REC Product** | **10% of Profit** | __X__ |
| **White Tags Product** | **10% of Profit** | __X__ |
| **White Tags Generation Product** | **10% of Retainer per Month** | __X__ |
| **Fixed-Price Development Fee** | **10% of Development Fee** | __X__ |
| **Software Development Fee** | **10% of Profit** | __X__ |
| **(Check box that applies)** | | |

7.  **Additional Terms Unique to This Client:**

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**                                    **KELLY BENNETT:**

_____                    _____
      Signed By                                                  Signed By

_____Mel Jones_____                        _____Kelly Bennett_____
 **Print or Typed Name**                          **Print or Typed Name**

__President and Chief Executive Officer____      __Director, Business Development__
                **Title**                                              **Title**

_____April 9, 2006_____                    _____April 8, 2006_____
          **Date**                                                **Date**

0000510

## EXHIBIT A

## END-USER REFERRAL FORM

1.  **End-User Company Name and Address:**     **Town of Caroline, NY**

_____

_____

_____

2.  **End-User Contact Name:**     _____

3.  **End-User Title:**     _____

4.  **End-User Phone Number:**     _____

5.  **End-User E-Mail Address:**     _____

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
| --- | --- | --- |
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**     **KELLY BENNETT:**

_____     _____
Signed By     Signed By

___Mel Jones___     ___Kelly Bennett___
Print or Typed Name     Print or Typed Name

__President and Chief Executive Officer__     __Director, Business Development__
Title     Title

__April 9, 2006__     __April 8, 2006__
Date     Date

0000511

## EXHIBIT A

### END-USER REFERRAL FORM

1. **End-User Company Name and Address:**   **Town of Shelter Island, NY**

2. **End-User Contact Name:**

3. **End-User Title:**

4. **End-User Phone Number:**

5. **End-User E-Mail Address:**

6. **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below.  The commissions will be paid as payments are received by the Prospect.  This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7. **Additional Terms Unique to This Client:**

**AGREED TO:**

**STERLING PLANET:**

_Mel Jones (signature)_
Signed By

Mel Jones
Print or Typed Name

President and Chief Executive Officer
Title

April 9, 2006
Date

**KELLY BENNETT:**

_Kelly Bennett (signature)_
Signed By

Kelly Bennett
Print or Typed Name

Director, Business Development
Title

April 8, 2006
Date

0000512

## EXHIBIT A

## END-USER REFERRAL FORM

1.  **End-User Company Name and Address:**   **Tyson Foods**

2.  **End-User Contact Name:**

3.  **End-User Title:**

4.  **End-User Phone Number:**

5.  **End-User E-Mail Address:**

6.  **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.  **Additional Terms Unique to This Client:**

**AGREED TO:**
**STERLING PLANET:**

_Signed By_

____Mel Jones____
Print or Typed Name

__President and Chief Executive Officer____
Title

____April 9, 2006____
Date

**KELLY BENNETT:**

_Signed By_

____Kelly Bennett____
Print or Typed Name

____Director, Business Development____
Title

____April 8, 2006____
Date

# EXHIBIT A

## END-USER REFERRAL FORM

1.   **End-User Company Name and Address:**    University of Rochester

_____

_____

_____

2.   **End-User Contact Name:**    _____

3.   **End-User Title:**    _____

4.   **End-User Phone Number:**    _____

5.   **End-User E-Mail Address:**    _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.   **Additional Terms Unique to This Client:**

_____

_____

_____.

**AGREED TO:**

**STERLING PLANET:**

_____
Signed By

__Mel Jones_____
Print or Typed Name

___President and Chief Executive Officer___
Title

____April 9, 2006____
Date

**KELLY BENNETT:**

_____
Signed By

____Kelly Bennett_____
Print or Typed Name

____Director, Business Development____
Title

____April 8, 2006_____
Date

0000514

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.    **End-User Company Name and Address:**    **Village of Tivoli, NY**

                _____

                _____

                _____

2.    **End-User Contact Name:**    _____

3.    **End-User Title:**    _____

4.    **End-User Phone Number:**    _____

5.    **End-User E-Mail Address:**    _____

6.    **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |
| (Check box that applies) | | |

7.    **Additional Terms Unique to This Client:**

_____

_____

**AGREED TO:**

**STERLING PLANET:**

| | **KELLY BENNETT:** |
|---|---|
| _Signed By_ | _Signed By_ |
| __Mel Jones__ | __Kelly Bennett__ |
| Print or Typed Name | Print or Typed Name |
| __President and Chief Executive Officer__ | __Director, Business Development__ |
| Title | Title |
| __April 9, 2006__ | __April 8, 2006__ |
| Date | Date |

0000515

**EXHIBIT A**

**END-USER REFERRAL FORM**

1.   **End-User Company Name and Address:**   **Xerox Corporation**

_____

_____

_____

2.   **End-User Contact Name:**   _____

3.   **End-User Title:**   _____

4.   **End-User Phone Number:**   _____

5.   **End-User E-Mail Address:**   _____

6.   **Scope:**

Employee has assisted Sterling Planet in the marketing and sale of renewable energy products and services to the above Prospect. The following renewable energy product and/or service commission is agreed by both parties as designated by the joint signatures of parties below. The commissions will be paid as payments are received by the Prospect. This End-User Referral Form replaces any earlier version for this Employee and this Prospect.

| Product Type | Commission % | |
|---|---|---|
| REC Product | 10% of Profit | __X__ |
| White Tags Product | 10% of Profit | __X__ |
| White Tags Generation Product | 10% of Retainer per Month | __X__ |
| Fixed-Price Development Fee | 10% of Development Fee | __X__ |
| Software Development Fee | 10% of Profit | __X__ |

(Check box that applies)

7.   **Additional Terms Unique to This Client:**

_____

_____

_____

**AGREED TO:**

**STERLING PLANET:**

_Mel Jones (signature)_

_____
Signed By

___Mel Jones_____
Print or Typed Name

___President and Chief Executive Officer____
Title

___April 9, 2006_____
Date

**KELLY BENNETT:**

_Kelly Bennett (signature)_

_____
Signed By

___Kelly Bennett_____
Print or Typed Name

___Director, Business Development____
Title

___April 8, 2006_____
Date

0000516

Re: end-user referral forms

## Mel Jones

| | |
|---|---|
| **From:** | Greg Chambers |
| **Sent:** | Sunday, June 18, 2006 10:35 PM |
| **To:** | Vincent Fugere; Sonny Murphy; Lindsay Roach; Marcus Krembs; Alan Zox; Elizabeth Kasprowicz; Kelly Bennett |
| **Cc:** | Mel Jones; Ron Mitchell; Joe Barclay |

**Subject:** Re: end-user referral forms

Yes, I already have it on the agenda.

Best regards,

**Greg Chambers**
Director, Business Development
Sterling Planet, Inc.
Office: 916 772 8227
Mobile: 916 847 9146
gchambers@sterlingplanet.com
http://www.sterlingplanet.com

**Sterling Planet -** *The Nation's Leading Renewable Energy Provider*

**From:** Vincent Fugere <vfugere@SterlingPlanet.com>
**Date:** Sun, 18 Jun 2006 22:28:05 -0400
**To:** Sonny Murphy <smurphy@SterlingPlanet.com>, Lindsay Roach <lroach@SterlingPlanet.com>,
Greg Chambers <gchambers@SterlingPlanet.com>, Marcus Krembs <mkrembs@SterlingPlanet.com>,
Alan Zox <Alan@SterlingPlanet.com>, Elizabeth Kasprowicz <ekasprowicz@SterlingPlanet.com>,
Kelly Bennett <kbennett@SterlingPlanet.com>
**Cc:** Mel Jones <mjones@SterlingPlanet.com>, Ron Mitchell <rmitchell@SterlingPlanet.com>, Joe
Barclay <jbarclay@SterlingPlanet.com>
**Conversation:** end-user referral forms
**Subject:** RE: end-user referral forms

I apologize for any inconvenience due to my incomplete End User Referral form.  Not responding to
the memo was an oversight on my part.  However, I have some questions as to how these forms
function.  Can we put this topic on the agenda for our BD call Monday?

Vinnie

Vincent R. Fugere
Account Manager
Sterling Planet, Inc.
3295 River Exchange Drive
Suite 300
Norcross, GA 30092
Office: 401 427 0281
Mobile: 917 562 1421
Fax: 401 633 6064
vfugere@sterlingplanet.com
http://www.sterlingplanet.com

PLAINTIFF'S DEPOSITION EXHIBIT
5
9-30-10

-----Original Message-----
From: Sonny Murphy
Sent: Sat 6/17/2006 3:08 PM
To: Lindsay Roach; Greg Chambers; Marcus Krembs; Alan Zox; Elizabeth Kasprowicz; Vincent Fugere;

Re: end-user referral forms

Kelly Bennett
Cc: Mel Jones; Ron Mitchell; Joe Barclay
Subject: RE: end-user referral forms

All,

I am working in the office today because it is important for all of us, including me, to execute our job responsibilities to the very best of our abilities at this point in the company's development. I am trying to balance Fathers Day tomorrow, leaving on a week long business trip on Monday, my 13 year old daughter leaving Monday for a California swim meet, my 12 year old daughter leaving Monday for a week in Florida and my oldest daughter's wedding on July 1st. In order to do my work today I need information that is contained in the completed forms referred to in the attached memo. I just reached Lindsey by phone and he tells me no completed forms have been returned.

One of the tenants that Greg and Kelly suggested in our sales infrastructure planning session was " unless someone is out of the country, every phone call or email will be returned within 24 hours". How do you reconcile this philosophy with the response to the attached request?

When Mel and I return from our trip on Friday we will review and validate the completed forms that have been returned. All incomplete or unreturned forms will be canceled. We will also review your top "ten list" that should be updated to present a quality professional picture of your clients and the status of your sales efforts with them.

Therrell "Sonny" Murphy, Jr.
Chairman
Sterling Planet, Inc.
3295 River Exchange Drive
Suite 300
Norcross, GA  30092
Phone: 678 325 3173
Mobile: 770 330 3712
Fax: 678 325 3174
smurphy@sterlingplanet.com
www.sterlingplanet.com

From: Lindsay Roach
Sent: Thu 5/25/2006 9:12 AM
To: Greg Chambers; Marcus Krembs; Alan Zox; Elizabeth Kasprowicz; John MacKellar; Vincent Fugere; Kelly Bennett
Cc: Sonny Murphy; Mel Jones; Ron Mitchell; Joe Barclay
Subject: end-user referral forms

Please open, read and respond to the attached memo.

Regards,

Lindsay Roach
Comptroller
Sterling Planet, Inc.
3295 River Exchange Drive
Suite 300
Norcross, GA 30092
Office: 404 259 2248
Fax: 678 325 3174
lroach@sterlingplanet.com
www.sterlingplanet.com

7/21/2010

Re: end-user referral forms

7/21/2010



3295 River Exchange Drive
Suite 300
Norcross, GA 30092
1 877 457 2306
www.SterlingPlanet.com

**The Nation's Leader in Retail Renewable kWh Sales**

**Memorandum**

Date: May 24, 2006

From: Lindsay Roach – Accounting Department

Subject: Internal Controls – End-User Referral Forms

To:  See attached

    The proper control of and maintenance of contractual commitments is vital to effective internal controls.  As part of this process, accounting maintains contracts with proper supporting documentation.  Sterling Planet requires that each new prospect must have an End-User Referral Form properly completed by the salesperson.  Properly completed means that the <u>entire form</u> must be completed, not merely signed.  Please review and complete your end user forms including company name and address, contact name, title, phone number, e-mail address and indicate date of last contact.  If no contact has been made, please so state and indicate when you anticipate making contact.  Please return the forms to accounting no later than May 31, 2006.  Thank you.

Lindsay Roach
Comptroller
Sterling Planet
office: 404-259-2248
fax:  (678) 325-3174
e-mail: lroach@sterlingplanet.com

♻ Recycled Paper

**Kelly Keswick**

**From:** Valerie Christopher
**Sent:** Friday, January 18, 2008 5:22 PM
**To:** Kelly Bennett
**Subject:** RE: Commissions

Bill Bastuk
Larsen Engineers ($176.25) - and we should be invoicing that amount now for 2008 (due 2/1/08)
We invoiced them $176.25 on 4/3/07 - yes, they paid.  The schedule is set up so that they will be billed again 4/1/2008 and 4/1/2009 for that same amount.

Navalis Company ($256.50)
We invoiced them $256.50 on 7/26/07 - yes, they paid.

Gary Skulnik (I know you've checked most of these before)
Arth Litho ($1,400 total; should have been invoiced $350 quarterly 12/1/06; 3/1/07; 6/1/07; 9/1/07)
Invoiced:
$700 on 3/20/07 - Paid
$350 on 6/21/07 - Paid
$350 on 12/31/07 - NOT PAID
Marriott Residence Inn ($5,200)
Invoiced:
$4,875 on 5/11/07 - Paid
We will invoice them another $4,875 in May 2008

Northern Plains Resource Council ($172.80)
Invoiced:
$172.80 on 3/27/07 - Paid
$182.40 on 6/20/07 - Paid

Envision Design - this may not be closed/no contract yet?
I have not seen this contract come through yet.
The Granger Group/Metro Health Village - this may not be closed/no contract yet?
We invoiced them $333 on 3/20/07 - yes, they paid.

Regards,

**Valerie Christopher**
Director, Client Services
Sterling Planet, Inc.
3295 River Exchange Drive
Suite 300
Norcross, GA  30092
Office: 678 218 4010
Fax: 678 325 3174
vchristopher@sterlingplanet.com
www.sterlingplanet.com

*2007 Department of Energy (DOE) Renewable Energy Marketer of the Year*



PLAINTIFF'S DEPOSITION EXHIBIT
6
9-30-10
PENGAD 800-631-6989

**From:** Kelly Bennett
**Sent:** Fri 1/18/2008 1:14 PM

6/30/2010 / 4:31 PM

# Agent Commission

**...illiam Bastuk Commission**

...son Engineers

| | REC Type | % | Quantity Sold | Price To Customer | Unit Cost of RECs | Customer Payment | Cost of RECs | Margin | Commission Percentage | Commission Amount | Customer Payment Info |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ...tional Green-e any | National Wind | 24% | 18,000 | $0.00235 | $0.00250 | $42.30 | $45.00 | | | | |
| % Wind; 25% Biomass; 50% Landfill Gas; 1% Solar | National Biomass | 25% | 18,750 | $0.00235 | $0.00100 | $44.06 | $18.75 | | | | |
| % Wind; 25% Biomass; 50% Landfill Gas; 1% Solar | National Landfill Gas | 50% | 37,500 | $0.00235 | $0.00200 | $88.13 | $75.00 | | | | |
| % Wind; 25% Biomass; 50% Landfill Gas; 1% Solar | National Solar | 1% | 750 | $0.00235 | $0.01000 | $1.76 | $7.50 | | | | |
| | | 100% | 75,000 | $0.00235 | | $176.25 | $146.25 | $30.00 | 20% | $6.00 | Cusomer payment of $176.25 received 04/03/07 |

**...ph's Company**

| | REC Type | % | Quantity Sold | Price To Customer | Unit Cost of RECs | Customer Payment | Cost of RECs | Margin | Commission Percentage | Commission Amount | Customer Payment Info |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ...tophr Green-e any | National Wind | 24% | 21,600 | $0.00285 | $0.00250 | $61.56 | $54.00 | | | | |
| % Wind; 25% Biomass; 50% Landfill Gas; 1% Solar | National Biomass | 25% | 22,500 | $0.00285 | $0.00100 | $64.13 | $22.50 | | | | |
| % Wind; 25% Biomass; 50% Landfill Gas; 1% Solar | National Landfill Gas | 50% | 45,000 | $0.00285 | $0.00200 | $128.25 | $90.00 | | | | |
| % Wind; 25% Biomass; 50% Landfill Gas; 1% Solar | National Solar | 1% | 900 | $0.00285 | $0.01000 | $2.57 | $9.00 | | | | |
| | | 100% | 90,000 | $0.00285 | | $256.50 | $175.50 | $81.00 | 20% | $16.20 | Cusomer payment of $256.50 received 07/20/07 |
| | | | | | | | Total Commission Earned to Date | | | $22.20 | |
| | | | | | | | Total Commission Paid Before This Check | | | $6.00 | |
| | | | | | | | Total Commission Check | | | $22.20 | |

1 of 1

Sterling Planet - Confidential

| FirstName | LastName | Address1 | City | State | Zip | Phone | Fax | Email | Contract Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| illiam | Bastuk | | Rochester | NY | 14622 | (585) 503-6826 | (585) 342-1249 | wbastuk@rochester.rr.com | 01/16/07 | termination letter sent? |
| hn | Cusack | | Easthester | NY | 10709 | (914) 527-3085 | (914) 793-4299 | johncusack@att.net | 07/27/04 | Gifford Park Associates |
| rds | Farrington | | Philmont | NY | 12565 | (518) 672-7111 | | chris.farrington@yahoo.com | 12/01/05 | BCF Partners |
| bby | Grigas | | Alpharetta | GA | 30004 | (404) 460-3716 | (770) 408-9100 | thegridersgroup@bellsouth.net | 06/21/05 | |
| illiam | Hossen | | Atlanta | GA | 30350 | (678) 621-4650 | | whosken@solarenergymarketing.com | | Solar Energy Marketing Inc. |
| hn | Kamen | | Rhinebeck | NY | 12572 | (845) 266-3596 | (800) 495-8048 | Ron.Kamen@Starphire.net | 08/15/06 | Starphire |
| hn | MacKellar | | Southbury | CT | 06488 | (203) 267-7744 | | johnmackellar@hotmail.com | 03/23/06 | Recommend continuation of agent relationship |
| nn | Mehals | | Lakeville | MA | 02567 | (866) 545-6611 | (508) 861-0367 | cmehals@eneronow.us | 12/01/06 | Recommend continuation of agent relationship |
| lena | Miele | | New Milford | NJ | 07646 | (646) 324-1611 | | helenamiele@earthlink.net | 12/01/06 | Clean Currently; needs to be converted to wholesale aggregator contract |
| ary | Skulnik | | Rockville | MD | 20850 | (301) 754-0430 | (240) 514-0190 | gskulnik@yahoo.com | 09/14/06 | a termination of agent agreement dated 1/6/06 found in file; copy not signed |
| racey | Smith | | Syracuse | NY | 13210 | | | | | |
| elvin | Stevenson | | Bronx | NY | 10462 | (718) 863-4156 | | gelvin@optonline.net | | |
| bbert | Tretak | | Las Vegas | NV | 89128 | (702) 240-4543 | | moneydoc@prodigy.net | 01/20/06 | International Energy Conservation |